IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SAMUEL "NIYEH" HIGGINS, | ) | Case No. |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS WARDEN TERI | ) | |
| KENNEDY, WARDEN TARRY | ) | |
| WILLIAMS, OFFICER SCHMELTZ, | ) | |
| MAJOR PRENTICE, SERGEANT JOHN | ) | |
| DOE 1, LIEUTENANT JOHN DOE 2, | ) | |
| UNIT SUPERVISOR JOHN DOE 9, and | ) | |
| OFFICERS JOHN DOES 3–8 AND 10–20, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants | ) | |

## **COMPLAINT**

Plaintiff Samuel "Niyeh" Higgins, by her undersigned attorneys, for her complaint

against Defendants Warden Teri Kennedy of Pontiac Correctional Center, Warden Tarry

Williams of Dixon Correctional Center, Officer Schmeltz, Major Prentice, Sergeant John Doe 1,

Lieutenant John Doe 2, Unit Supervisor John Doe 9, and Officers John Does 3–8 and 10–20, as

follows:

## INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the First, Eighth, and Fourteenth Amendments to the United States Constitution; to Title IX; and to the Illinois Hate Crimes Act.

2.     Niyeh Higgins is a 37-year-old Black transgender woman who lives in Chicago. From March 2018 until February 2022, she was incarcerated in the Illinois Department of Corrections (IDOC). IDOC officials housed Niyeh at Pontiac Correctional Center ("Pontiac"), a maximum-security men's prison, from December 2018 to February 4, 2021. From February 4, 2021, to February 4, 2022, IDOC officials housed Niyeh at Dixon Correctional Center ("Dixon"), a medium-security men's prison.

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

5.     Plaintiff Niyeh Higgins is a 37-year-old transgender woman who was incarcerated in the Illinois Department of Corrections from March 19, 2018, to February 4, 2022. During the operative dates of this Complaint, Niyeh was confined at Lawrence Correctional Center in Sumner, IL, Pontiac Correctional Center in Pontiac, IL, and at Dixon Correctional Center in Dixon, IL.

6.     Defendant Teri Kennedy was the Warden of Pontiac Correctional Center during the operative dates of this Complaint. At all times relevant to the events at issue in this case, Defendant Kennedy was employed by the Illinois Department of Corrections. As such, she was acting under color of the law. At all times relevant to the events at issue in this case, Defendant

2

Kennedy was responsible for, among other things, ensuring the reasonable safety of people in IDOC custody, including protecting them from harassment and assaults. Defendant Kennedy is responsible for supervising all staff and managing all operations at Pontiac. She is sued in her individual and official capacity.

7. Defendant Tarry Williams is the Warden of Dixon Correctional Center. At all times relevant to the events at issue in this case, Defendant Williams was employed by the Illinois Department of Corrections. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Warden Tarry was responsible for, among other things, ensuring the reasonable safety of people in IDOC custody, including protecting them from harassment and assaults. Defendant Williams is responsible for supervising all staff and managing all operations at Dixon. He is sued in his individual and official capacity.

8. Defendant Major Prentice, Officer Schmeltz, Sergeant John Doe 1, Lieutenant John Doe 2, Unit Supervisor John Doe 9, and Officer John Does 3–8 and 10–20 are IDOC employees at Pontiac Correctional Center or Dixon Correctional Center. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections. These defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS
### Plaintiff Niyeh Higgins Is a Transgender Woman

9. Plaintiff Niyeh Higgins was born in Chicago, Illinois, on September 19, 1985. Niyeh began to identify herself as a girl at the age of five. Niyeh began taking hormones at the age of 26.

10.     Throughout childhood, Niyeh was forced to move between the homes of her mother, aunt, and various foster homes due to her family's involvement in the foster care system. During this time, she frequently dealt with both physical and emotional violence, as well as sexual assault from family members, foster home staff, and other youth residing in the foster homes that she was placed in.

11.     Despite the hardship that Niyeh faced from an early age, Niyeh aspires to work in service of other transgender individuals that face hardships like the ones that she faced as a young person. She also is an avid reader and enjoys writing. Niyeh hopes to one day publish a book about her life experiences and the pride she has in being a Black transgender woman who has survived horrific circumstances and treatment.

### The Illinois Department of Corrections Housed Plaintiff Niyeh Higgins in Men's Prisons Despite the Fact That She Is a Transgender Woman

12.     Niyeh first entered IDOC custody on March 19, 2018.

13.     Upon entering IDOC custody, Plaintiff was exclusively housed in male prisons and experienced endless harassment and abuse by IDOC staff and prisoners because of her transgender status and because IDOC staff inappropriately housed Niyeh in a men's prison.

14.     Niyeh's early years of incarceration were incredibly difficult as she adjusted to confinement in a men's facility.

15.      On at least three occasions, Niyeh attempted suicide due to the harassment and violence she faced in men's IDOC facilities as a transgender woman.

### IDOC Officials and Employees Have Notice that Transgender Women in Custody are Particularly Vulnerable to Abuse

16.     According to the National Prison Rape Elimination Act (PREA) Resource Center, "Data shows transgender people have the highest risk of experiencing sexual abuse in confinement, yet correctional staff refuse to respect transgender people by referring to them by their correct gender pronouns and preferred name. This sends the clear message both to transgender incarcerated people and to fellow incarcerated people that they are not deserving of the same levels of respect, helping paint them as 'acceptable' targets of victimization."

17.     According to the National PREA Resource Center, "Being transgender is a known risk factor for being sexually victimized in confinement settings. The [PREA] standard, therefore, requires that facility, housing, and programming assignments be made 'on a case-by-case basis.' Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard. A PREA-compliant policy must require an individualized assessment. A policy must give 'serious consideration' to transgender or intersex inmates' own views with respect to safety."

18.     According to a report by the National Center for Transgender Equality, in 2015 alone, transgender respondents "were over five times more likely to be sexually assaulted by facility staff than the U.S. population in jails and prisons, and over nine times more likely to be sexually assaulted by other inmates." Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 15 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

19.     A survey conducted by the National Center for Transgender Equality found that "Once they are incarcerated, trans people are at significantly higher risk of violence. Trans

prisoners are over nine times more likely than the prison average to be assaulted or abused by fellow prisoners, and over five times more likely to be assaulted or abused by facility staff."

20.     According to a 2015 survey also conducted by the National Center for Transgender Equality, a quarter of transgender prisoners surveyed reported being physically assaulted by other people in custody or staff." Nora Neus, *Trans Women Are Still Incarcerated with Men and It's Putting Their Lives at Risk*, CNN, Jun. 23, 2021, https://www.cnn.com/2021/06/23/us/trans-women-incarceration/index.html.

### The Northern District of Illinois Entered a Preliminary Injunction That Permits Transgender Individuals to Select the Gender of the Correctional Officer Conducting Their Strip Search

21.     *Monroe v Balwin*, No. 3:18-CV-00156-NJR (SD IL), is a class action lawsuit challenging IDOC's provision of care and treatment to transgender women in its custody.

22.     On December 19, 2019, Judge Nancy Rosenstengel found that IDOC's failure to protect transgender women in its custody from male officers conducting pat downs and strip searches required court intervention and ordered IDOC to "avoid cross gender searches."

*23.*     On August 9, 2021, Judge Rosenstengel ordered more specific relief and required IDOC to amend its policies so that transgender women "*shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search SHALL BE conducted by a correctional officer of the gender requested*."

24.     All IDOC facilities must allow transgender inmates to choose the gender of the correctional officer searching their person.

25.     On August 11, 2021, Chief Eilers sent out an email to Dixon staff indicating that all transgender and gender non-conforming individuals in custody shall be searched by a staff member of the gender chosen by that person, which is designated on their identification card.

6

**Pattern and Practice Allegations Against Wardens Teri Kennedy and Tarry Williams**

26.     Despite the fact that Niyeh is a transgender woman, Defendants Williams and Kennedy permitted Niyeh to be housed in the men's prisons they operated. Defendants Williams and Kennedy repeatedly denied her a formal, individualized, in-person review to determine whether she should be placed in a women's prison.

27.     Defendants Williams and Kennedy failed to require that their staff members protect Niyeh from harm, abuse, harassment, and humiliation.

28.      Defendants Williams and Kennedy knew that Niyeh was one of several transgender women in their custody. IDOC's 2019 PREA report states that approximately 62 transgender women were housed throughout the 21 men's prisons in Illinois.

29.     Defendants Williams and Kennedy knew that Niyeh, as a transgender women housed in a men's prison, was particularly vulnerable to abuse and harassment.

30.     Defendants Williams and Kennedy knew that, because of Niyeh's increased vulnerability, in order to keep her safe, they were required to modify the procedures within their prisons, provide specific instruction to their staff regarding the protections to which Niyeh was entitled, and take other reasonable measures to ensure Niyeh's safety. They failed to take any action to protect Niyeh from the abuse and harassment she inevitably suffered.

31.     As a result of Defendant Williams and Kennedy's failures and Niyeh's placement in male prisons, she endured constant verbal harassment and abuse from both IDOC staff members and other people in custody. On a daily basis, people referred to her using transphobic slurs and threatened her with both physical and sexual violence. Niyeh lived in a constant state of terror, and the verbal abuse and harassment often caused her mental health to decompensate.

32.     Defendant Williams and Kennedy failed to enforce a requirement that Niyeh be permitted to shower separately from the males in custody. As a result, Niyeh had to choose

between maintaining her personal hygiene or enduring the barrage of abuse and threats of sexual violence that she endured whenever she was naked in front of the men in custody with her.

33.     Niyeh repeatedly requested permission from IDOC staff members to shower alone, out of sight of the men in custody. She filed numerous grievances on this issue and upon information and belief, Defendants Williams and Kennedy were aware of her requests. Neither Defendant took any action to protect Niyeh from the harassment, threats, and humiliation she experienced when she was forced to shower in front of men during her entire incarceration.

34.     Defendants Williams and Kennedy failed to protect Niyeh from being strip-searched by male IDOC employees. Every time IDOC staff stripped searched Niyeh, male staff completed the search. This happened even when no exigent circumstances were present and female staff were available to conduct the search. Upon information and belief, from January 20, 2021, to February 2022, IDOC staff members stripped search Niyeh 50–70 times. During each search, Niyeh was forced to disrobe in front of male officers who taunted her, humiliated her, threatened her with physical violence, and as detailed further below, groped her breasts.

35.     Despite having knowledge of the violence and harassment that Niyeh faced, Defendants Kennedy and Williams failed to intervene to keep Niyeh safe. Because of these failures, Niyeh was subjected to serious harm throughout her incarceration, including severe harassment, sexual violence, and constant threats of physical violence.

36.     To this day, as a result of Defendants Williams and Kennedy's actions and inactions, as well as of the harassment and abuse she faced as a transgender woman in IDOC custody, Niyeh suffers severe mental distress, depression, and suicidal thoughts.

**IDOC Staff Sexually Harassed and Abused Niyeh at the Pontiac Correctional Facility**

37.     From December 2018 to February 4, 2021, IDOC housed Niyeh at Pontiac Correctional Facility. While at Pontiac, correctional officers and staff consistently harassed her and subjected her to an abusive environment because she is a transgender woman. Some officers rejected her identity as a transgender woman, and others would make sexual and/or harmful comments to her using slurs such as "fag," "he/she," etc.

38.     Defendant Officer Schmeltz, a male correctional officer, sexually assaulted and humiliated Niyeh during a cell search. Upon information and belief, this incident occurred during the last week of January in 2021.

39.     When Defendant Officer Schmeltz entered Niyeh's cell, she reminded him that she is a transgender woman and stated her need to be searched by a female staff member.

40.     Defendant Schmeltz ignored Niyeh's requests, handcuffed her to a bar in her cell and proceeded to search her person and the cell. During this search, he felt all over her body, patting her down ostensibly to determine if she had any contraband on her. When Defendant Schmeltz hand arrived at Niyeh's breasts, he slowed the search down, and then proceeded to grab and fondle her breasts.

41.     Immediately after this assault, Officer Schmelz told Niyeh that "he hated transgender, gay, and faggot people." Multiple people living on the unit witnessed this exchange.

42.     Niyeh informed Defendant Major Prentice about the incident that occurred with Defendant Officer Schmeltz, and requested that in the future, IDOC prohibit male officers from conducting any strip searches of her. Defendant Major Prentice laughed at Niyeh, mocked her and told her that male officers would continue to strip search her. Major Prentice took no action to protect Niyeh from the harm of male officers conducting invasive strip searches of her.

43.    As a result of Major Prentice's failure to act, while housed at Pontiac from December 2018 until February 4, 2021, IDOC male staff inappropriately strip searched and sexually abused her dozens of times.

44.    Upon information and belief, from January-February 2021, John Does 18-20, conducted numerous physically and sexually aggressive pat downs and/or strip searches of Niyeh. None of these circumstances happened during exigent circumstances. Each of these officers knew that Niyeh was a transgender woman and that a female officer should have conducted the search and that Niyeh would be subjected to physical and emotional harm as a result of these searches. Despite this knowledge, these officers proceeded to search Niyeh in a manner that caused her serious harm and humiliation by inter alia, groping her body, including but not limited to her breasts and genital area, viewing her body in various stages of undress, mocking, taunting and threatening her with physical and sexual violence.

**IDOC Staff Continue Abusive Strip Searches Fail to Protect Niyeh from Sexual Abuse at Dixon Correctional Facility**

45.    In February 2021, IDOC officials transferred Niyeh to Dixon Correctional Center. Dixon is a men's correctional facility.

46.    At Dixon, correctional officers, staff members, and inmates continued to discriminate against and abuse, humiliate and threaten Niyeh with physical and sexual violence. Officers and staff members harassed Niyeh with sexual language and transphobic slurs on a daily basis.

47.    On May 26, 2021, Defendant Officer John Doe 3 conducted an abusive and humiliating strip search of Niyeh. Prior to the search, Niyeh reminded Defendant Doe 3 that she was a transgender woman and that a female staff member should search her. Niyeh specifically

requested that a female IDOC officer conduct the strip search. Even though no exigent circumstances were present, and Defendant John Doe 3 knew that proceeding with this search would harm Niyeh, Defendant John Doe 3 denied Niyeh's request and proceeded with the search.

48.     Defendant John Doe 3 forced Niyeh to disrobe and then stand before him naked as he shook her clothes, and ordered her to lift her arms, lift her feet, turn around and spread her buttocks. During the entirety of this search, Defendant John Doe 3 mocked and humiliated Niyeh, referring to her with anti-gay and transphobic slurs.

**Plaintiff Is Sexually Assaulted After Dixon Correction Center Staff Ignore Her Cries for Help**

49.     While at Dixon, an inmate named "Demon" made sexual advances at Niyeh. "Demon" sent Niyeh threatening notes that graphically detailed the sexual acts that he wanted to do to her. Demon sent these notes to Niyeh several times a week for about a month. "Demon" told other inmates on the unit that he intended to be with Niyeh sexually.

50.     Niyeh became scared because of the language that "Demon" used in the notes, and because several other inmates on the unit knew "Demon's" intentions to be with Niyeh sexually.

51.     Niyeh verbally reported the threats to Defendant Officers John Does 4-8, who worked on her housing unit, and Defendant Unit Supervisor John Doe 9. Niyeh requested that each of these officers take action to protect her from Demon. Each of these Defendants failed to take action to protect Niyeh.

52.     In June 2021, "Demon" entered Niyeh's cell and trapped her there by blocking the entrance, slapping her and threatening her with physical harm. He then fondled her body while

11

threatening her with further instances of physical and sexual violence. He likely ended this assault when he realized Niyeh's cell mate was present and witnessed the entire event.

53.     After this assault, Niyeh reported it to Defendant Does 4-9. They responded by mocking Niyeh about the allegations against "Demon" by using slurs demeaning to transgender individuals.

54.     Niyeh knew that Defendant Does 4-9 would take no action to keep her safe from Demon and that Demon intended to continue to physically and sexually assault her. As a result, Niyeh requested to be transferred into Dixon's segregation unit in order to protect herself from Demon. While in segregation she was locked alone in her cell for 23 hours a day and her mental health began to deteriorate.

55.     Defendant Does 4-9 ignored Niyeh's requests for help and refused to protect her from Demon. As a direct result of their actions and inactions, Demon physically and sexually assaulted Niyeh.

**Plaintiff Requested to Be Housed in Segregation Because She Was Fearful for Her Safety, and Because Dixon Staff Failed to Protect Her from Sexual Abuse**

56.     The only place that Niyeh felt that she would be safe from physical and sexual violence was in segregation, because IDOC staff failed to intervene or protect Niyeh from the violence of other inmates.

57.     While at Dixon, Niyeh requested to be transferred to segregation at least four times in order to escape the violence and harassment of IDOC staff and other inmates, including "Demon."

58.     Defendant Officers John Does 10–14 strip searched Niyeh each time she was housed in segregation, despite her request to be searched by women correctional officers.

12

59.     Defendant Officers John Does 10–14 threatened to call the weapons taskforce if Niyeh did not submit to the strip search by a man.

60.     Each time Niyeh complied with the search in segregation, Defendant Officers John Does 10–14 conducted the search in a manner that was abusive. Defendant Officers John Does 10–14 touched and groped Niyeh's body each time they conducted strip searches in segregation.

61.     After the strip searches, Niyeh filed PREA reports about the abusive searches. In response to Niyeh's PREA reports, IDOC staff found that because she submitted to the search, there was no violation of IDOC policy. In reality, the Defendant officers forced Niyeh to comply with the strip searches. No further action came from this PREA report.

62.     The violence that Niyeh faced was extremely overwhelming and she ended up self-harming by cutting herself in response. Niyeh asked for a crisis team immediately after cutting herself; however, the request was denied until the following day.

**Plaintiff Continued to Be Harassed, Abused, and Strip Searched in Violation of a Preliminary Injunction Permitting Transgender Individuals to Choose the Gender of the Officer Searching Them**

**IDOC Staff Conducts Large Group Strip Search and Forces Plaintiff to Endure Further Humiliation, Harassment and Abuse**

63.     On August 24, 2021, IDOC staff conducted a mass strip search and forced dozens of individuals in custody who were in Dixon's outside recreation area (referred to as the "yard") to strip naked and subject to a search.

64.     IDOC staff ordered Niyeh to enter a cage and Defendant Officers John Doe 15 and John Doe 16 approached the cage to conduct her strip search. Niyeh reminded Defendant Officers Doe 15 and 16 that she was a transgender woman, that she had a right to have a female

IDOC staff person search her and that she would suffer harm if they proceeded to conduct the search.

65.     Defendant Officers 15 and 16 ignored Niyeh's request and proceeded with the strip search. They ordered Niyeh to undress in the cage, while male people in custody could clearly view her naked body. During the strip search male people in custody stared at Niyeh's naked body and threatened her with sexual and physical violence.

66.     While Niyeh was naked and receiving these threats, Defendant Officers John Doe 15 and John Doe 16 laughed and mocked Niyeh.

67.     Thirteen days before this strip search, Chief Eilers emailed Dixon staff and informed them that the federal court required staff to accommodate and protect transgender women in custody from invasive searches conducted by male IDOC staff. Despite receiving this notice, Defendants Doe 15 and 16 proceeded with this abusive strip search.

**IDOC Conduct Abusive Strip Searches Before and After Visitation**

68.     In the fall of 2021, a friend of Niyeh's scheduled a visit with her for November 6, 2021. IDOC staff were aware of this visit at least two weeks prior to the scheduled date. IDOC strip searches people in custody before and after visitation. In an effort to be proactive, Niyeh informed Dixon officials that she would require a female staff person to strip search her before and after her visit. Upon information and belief, Defendant Warden Williams, Officer John Doe 17, Sergeant John Doe 1 and Lieutenant John Doe 2 were aware of this request in advance of the initial strip search.

69.     Despite Niyeh's request, IDOC staff neglected to make arrangements that accommodated Niyeh's request.

70.     Defendant Officer John Doe 17 informed Niyeh that if she did not comply with a strip search conducted by a man, she would forgo the visit with her friend. Plaintiff did not feel comfortable about a search conducted by a man considering the abusive she previously endured during IDOC strip searches. However, in order to have the visit with her friend, Niyeh complied with the search.

71.     Defendant Officer John Doe 17 conducted Niyeh's strip search in a room that provided no privacy. The door remained open the entire time of the search, making Niyeh's body viewable to several individuals who passed by. The strip search conducted by Defendant Officer John Doe 17 was violating, invasive, and humiliating for Niyeh.

72.     Defendant Officer John Doe 17 asked Niyeh to bend over, spread her cheeks, cough, and squat all within view of other correctional officers, staff, and inmates. Defendant Officer John Doe 17 patted down Niyeh in a manner that included groping and touching all over Niyeh's body parts, including her breasts.

73.     Defendant Officer John Doe 17 became aroused and got an erection after completing the search. Niyeh felt the erection against her body.

74.     Niyeh requested that a different officer conduct the strip search immediately following the visit with her friend, because she felt extremely uncomfortable and unsafe following Defendant Officer John Doe 17's abusive actions.

75.     After this egregious incident, Niyeh informed the Defendant Sergeant John Doe 1 and Defendant Lieutenant John Doe 2 about the actions of Defendant Officer John Doe 17. Niyeh also filed a PREA report about the incident. However, IDOC staff never answered her PREA report, and no remedial steps were taken to address the first officer's conduct.

76.     Niyeh filed several PREA reports about officer misconduct during her time at Dixon. Each PREA report was deemed "unfounded."

77.     IDOC staff continues to designate Niyeh's PREA reports as unfounded, and requests for strip searches by women were not met. Some of the responses included "it's not going to happen" and "women are not going to search you."

78.     Niyeh dealt with invasive, abusive, and humiliating strip searches conducted by men until she was released from Dixon Correctional Facility on February 4, 2022.

79.     The abusive strip searches, as well as the emotional, physical, and sexual abuse took a significant toll on Niyeh. She was often distraught, depressed, and fearful for her safety.

## COUNT I
### 42 U.S.C. §1983—14th AMENDMENT EQUAL PROTECTION CLAUSE
### Claim for Damages Relief against Kennedy, and Williams

80.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

81.     Count I is alleged against Defendants Warden Kennedy, and Warden Williams in their individual capacities.

82.     Despite being a transgender woman, Niyeh was immediately placed in a men's prison when she entered IDOC custody without any formal review on whether placement in a female prison would be appropriate.

83.     While in IDOC custody, Niyeh faced verbal sexual harassment and sexual violence because of the way that IDOC staff interacted with her as a transgender woman. The verbal harassment was so pervasive and ongoing that it constitutes intentional discrimination on the basis of her gender identity. Niyeh was subjected to constant insults, threats, intimidation, and humiliation at a level that incarcerated cis-gender men and women simply do not endure.

16

84.     As a result of the unjustified and unconstitutional conduct of the individual Defendants, Plaintiff suffered and continues to suffer damages, including but not limited to actual damages, humiliation, pain, fear, and emotional distress.

### COUNT II
### 42 U.S.C. § 1983—8th AMENDMENT-FAILURE TO PROTECT

85.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

86.     Count II is alleged against Defendants Warden Kennedy, and Warden Williams in their individual capacities.

87.     Defendants Warden Kennedy, and Warden Williams failed to protect Niyeh from abusive strip searches and permitted male correctional officers to strip search her in an abusive manner. They further failed to require their staff to take action to protect Niyeh from the constant abuse, threats and harassment she endured by inter alia, permitting her to shower alone, requiring staff to take action when Niyeh reported threats of sexual violence, and disciplining staff who engaged in harassment and sexual/physical abuse of Niyeh.

88.     As a result of the unjustified and unconstitutional conduct of the individual Defendants, Plaintiff suffered and continues to suffer damages, including but not limited to actual damages, humiliation, pain, fear, and emotional distress.

89.     As such, plaintiff seeks actual and punitive damages.

### COUNT III
### 42 U.S.C. § 1983—8th AMENDMENT CRUEL & UNUSUAL PUNISHMENT FOR ABUSIVE STRIP SEARCHES
### Claim for Damages Relief Against Defendants Officer Schmeltz, Officer John Does 3-8, and Officer John Does 10-20

90.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

91.     Count II is against Defendants Officer Schmeltz, Officer John Does 3-8, and Officer John Does 10-20.

92.     As described more fully above, Defendants inflicted unnecessary physical and emotional pain and suffering on Plaintiff. They did so intentionally, wantonly, and/or with malice in violation of Plaintiff's Eighth Amendment rights.

93.     Alternatively, Defendants knew the risk of harm that their misconduct posed to Plaintiff and nevertheless acted with deliberate indifference in executing the invasive, abusive strip searches.

94.     As a result of Defendants' unjustified and unconstitutional conduct, Plaintiff suffered pain, emotional distress, and injuries.

95.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights, and not for any legitimate penological purpose.

96.     The actions of the individual Officer Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

97.     As such, plaintiff seeks actual and punitive damages.


**COUNT IV**
**42 U.S.C. § 1983—8th AMENDMENT CRUEL & UNUSUAL PUNISHMENT FOR FAILURE TO PROTECT FROM SEXUAL AND PHYSICAL ASSAULT**
**Defendants Warden Kennedy, Warden Williams, Major Prentice, Officer Schmeltz, Sergeant John Doe 1, Lieutenant John Doe 2, Officer John Does 3-8, and Officer John Does 10-20**

98.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

99.     Count IV is against Defendants Warden Kennedy, Warden Williams, Major Prentice, Officer Schmeltz, Sergeant John Doe 1, Lieutenant John Doe 2, Officer John Does 3-8, and Officer John Does 10-20.

100.     As described more fully above, Defendants inflicted unnecessary physical and emotional pain and suffering on Plaintiff. They did so intentionally, wantonly, and/or with malice in violation of Plaintiff's Eighth Amendment rights.

101.     Alternatively, Defendants knew the risk of harm that their misconduct posed to Plaintiff and nevertheless acted with deliberate indifference in executing the invasive, abusive strip searches.

102.     As a result of Defendants' unjustified and unconstitutional conduct, Plaintiff suffered pain, emotional distress, and injuries.

103.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights, and not for any legitimate penological purpose.

104. The actions of the individual Officer Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

## COUNT V
### 42 U.S.C. § 1983—8th AMENDMENT FAILURE TO INTERVENE
### Claim for Damages Relief Against All Defendants

105. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

106. Count III is alleged against all Defendants.

107. As described more fully above, Defendants each had a reasonable opportunity to prevent the violation of the constitutional rights of Plaintiff.

108. Plaintiff's injuries were caused by employees of IDOC, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

109. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights, and not for any legitimate penological purpose.

110. As a direct and proximate result of the Defendants' failure to intervene, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Samuel "Niyeh" Higgins requests that this Court enter judgment in her favor against the Defendants in the following manner:

1. Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

2. Award Plaintiff such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: January 20, 2023

Respectfully Submitted,

/s/ Kara Crutcher

Kara Crutcher

Community Justice and Civil Rights Clinic

Northwestern Pritzker School of Law 375 E. Chicago Ave., 8th Floor Chicago, IL 60611

Phone: 773-575-9010

kara.crutcher@law.northwestern.edu

/s/ Sheila A. Bedi

Sheila Bedi

Community Justice and Civil Rights Clinic

Northwestern Pritzker School of Law 375 E. Chicago Ave., 8th Floor Chicago, IL 60611

Phone: 312-503-2492
sheila.bedi@law.northwestern.edu