IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN
MELENDEZ, EBONY STAMPS, LYDIA
HELENA VISION, SORA
KUYKENDALL, and SASHA REED,

      Plaintiffs,

v.

JOHN BALDWIN, STEVE MEEKS, and
MELVIN HINTON,

      Defendants.

Case No. 18-CV-00156-NJR-MAB

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora

Kuykendall, and Sasha Reed are transgender women in the custody of the Illinois

Department of Corrections ("IDOC") (Doc. 1). They filed this putative class action under

42 U.S.C. § 1983, alleging IDOC provides transgender inmates inadequate treatment for

gender dysphoria, in violation of the Eighth Amendment (*Id.*). Plaintiffs bring this suit

against the IDOC Director, Chief of Health Services, and Mental Health Supervisor in

their official capacities (*Id.*).

### THE COMPLAINT

According to the Complaint, IDOC utilizes a committee of unqualified officials to

oversee the security, placement, and treatment of transgender inmates ("the Transgender

Committee") (Doc. 1). Through the Transgender Committee and other flawed policies,

Page **1** of **39**

Higgins-000342

IDOC often delays or denies hormone therapy for reasons not recognized by the medical community; fails to provide adequate hormone therapy and hormone monitoring; fails to consider and provide surgery as part of medically necessary treatment for gender dysphoria; prevents and fails to permit, accommodate, and facilitate social transition necessary to treat gender dysphoria; and fails to provide access to clinicians competent to treat gender dysphoria, resulting in misdiagnosis and inappropriate treatment.

Plaintiffs seek a preliminary injunction directing Defendants to: (1) cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria resulting in denials and delays of treatment; (2) cease the policy and practice of denying and delaying hormone therapy for reasons that are not recognized as contraindications to treatment; (3) cease IDOC's policy and practice of refusing to evaluate and provide surgery to treat gender dysphoria; and (4) cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia.

Plaintiffs also seek medically necessary treatment for Plaintiffs and the putative class members, including: (1) access to clinicians who meet the competency requirements stated in the Standards of Care to treat gender dysphoria; (2) evaluation for gender dysphoria upon request or clinical indications of the condition; (3) timely medically prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and monitoring and gender-affirming surgery; (4) medically necessary social transition, including individualized placement determinations, avoidance of cross-

Higgins-000343

gender strip searches, and access to gender-affirming clothing and grooming items; and (5) training for IDOC staff on the importance of social transition, including using proper names and pronouns for transgender inmates. Finally, Plaintiffs request the Court appoint a medical expert in gender dysphoria to oversee IDOC's implementation of the above-referenced relief.

The Court held a two-day hearing on the motion for preliminary injunction and now makes the following findings of facts and conclusions of law (Docs. 155 & 156).

<u>FACTS</u>

*Treatment of Gender Dysphoria*

Gender dysphoria refers to a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender (Doc. 157, p. 95; Doc. 158, p. 14). Gender dysphoria is considered a medical condition and has been removed from the mental and behavioral disorders in the World Health Organization Classification of Diseases and the Diagnostic Statistical Manual of Mental Disorders (Doc. 158, p. 95). The World Professional Association for Transgender Health ("WPATH") is a professional association dedicated to understanding and treating gender dysphoria (Doc. 157, p. 98). WPATH dictates medically-accepted Standards of Care for treating gender dysphoria (*Id.* at p. 7). According to WPATH, its Standards of Care are "the highest standards of health care" for transgender people (Doc. 123, Ex. 13, p. 8). IDOC purports to follow the Standards of Care and has updated its mental health standards operating procedure manual to incorporate them (Doc. 143, Ex. 4, pp. 4, 10). According to WPATH, treatment options for

Higgins-000344

gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and surgery (Doc. 158, p. 14).

WPATH lists the minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria (*Id.* at p. 25). Specifically, a person must: hold a master's degree in behavioral science; be familiar with the Diagnostic Statistical Manual of Mental Disorders or the International Classification of Diseases; have documented supervision in psychotherapy; understand the variations of gender identities and gender expressions; have continuing education in the assessment and treatment of gender dysphoria; have cultural competence; and be aware of the growing body of literature in the area (*Id.* at pp. 25-26). Individuals who are new to the field should work under the supervision of someone with competence who is regarded as an expert in gender dysphoria (*Id.* at p. 26).

**Social Role Transition**

Social role transition is living in the role congruent to one's affirmed identity. For instance, in the case of a transgender woman, social transition would include wearing a female hairstyle, female clothing, and makeup, and using a feminine name, female toiletries, and a female bathroom (Doc. 158, p. 16). In a prison setting, social transition would require a transgender woman be afforded the same canteen items that female prisoners can access, have means to safe and effective hair removal, be referred to by a female name, and be permitted to wear makeup or clothing that affirms her gender (*Id.* at p. 17).

**Psychotherapy**

Higgins-000345

Psychotherapy helps individuals become more resilient, deal with stigma, manage family situations, and cope with the social problems that are attendant to gender dysphoria (*Id.* at p. 14).

**Surgery**

There are different surgical options for transgender individuals, including reconstruction of the genitalia, also known as gender-affirming surgery (*Id.* at pp. 20, 90). Reconstruction eliminates the major source of hormones that contribute to and cause gender dysphoria (*Id.* at pp. 20-21). After reconstruction, the urogenital organs function and appear the same as one's peers (*Id.*). In 2014, Medicare declared gender-affirming surgery to be medically necessary and safe (*Id.* at p. 88). Studies indicate that less than one percent of patients who undergo gender-affirming surgery around the world experience regret (*Id.* at p. 90). Other studies show suicide and self-harm dramatically decrease following reconstruction surgery (*Id.*). Other surgical options include removal of the breasts and chest reconstruction (*Id.* at p. 21).

**Cross-Sex Hormone Therapy**

Cross-sex hormone therapy involves taking hormones to masculinize or feminize the body (*Id.* at p. 14). An individual should not begin hormone therapy unless he or she has well-documented gender dysphoria above the age of majority and has no significant mental health concerns that prevent him or her from giving informed consent (*Id.* at p. 19). Hormone therapy is often a necessary component of treating gender dysphoria (*Id.* at p. 156).

The Endocrine Society Guidelines are internationally recognized baseline

Higgins-000346

guidelines for the adequate treatment of gender dysphoria (Doc. 157, p. 91). Hormone therapy that falls below the Guidelines is considered less-than-adequate treatment (*Id.* at pp. 98-99). The Guidelines state that once a person begins hormone therapy, they should undergo baseline lab testing to monitor hormone levels (*Id.* at p. 102). Hormone levels need to be checked every two to three months for the first year of treatment, and dosages should be adjusted accordingly until a target hormone level is achieved (*Id.*). After this period, hormone levels should be checked once or twice each year (*Id.*). An individual who suddenly stops taking hormones is at risk for serious medical or mental health complications (*Id.* at p. 103).

Spironolactone and Estradiol are the two main agents involved in hormone therapy for transgender women (*Id.* at pp. 103-04). Spironolactone is a testosterone-blocker, and Estradiol is estrogen (*Id.* at pp. 104, 109). Estradiol is administered at a starting dose of two milligrams and titrated to four or six milligrams (*Id.* at p. 104). Four milligrams typically results in target concentrations (*Id.* at p. 105). For transgender men, hormone treatment involves testosterone injections (*Id.* at p. 106).

Spironolactone is a diuretic that can elevate potassium levels and cause heart arrhythmias, kidney failure, and death (*Id.* at p. 107). Estradiol enlarges the pituitary gland, which can cause blindness if the gland gets too big (*Id.* at pp. 107-08). Thus, monitoring hormone levels is important for efficacy and safety (*Id.* at p. 108).

There are other forms of estrogen besides Estradiol, but the Endocrine Society Guidelines do not recommend them because they are very difficult to monitor (*Id.* at pp. 109-110). For example, Premarin and Menest, which are conjugated estrogens, are not

Page **6** of **39**

Higgins-000347

naturally produced by the body; they come from pregnant horse urine (*Id.* at p. 110).

Transgender people may receive hormone therapy but still experience symptoms of gender dysphoria because their body does not match their gender identity (*Id.* at p. 109). Hormone therapy does not shrink genitals or make them disappear (*Id.*).

### *IDOC's Policies on Transgender Inmates*

IDOC's Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders," sets forth the policies and procedures for evaluating and treating inmates with gender dysphoria ("the GID Directive") (Doc. 1, p. 17; Doc. 123, Ex. 10). The GID Directive creates the Transgender Committee, which is a group of IDOC officials who are responsible for reviewing placements, security concerns, and overall health-related treatment plans for transgender prisoners with gender dysphoria, as well as overseeing gender-related accommodations (Doc. 61, p. 29). The Transgender Committee has five voting members: IDOC's Chief of Psychiatry, Chief of Health Services, Chief of Mental Health Services, Chief of Operations, and Transfer Coordinator (Doc. 158, pp. 102, 146-52; Doc. 61, pp. 20-21). None of these individuals meets WPATH's minimum qualifications for treating transgender people and two have no medical training (Doc. 158, pp. 146-51).

The Committee meets once each month to review inmates' treatment and care (*Id.* at p. 105). The Committee reviews approximately twenty cases at each meeting and goes over treatment plans and inmate requests (*Id.*). IDOC's therapists present issues to the Transgender Committee on behalf of the inmate (*Id.* at pp. 111-13). The Committee reviews information about each inmate, including the inmate's treatment plan, but does

Higgins-000348

not review an inmate's complete medical records (*Id.* at pp. 113, 163). The Committee generally allots six minutes to hear an inmate's case (*Id.* at p. 162). The Committee decides issues based on a majority vote of its five members, but nonmedical members do not vote on medical issues (*Id.* at pp. 157, 187). After the Committee renders a decision, the inmate's therapist or physician is responsible for carrying out the plan (*Id.* at p. 113). There is no formal appeals process for challenging the Committee's decisions (*Id.* at pp. 160-61).

### Dr. William Puga

Dr. William Puga is a physician who specializes in psychiatry (Doc. 158, p. 102). He has served as IDOC's Chief of Psychiatry since March 2018 (Doc. 158, pp. 102, 135). He oversees the psychiatric treatment at all thirty-one facilities and is the chairman of the Transgender Committee (*Id.* at p. 104). Since he began working with the Committee, Dr. Puga has become familiar with the Standards of Care, has read about endocrinology and surgical issues, and has studied how other states work with transgender offenders (*Id.* at p. 109). Dr. Puga also authors a newsletter for the psychiatric staff that discusses psychiatrists' role in treating and evaluating transgender inmates (*Id.*).

The Committee considers whether or not an inmate should begin hormone therapy (*Id.* at p. 114). Dr. Puga estimates that about seventy IDOC inmates are on hormones (*Id.*). According to Dr. Puga, if an inmate was taking hormones prior to incarceration, the Committee generally approves the continuation of hormone therapy without much scrutiny (*Id.*). But if an inmate wants to begin hormone therapy for the first time, the Committee conducts a review to determine whether therapy is appropriate and

Higgins-000349

Case: 3:18-cv-00156-NJR Document 156 Filed: 12/19/15 Page 9 of 39 Page ID #2328

safe (*Id.*). Periodically, the Committee denies requests to begin hormone therapy if the inmate is psychiatrically unstable or if hormone therapy is contraindicated due to an inmate's medical history of conditions like embolisms, liver disease, or cardiac issues (*Id.* at pp. 114-15). If the Committee approves hormone therapy, the inmate's physician administers the hormones (*Id.* at p. 121).

Hormone therapy can cause complications (*Id.* at p. 117). For instance, in April 2019, a transgender inmate had a stroke that left her partially paralyzed and affected her speech (*Id.*). IDOC concluded that the hormones caused the stroke (*Id.* at pp. 117-18).

IDOC has raised the issue of misgendering (calling transgender people by the wrong pronouns) with its employees and has provided education and training for correctional officers on dealing with transgender inmates (*Id.* at p. 125). IDOC also encourages facilities to call inmates by their preferred name and has terminated employees who are verbally abusive to transgender inmates (*Id.* at pp. 126-27).

Dr. Puga testified the Committee will entertain requests for gender-affirming surgery but it has not actually evaluated a specific inmate as a surgical candidate (*Id.* at p. 120). Also, the Committee addresses social transition issues, but the therapists and the facilities make many decisions such as showering accommodations and access to commissary items (*Id.* at pp. 123-24).

The Committee reviews transfer requests from transgender female inmates who want to reside at female facilities (*Id.* at p. 128). Dr. Puga contacts the inmate's current facility, reviews disciplinary and medical records, speaks with the inmate's therapist, and gathers as much relevant information as he can to present to the Committee (*Id.* at

Higgins-000350

pp. 128-29, 132). Dr. Puga believes a total of two transgender females have transferred to a female facility (*Id.*). Dr. Puga testified that one of the inmates was "fairly successful" at the female facility (*Id.*). The other inmate, Janiah Monroe, stopped taking her hormones and was sexually active (*Id.*). Dr. Puga talked to the warden and mental health staff at the female facility, who reported the transgender women were not well received (*Id.* at p. 129). Dr. Puga stated that many women in IDOC's care have been exposed to domestic, physical, or emotional violence, and transgender women sometimes scare the other women (*Id.* at p. 130). Dr. Puga received information that Monroe threatened staff and other inmates (*Id.* at pp. 134-35). Women at the facility filed complaints against Monroe under the Prison Rape Elimination Act; some were false but many were legitimate (*Id.* at p. 130). The female facility eventually placed Monroe in segregation for her own safety (*Id.* at pp. 135-36). According to Dr. Puga, these difficulties have not deterred the Committee from considering transfer requests on an individual basis (*Id.*).

Dr. Puga does not recall learning about gender dysphoria in medical school (*Id.* at p. 139). He treated two transgender patients while in private practice, three transgender patients while working at a hospital, and three transgender patients while working as a consultant to a school district (*Id.*). Dr. Puga did not serve as these individuals' primary provider for gender dysphoria (*Id.* at p. 141). Dr. Puga has never treated a transgender individual under the supervision of a WPATH-certified physician, prescribed hormones to a transgender patient, been involved in monitoring hormone levels of a transgender patient, approved surgery for a transgender patient, or presided over the social transition of a transgender patient (*Id.* at pp. 144-45). He is unaware of any standards for prescribing

Higgins-000351

hormones and testified, "For psychiatry I have guidelines for medications that we prescribe but I don't know how medicine works, frankly" (*Id.* at p. 175). He stated, "Dr. Reister has probably the most experience out of everybody [on the Committee] as far as working with [transgender patients]" (Doc. 158, p. 103).

**Dr. Shane Reister**

Dr. Shane Reister is the southern regional psychologist for IDOC who consults the Transgender Committee (Doc. 143, Ex. 3, pp. 6-7). He has a doctorate in psychology and his experience includes a practicum at an LGBT specialty site (*Id.* at p. 5). Dr. Reister worked at a correctional facility in Rushville, Illinois, where he organized an LGBT group therapy program (*Id.*). He also attended a WPATH conference a couple of years ago and is scheduled to attend a second conference this year (*Id.* at pp. 5-6). He has been a member of WPATH for five years (*Id.*). Dr. Reister developed sensitivity training for IDOC staff, which is designed to help employees interact appropriately with transgender inmates (*Id.* at p. 7). Dr. Reister does not prescribe hormones; he defers to Dr. Puga for medical treatment of patients with gender dysphoria because these decisions are outside Dr. Reister's competency (*Id.* at p. 16).

*Expert Testimony*

**Dr. Vin Tangpricha**

Dr. Vin Tangpricha testified on behalf of Plaintiffs (*Id.* at p. 88). He is board-certified in endocrinology and specializes in treating transgender individuals (*Id.*). Dr. Tangpricha holds a medical degree from Tufts University and a Ph.D. from Boston University (*Id.*). He estimates he has treated more than 360 transgender patients and has

Higgins-000352

published thirty peer-reviewed articles related to gender dysphoria, including the WPATH Standards of Care (*Id.* at pp. 90-91). Dr. Tangpricha was also involved in creating the Endocrine Society Guidelines (*Id.* at p. 91). The first version of the Guidelines was published in 2008, and an updated version was published in 2017 (*Id.* at p. 145). Dr. Tangpricha is the president of WPATH, on the board of directors for the American Association for Clinical Endocrinologists ("AACE"), and chairs AACE's national education committee (*Id.* at p. 92).

Dr. Tangpricha testified that gender dysphoria is a serious medical condition and that failure to properly treat the condition can result in anxiety, depression, self-harm, and suicide (*Id.* at p. 95). Dr. Tangpricha reviewed the record in this case and is familiar with the Transgender Committee (*Id.* at p. 11). He does not believe any of the voting members on the Committee are qualified to make decisions about hormone therapy (*Id.*). Dr. Tangpricha reviewed an IDOC medical record where the Committee denied an inmate's request for an increased dosage of estrogen and a bra without providing a medical reason or completing a blood test to determine hormone levels (*Id.* at pp. 115-16). In another record, the Committee denied a request for an increased dosage of estrogen because the inmate was not "stable" (*Id.* at pp. 117-18). But the remarks under the mental health section of the document state "Currently stable. Attending all programming. Working full-time in inmate commissary" (*Id.*). Dr. Tangpricha could not find any medical rationale for the denial of the request (*Id.*). He reviewed other similar documents and noted the Committee was denying requests for increased hormones without testing hormone levels (*Id.*). The Committee also denied requests for injections without a

Higgins-000353

reasoned basis; injections can be necessary when someone's body does not absorb the hormone pills (*Id.* at p. 119-20).

Dr. Tangpricha reviewed Plaintiffs' medical records and determined IDOC's treatment for each woman failed to comply with the Endocrine Society Guidelines. For instance, IDOC prescribed Plaintiffs Menest and Premarin (*Id.* at pp. 124), delayed hormone therapy for Plaintiffs without medical justification (*Id.* at p. 126-27), and failed to monitor Plaintiffs' hormone levels (*Id.* at pp. 124-28). The few times IDOC conducted blood tests on Plaintiffs, their hormone levels were below therapeutic levels (*Id.* at pp. 121-28). Dr. Tangpricha reviewed medical records from other transgender inmates in IDOC's custody and found the same deficiencies in treatment (*Id.* at pp. 129-38). In one circumstance, an inmate was prescribed Spironolactone but no Estradiol, so the estrogen had little effect (*Id.* at pp. 140-41). In a psychiatry record in the inmate's file, the mental health professional refers to "gender identity disorder," which is an outdated and offensive term (*Id.* at p. 139). The professional also referred to the inmate with male pronouns and called her gender dysphoria a delusion:

> He is cooperative in a very limited sense, his judgment and inside rapport, but he knows he's still a male. He tries to show that he is female. He is in some kind of a delusion that he is female, and once his voice starts getting a high pitch, he will start talking.

(*Id.*).

Dr. Tangpricha also noted there are records of inmates on hormone therapy with elevated potassium, prolactin, and creatinine levels, which place these individuals at risk for complications (*Id.* at p. 142). Of all the records Dr. Tangpricha reviewed, IDOC did not monitor ninety percent of the inmates in accordance with the Endocrine Society

Page **13** of **39**

Higgins-000354

Guidelines (*Id.* at p. 143). Approximately twenty-five to fifty percent of the inmates were not monitored at all (*Id.* at p. 144). Also, over ninety percent of the inmates who IDOC did monitor had hormone levels that fell below the therapeutic range (*Id.* at p. 143).

**Dr. Randi Ettner**

Dr. Randi Ettner is a clinical and forensic psychologist with a specialty in the assessment and treatment of gender dysphoria (Doc. 158, p. 5). She received a Ph.D. from Northwestern University and has been licensed as a psychologist since 1980 (*Id.*). She has authored over thirty peer-reviewed publications on transgender health and "seen" over 3,000 individuals with gender incongruity (*Id.* at pp. 6-7). Dr. Ettner has consulted surgeons and mental health professionals on transgender health and chairs the WPATH's committee for incarcerated people (*Id.* at pp. 7-8).

Dr. Ettner reviewed Plaintiffs' medical records and grievances; analyzed the Committee reports; and interviewed and administered psychodiagnostics testing to Plaintiffs (*Id.* at p. 9). She concluded Plaintiffs have severe gender dysphoria and IDOC provides inadequate and inappropriate care by delaying hormone therapy, failing to facilitate social transition, and not assessing anyone for surgical intervention (*Id.* at pp. 9-10, 38). Dr. Ettner reviewed the records of other transgender IDOC inmates and observed the same pattern of inadequate treatment (*Id.* at pp. 10-12, 37-38). She stated that individuals with gender dysphoria who do not have access to treatment typically engage in self-treatment (auto-castration or auto-penectomy), experience psychological decompensation, or commit suicide (*Id.* at pp. 26-27, 58).

Higgins-000355

Dr. Ettner testified that the Committee has denied inmates' requests for hormone therapy for a number of reasons that are not medically justified (*Id.* at pp. 34-44). For instance, the Committee denied hormone therapy because inmates suffered from PTSD, did not have social support, were "faking" gender dysphoria, had unresolved trauma, and/or needed to show more stability (*Id.*; Pls. Exs. 11-16).

Dr. Ettner does not believe any of the members of the Transgender Committee are competent to treat gender dysphoria (Doc. 158, p. 50). Based on her review of the Committee's decisions and inmates' medical records, Dr. Ettner concluded the Committee is making decisions that fall below the Standards of Care and place inmates at risk (*Id.* at p. 51). Also, Dr. Ettner believes IDOC's mental health staff, in general, is incompetent to treat gender dysphoria based on records of misgendering inmates and conflating sexual identity with gender identity (*Id.* at pp. 55-56).

Dr. Ettner reviewed the minutes from IDOC's Suicide Task Force Committee meeting held on October 14, 2015 (*Id.* at pp. 56-58; Pl. Ex. 20). The note states a transgender woman committed suicide on May 31, 2015 (*Id.*). The inmate had requested hormone therapy in May 2014 and was evaluated for gender dysphoria in April 2015 but was never prescribed hormones (*Id.*). One of the members of the Suicide Task Force Committee stated, "[L]apse in presentation to Transgender Committee could have been a reason for the suicide" (*Id.*). Prior to her death, however, the inmate had been in segregation for one year and had an "encounter with a staff member" just two days before (*Id.*).

Dr. Ettner testified that transgender inmates are still at risk for self-harm, psychological decompensation, and suicide because there is no evidence they are

Higgins-000356

receiving necessary medical treatment for gender dysphoria in a timely manner (*Id.* at pp. 58-59). She stated these problems can be addressed by qualified individuals who conduct in-person assessments of inmates and generate a treatment plan (*Id.* at p. 58). According to Dr. Ettner, there are prison systems that send inmates with gender dysphoria to meet with a trained expert for evaluation (*Id.*). Thus, IDOC would not necessarily have to hire an expert for every facility (*Id.*). Also, IDOC staff could go through the training to receive certification in treating gender dysphoria, but this involves classes, mentoring, testing, and participating in clinical cases (*Id.* at p. 59).

Dr. Ettner has evaluated over forty inmates for gender dysphoria throughout the country (*Id.* at p. 84). All of these evaluations were for litigation purposes and on behalf of plaintiffs (*Id.* at p. 85). She concluded that three of the inmates she evaluated were receiving adequate care (*Id.* at pp. 85-86). Dr. Ettner opined that the named Plaintiffs in this case should be evaluated for surgery (*Id.* at p. 99).

### *The Plaintiffs*

#### Janiah Monroe

Janiah Monroe has been in IDOC custody since 2008; at the time of the evidentiary hearing, she resided at Logan Correctional Center ("Logan"), a female facility (Doc. 157, pp. 184-85).[1] Monroe was assigned male at birth and grew up in Chicago and New York with a very religious family (*Id.* at p. 185). Monroe knew from a young age that she was a female; she told her parents on her third birthday that she wanted to be their daughter

---

[1] The Court notes that according to filings after the hearing in this case, there have been a number of issues concerning Monroe's placement and her health. Thus, the Court requests an update on these matters from Plaintiffs' counsel.

Higgins-000357

(*Id.*). In her youth, Monroe enjoyed playing with her female cousins, playing jump rope, and fixing her hair (*Id.* at p. 186). She wore both male and female clothing (*Id.* at p. 187). When Monroe would exhibit feminine characteristics, her father beat her (*Id.* at p. 185).

Monroe began taking hormones and birth control pills when she was about eleven years old (*Id.* at p. 188). Monroe hated being perceived as a male and felt anxiety and shame; she felt hatred toward herself, her body, and the way she sounded (*Id.* at p. 189). Monroe's struggles with gender dysphoria drove her to attempt suicide (*Id.*).

When Monroe was first incarcerated in 2008, she informed IDOC she was transgender and requested gender reassignment surgery, hormone therapy, and electrolysis (*Id.* at pp. 191-92). IDOC told her it would not provide hormone therapy to inmates unless they were legally on hormones prior to incarceration (*Id.* at p. 192). The denial of treatment was "[e]xcruciatingly painful" for Monroe (*Id.* at p. 193). She attempted self-castration, chewed through the arteries in both of her arms, chewed out a vein, carved a swastika in her wrist to symbolize self-hate, and hung herself (*Id.*).

For the first decade of her incarceration, Monroe was housed in male facilities, where she was subjected to verbal harassment, physical assaults, and sexual abuse at the hands of other inmates and correctional officers (*Id.* at pp. 194-96). Monroe described living in male facilities as "terrifying" (*Id.* at p. 196). When she stood up for herself, the correctional officers would purposely place her in a cell with a sexually violent inmate and laugh at her when she called for help (*Id.* at p. 197). During pat-downs, male officers commented on Monroe's body and inappropriately groped her (*Id.* at p. 204). Monroe filed grievances over the mistreatment but rarely received a response (*Id.* at p. 198).

Higgins-000358

Case: 3:18-cv-00156-NJR Document 106-3 Filed: 12/19/19 Page 18 of 39 Page ID #:2537

IDOC did not diagnose Monroe with gender dysphoria until 2012—four years after she was first incarcerated (*Id.* at p. 199). After multiple unsuccessful requests for treatment, Monroe began hormone therapy in April 2012 (*Id.* at p. 200). Hormone therapy helps Monroe's gender dysphoria to some extent, but she describes it as "putting a Band-Aid on a wound that needs stitches" (*Id.* at p. 202). Monroe believes her hormone dosages are inadequate (*Id.* at p. 202). Monroe has cut her penis and scrotum so many times that she cannot recall each instance; she hopes her genitals become infected so IDOC is forced to remove them (*Id.* at pp. 201-02). Monroe believes she needs breast implants, vaginoplasty, and clitoroplasty, so her "mind and [] body can be one" (*Id.* at p. 213). She has made countless requests and filed at least ten grievances asking for surgery, but has never been evaluated as a surgical candidate (*Id.* at pp. 213-14).

At the female facility, Monroe has access to female undergarments, makeup, brushes, combs, and beauty shops, and is searched by female officers (*Id.* at pp. 203-04). At male facilities, transgender inmates only have access to a bra (*Id.*). After transferring to the female facility, Monroe became involved in a sexual relationship with a female inmate (*Id.* at pp. 210-12). Consensual sexual encounters among inmates at the female facility are not uncommon (*Id.* at p. 212). The woman Monroe was involved with accused Monroe of sexual assault, but IDOC determined the allegations were false (*Id.* at pp. 211-12, 221). Monroe believes her accuser was jealous of her friendship with another woman (*Id.*). Monroe testified her penis is not fully functioning and has not functioned at any time since she was transferred to Logan (*Id.* at p. 222).

Higgins-000359

**Marilyn Melendez**

Marilyn Melendez is an inmate in IDOC custody who, at the time of the evidentiary hearing, was housed at Pontiac Correctional Center ("Pontiac"), a male facility (*Id.* at p. 13). Melendez was assigned male at birth but, at a young age, her mother explained that she was a girl born in a boy's body (*Id.* at p. 14). When Melendez was eight or nine years old, her mother started her on hormones, testosterone blockers, and estrogen (*Id.* at p. 15). Melendez developed breasts, but when she was thirteen, her mother could no longer afford the treatment (*Id.* at pp. 15-16, 40). Melendez went through male puberty; she grew taller, her shoulders broadened, she developed muscles, her voice deepened, and she began experiencing erections (*Id.* at p. 16). Melendez "felt like a monster" and her peers made fun of her (*Id.*). She was involved in a lot of fights and started doing drugs, which led to her incarceration (*Id.*).

Melendez came under IDOC's custody in 2012 and was initially housed at Stateville Correctional Center ("Stateville") (*Id.*). She immediately told Stateville she was transgender, but she was never evaluated for gender dysphoria (*Id.*). Two weeks later, Melendez was transferred to Menard Correctional Center ("Menard") (*Id.* at pp. 16-17). She reiterated to the chaplain, a grievance counselor, and the mental health department that she was transgender and requested hormone therapy (*Id.* at pp. 17-18). Melendez was denied hormone therapy and never evaluated for gender dysphoria (*Id.*). Melendez was transferred to Pontiac one year later and told the facility she was transgender (*Id.* at p. 18). Pontiac officials told Melendez she was a cross dresser and just seeking attention (*Id.*). In 2015, Melendez was transferred back to Stateville (*Id.* at pp. 18-19). She was

Higgins-000360

Case 3:18-cv-00156-NJR   Document 186-3   Filed 12/19/25   Page 20 of 39   Page ID #2339

evaluated for gender dysphoria but told she needed additional counseling before a she could receive a final diagnosis (*Id.* at p. 19). Melendez was finally diagnosed with gender dysphoria in March 2015 (*Id.* at p. 20).

The Transgender Committee initially denied Melendez's request for hormone therapy because it believed she needed further counseling (*Id.* at p. 21). Melendez was approved for hormone therapy in 2015 and began treatment in July or August 2015 (*Id.* at p. 22). But Melendez testified IDOC has not addressed her needs for hormone therapy (*Id.* at p. 23). IDOC started Melendez on the lowest dosage of hormones for a ninety-day period to see if she would experience any complications, and IDOC was supposed to conduct blood tests after the ninety days to determine an appropriate dosage (*Id.*). After the ninety days, Melendez was still growing excess facial and body hair, she was experiencing erections, her skin was oily, and she did not develop any breast tissue (*Id.*). Melendez was transferred to Pontiac, where she told the medical director she was unsatisfied with the dosage (*Id.* at p. 24). The physician told Melendez he did not "really know anything about transgender health" (*Id.*). Melendez filed grievances, and IDOC increased her dosage (*Id.*). Melendez is still unsatisfied with her hormone therapy as she has frequent erections, her testicles have not shrunk, and she grows excess hair (*Id.* at p. 25).

Melendez requested gender-affirming surgery but was told IDOC does not pay for sexual reassignment surgery (*Id.* at p. 26). Melendez believes she needs penile inversion surgery or the removal of her genitals, hair removal surgery, liposuction, breast augmentation, brow shaving, chin shaving, and cartilage shaving (*Id.* at p. 28). Living

Page **20** of **39**

Higgins-000361

Case 3:18-cv-00156-NJR   Document 186-3   Filed 12/19/19   Page 21 of 39   Page ID #2340

without surgery is "upsetting" and "depressing," and brings Melendez "disgust and discomfort" (*Id.* at p. 27). Using the restroom and showering makes her feel like a "freak" (*Id.*).

IDOC denied Melendez's request for hair removal because inmates are already allowed accessed to Magic Shave (hair-removal cream) and razors (*Id.* at pp. 29, 48). Melendez testified that hormones make skin softer and more sensitive, so the Magic Shave makes her skin peel and blister (*Id.* at p. 48). Melendez wants access to all of the products that inmates in the female facilities can access (*Id.* at p. 33). Melendez testified that living without feminine products is depressing (*Id.* at pp. 33-34). She has dry skin and, for an entire year, brushed her hair with her fingers and a spork (*Id.* at p. 34). She is forced to use men's soap and aftershave (*Id.*).

Melendez requested a bra in 2015 and received one in 2017 (*Id.* at p. 32). She wants additional gender-affirming clothes and undergarments (*Id.* at p. 33). Melendez requested gender-affirming clothes from health care, mental health, commissary, and the warden, but is still waiting for an answer (*Id.* at pp. 29-30, 36). The lack of gender-affirming clothing has negatively impacted her social transition (*Id.* at p. 35).

Melendez has never been housed in a female facility (*Id.* at p. 36). Melendez is strip-searched by men in front of male inmates, and the correctional officers laugh at her (*Id.* at p. 52). Correctional officers have verbally harassed and groped Melendez and she is often misgendered (*Id.* at pp. 37-38). IDOC staff has called Melendez "him," "dude," "it," and "he-she" (*Id.* at p. 38). Melendez requested to be moved to a female facility in the past, but has not recently requested a transfer because she heard transgender women

Higgins-000362

in female facilities are segregated (*Id.* at p. 86).

Melendez has contemplated suicide in the past year and testified that if her current treatment persists, she will kill herself or put herself in a position where someone else kills her (*Id.* at pp. 38-39).

**Sasha Reed**

Sasha Reed is a transgender woman who, at the time of the evidentiary hearing, was incarcerated at Lawrence Correctional Center ("Lawrence"), a male facility (*Id.* at pp. 54, 71). When Reed was three years old, she was placed in her aunt's care and sexually and physically abused (*Id.*). Reed first understood she is female when she was eight years old (*Id.*). Her caretakers in the Department of Child and Family Services were not supportive of her female gender identity (*Id.* at p. 55). She felt "horrible" when people treated her as a male, and she felt stressed and depressed (*Id.* at p. 56). When Reed was seventeen, she began wearing female clothing (*Id.* at p. 55). Prior to her incarceration, Reed never received any type of treatment for gender dysphoria (*Id.* at p. 56).

When Reed came under IDOC's care in July 2013, she alerted officials at Stateville that she was transgender and requested to speak to a mental health professional (*Id.* at pp. 56-57, 60). Reed never met with anyone on the Transgender Committee, spoke with any mental health professionals, or received any treatment for gender dysphoria while she was at Stateville (*Id.* at pp. 57-58). Reed was depressed, anxious, and suicidal (*Id.* at p. 58). She attempted suicide because IDOC was not treating her gender dysphoria (*Id.*).

Reed was transferred to Pontiac for a year and a half and told a nurse that she was transgender (*Id.* at p. 59). Reed never received any sort of treatment for gender dysphoria

Higgins-000363

while at Pontiac (*Id.*). Reed was transferred to Menard, and in 2015, she alerted officials she was transgender (*Id.* at p. 60). She was diagnosed with gender dysphoria and began receiving treatment in November 2015 (*Id.*).

Reed started hormone therapy in March 2017 and is still taking hormones today (*Id.* at p. 61). Prior to starting therapy, Reed had to submit a survey to the Transgender Committee (*Id.*). The Committee met with Reed a month or two later and denied her request for hormone therapy (*Id.* at p. 62). The Committee told Reed she had to stop taking her medication for schizophrenia for six weeks before taking hormones (*Id.*). Reed complied, but the Committee still denied therapy (*Id.* at p. 63). Reed was attending mental health sessions every two weeks during this period and told her doctor she was depressed, anxious, and had thoughts of self-harm (*Id.* at p. 63). Reed was eventually prescribed hormones in March 2017 (*Id.* at p. 64).

In 2016, Reed filed a grievance requesting female clothing, soap, deodorant, shampoo, and body wash, and a transfer to a female facility; her request was denied (*Id.* at pp. 64-65). She filed another grievance in 2016, which was also denied (*Id.* at p. 65). Along with filing grievances, Reed requested female grooming items from mental health professionals and the warden (*Id.*). The warden told Reed, "[T]his is a man [sic] facility, we don't do that" (*Id.* at p. 66). Reed also requested a bra in 2016 and 2017, but her grievances were denied because the facility stated a bra was not medically necessary (*Id.* at pp. 66-67). Reed finally received a bra in 2017 (*Id.* at p. 67). Reed wants access to female grooming products because she does not feel comfortable using products created for men (*Id.* at pp. 81-82).

Higgins-000364

In 2016 and 2017, Reed filed grievances for gender-affirming surgery, but IDOC denied the requests (*Id.* at pp. 68-69). She testified she is a woman and does not feel comfortable having male "parts" (*Id.* at p. 68). Reed felt suicidal after IDOC denied her grievances and without surgery she does not feel hopeful about her future (*Id.*). Reed's mental health professional told her IDOC is not permitting any surgeries (*Id.*).

Reed does not feel safe at a male facility (*Id.* at p. 71). IDOC staff and fellow inmates verbally harass Reed because of her gender identity (*Id.* at pp. 71-72). Men try to get her to show them her breasts or they try to grope her (*Id.* at p. 72). Reed filed a complaint about the harassment but has not received a response (*Id.* at pp. 72-73). Male correctional officers strip-search Reed, which makes her feel violated (*Id.* at p. 73). Reed has requested that female officers perform the searches, but the facility told her there is no policy about having females search transgender inmates in male facilities (*Id.* at p. 74). When Reed told IDOC she was transgender, she was never evaluated for a transfer to a female facility (*Id.* at pp. 74-75).

When Reed was first incarcerated, she told mental health professionals she heard voices in her head that instructed her to cut herself (*Id.* at p. 76). In July 2013, IDOC staff found Reed in her cell with a sheet around her neck, giving the thumbs up sign (*Id.*). Reed admitted she suffers from symptoms that cause depression and self-harm aside from gender dysphoria (*Id.* at pp. 79-80). Reed attends group therapy but is still upset that she is not receiving the right treatment for gender dysphoria (*Id.* at pp. 83-84). Sometimes she is suicidal (*Id.* at p. 84). Reed brings up her feelings to mental health staff, but they do not listen to her (*Id.*).

Higgins-000365

IDOC classifies Reed as a "vulnerable" inmate and restricts her housing assignments and jobs (*Id.* at p. 82). As a vulnerable inmate, Reed is permitted to shower separately from other inmates, in private (*Id.* at pp. 81-82).

**Sora Kuykendall**

Sora Kuykendall first identified as a female when she was about five years old (Doc. 123, Ex. 6, p. 1). Kuykendall's family did not support her gender identity, so she was never evaluated for gender dysphoria (*Id.*).

Kuykendall experienced extreme depression when she went through male puberty (*Id.* at pp. 1-2). When she was a teenager, she attempted suicide because of the despair she felt from being trapped in a man's body (*Id.* at p. 2).

Kuykendall came under IDOC's care in November 2014 and, at the time of the evidentiary hearing, was housed in a male facility (*Id.* at pp. 2, 4). She requested hormone therapy within a week, but IDOC denied her request and refused to evaluate her for gender dysphoria (*Id.* at p. 2). IDOC eventually evaluated her for gender dysphoria after she attempted self-castration in 2015 (*Id.*). Kuykendall began taking Spironolactone and Menest in February 2015 (*Id.*). She has repeatedly requested IDOC officials conduct blood and laboratory tests to monitor her hormone levels, but as of April 2019, her hormone levels had never been monitored (*Id.*). Kuykendall has developed breasts and she requested a bra in June 2015; however, she did not receive a bra until six months later (*Id.*). Kuykendall has repeatedly requested feminine grooming and cosmetic products by filing formal grievances, but IDOC has denied or ignored her requests (*Id.* at pp. 2-3).

Kuykendall still suffers from gender dysphoria (*Id.* at p. 3). She is disturbed by her

Page **25** of **39**

Higgins-000366

genitals and body hair (*Id.*). She has continuously requested gender-affirming surgery since June 2015, but IDOC has not evaluated her for surgery (*Id.*). Kuykendall feels extremely depressed and anxious, and she has frequent thoughts of self-harm (*Id.*).

Kuykendall is strip-searched by male officers and in the presence of other males, which makes her feel humiliated and violated (*Id.*). She filed a grievance in March 2017 requesting to be strip-searched by females, but has not received a response (*Id.*). Kuykendall testified that IDOC staff, including mental health professionals, are consistently disrespectful and refer to her with male pronouns and call her "it" (*Id.* at p. 4). She feels unsafe and is verbally harassed on a daily basis (*Id.*).

**Lydia Helena Vision**

Lydia Helena Vision knew from a young age that she was female (Doc. 123, Ex. 5, p. 1). She entered IDOC custody in June 2004 and, at the time of the evidentiary hearing, was housed at Danville Correctional Center ("Danville") (*Id.*). Vision told IDOC personnel she was transgender in 2015 and was diagnosed with gender dysphoria in March 2016 (*Id.*). Since her diagnosis, Vision has requested hormone therapy, female clothing, and gender-affirming grooming items, but IDOC repeatedly denied her requests (*Id.* at pp. 1-2). IDOC told Vision she had to attend sessions for PTSD before beginning hormone therapy (*Id.* at p. 2).

In July 2016, IDOC referred Vision to a psychiatrist who evaluated her via Skype and confirmed the diagnosis of gender dysphoria (*Id.*). Vision stated the psychiatrist confirmed that the lack of hormone therapy was causing Vision extreme distress and recommended she discuss hormone therapy with a physician (*Id.*). IDOC still refused to

Higgins-000367

provide Vision hormone therapy; her treatment plan consisted of monthly counseling sessions with counselors who misgendered her and were unfamiliar with transgender issues (*Id.*).

Vision was forced to continue showering in general population for several months after her diagnosis (*Id.*). She had panic attacks while showering (*Id.*). At some point, Danville organized a transgender group, and Vision began attending sessions (*Id.* at p. 3). She also attended regular therapy sessions and requested more material on gender dysphoria (*Id.*). She joined an outside LGBTQ organization and wrote to other transgender people (*Id.*). Vision tried to take measures to feminize her appearance, such as following a special weightlifting program to enhance her breast size (*Id.*). Nonetheless, she felt increasingly depressed and anxious without access to hormone treatment and feminine products (*Id.*). Vision quit her job in the laundry room because of depression (*Id.* at p. 4).

Vision filed several grievances throughout her incarceration requesting hormones, gender-affirming clothes, grooming products, and placement in a cell with another transgender inmate (*Id.* at p. 3). IDOC eventually gave Vision a bra in 2017 but denied her remaining requests (*Id.*).

A psychiatrist evaluated Vision in October 2017 and recommended IDOC consider her for hormone therapy (*Id.*). IDOC still failed to start Vision on hormones (*Id.*). Another psychiatrist evaluated Vision in January 2018 and confirmed her diagnosis of gender dysphoria (*Id.*). Again, IDOC did not prescribe Vision hormones (*Id.*). Vision was transferred to Graham Correctional Center in May 2018 (*Id.*). In June 2018, yet another

Higgins-000368

psychiatrist evaluated Vision and confirmed her diagnosis of gender dysphoria (*Id.* at p. 5). Vision was becoming more anxious and depressed and had trouble eating and sleeping (*Id.*). In late 2018, thirty-two months after her original diagnosis of gender dysphoria, Vision finally began hormone therapy (*Id.*).

Vision is still "terrified" she will never receive the treatment she needs (*Id.*). She has trouble accessing information about treatment and has had problems with prescription changes and hormone dosages (*Id.*). Also, Vison wants to be housed at a female facility (*Id.* at p. 6).

LEGAL STANDARDS

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil Procedure ("Rule") 65, the party moving for an injunction has the burden of showing that it has some likelihood of succeeding on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied, against the potential harm to the non-movant if the injunction were wrongfully granted. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086.

Higgins-000369

The Prison Litigation Reform Act ("PLRA") applies to suits filed by incarcerated people and limits the equitable relief a district court can order. 42 U.S.C. § 1997e & 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

Here, Plaintiffs allege IDOC is deliberately indifferent in its treatment of transgender inmates. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011) (internal quotations and citations omitted). The deliberate indifference inquiry has two parts. The Court examines (1) whether a plaintiff suffered from an objectively serious medical condition and (2) whether the defendants were deliberately indifferent to that condition. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019). "To prove deliberate indifference, 'mere negligence is not enough . . . [A] plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

### DISCUSSION

The parties agree that gender dysphoria is an objectively serious medical

Page **29** of **39**

Higgins-000370

condition. *See Campbell*, 936 F.3d at 545. The parties differ, however, on what constitutes constitutionally adequate treatment. Plaintiffs contend IDOC puts transgender prisoners' health and lives at risk by delaying the evaluation and treatment of gender dysphoria; permitting the Transgender Committee to make medical decisions for transgender inmates; improperly administering hormone treatment; denying transgender inmates the ability to socially transition; and failing to provide gender-affirming surgery to inmates. The linchpin of Plaintiffs' arguments seems to be that IDOC does not comport with WPATH's Standards of Care.

Plaintiffs' experts, Dr. Ettner and Dr. Tangpricha, both relied on the Standards of Care and the Endocrine Society Guidelines to conclude that IDOC provides inadequate treatment to transgender inmates. But Defendants argue the Standards of Care delineate the *highest* level of care, rather than the constitutionally adequate care IDOC must provide. After all, it is well-settled that prisoners are not "entitled to demand specific care" or "the best care possible." *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Along the same lines, Defendants assert the Court should discount the opinions of Dr. Ettner and Dr. Tangpricha as biased and unreliable.

Defendants discredit Dr. Ettner and Dr. Tangpricha because of their involvement in WPATH and their experience testifying for plaintiffs in cases involving gender dysphoria. "Rule 702's reliability elements require the [Court] to determine only that the expert is providing testimony that is based on a correct application of a [valid] methodology and that the expert considered sufficient data to employ the methodology." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). "The focus, therefore, 'must

Higgins-000371

be solely on principles and methodology, not on the conclusions that they generate.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (quoting *Daubert v. Merrell Pharm., Inc.*, 509 U.S. 570, 595 (1993)).

Here, Dr. Ettner and Dr. Tangpricha based their testimony on WPATH's Standards of Care, which are endorsed as the standards for treating gender dysphoria by the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the Endocrine Society, and the National Commission on Correctional Health (Doc. 158, p. 24). Dr. Tangpricha testified the Standards of Care are the "floor" for treating gender dysphoria (Doc. 157, p. 98). Defendants' own witness, Dr. Puga, testified he was not familiar with any other association that rivals WPATH's level of universal acceptance in the transgender health field (Doc. 158, p. 142). Moreover, Defendants have not put forth a single expert to contest the Standards of Care or offer an opinion about the appropriate level of care for transgender inmates. Thus, this Court joins many other courts who agree the Standards of Care are the appropriate benchmark for treating gender dysphoria. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (and cases cited therein).

Also, Dr. Ettner and Dr. Tangpricha's involvement with WPATH does not overshadow their qualifications as experts in transgender health. Together, they have treated thousands of individuals with gender issues, authored roughly sixty peer-reviewed articles on transgender health, and earned a medical degree and Ph.Ds.

Defendants point out Dr. Tangpricha testified he did not recall seeing any medical

Higgins-000372

records where an inmate refused hormone therapy (Doc. 157, p. 157). At the hearing, however, Defendants confronted Dr. Tangpricha with records where an inmate refused to take hormones on several occasions (*Id.* at pp. 176-79). Defendants indicated they were going to move to admit the records into evidence, but did not do so. Thus, it is impossible to infer how the records affect Dr. Tangpricha's reliability. Even so, Dr. Tangpricha's unfamiliarity with a few pages of medical documents out of the thousands in this case does not weigh on his credibility. In sum, the opinions of Dr. Tangpricha and Dr. Ettner are based on well-recognized scientific and medical standards and they have established themselves as experts in the field of transgender health.

**Likelihood of Success on the Merits**

For purposes of a preliminary injunction, Plaintiffs must demonstrate a likelihood of success on the merits, *i.e.*, that they have a "better than negligible" chance of proving their claims. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). Because the parties agree that gender dysphoria constitutes an objectively serious medical condition, Plaintiffs must show IDOC consciously disregarded a known and substantial risk of harm associated with gender dysphoria. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

IDOC is well-aware that transgender inmates are at a high risk of suffering from mental health issues and resorting to self-harm. Plaintiffs' grievances and medical records document a pattern of genital mutilation and suicide attempts among the transgender population (Pl. Exs. 4, 9, 10, 12, 14, 15, 16, 17). Unfortunately, a transgender inmate successfully committed suicide while in IDOC's care in May 2015 (Pl. Ex. 20).

Despite these known risks, there is evidence that IDOC denies and delays the

Higgins-000373

diagnosis and treatment of gender dysphoria without a medical basis or penological purpose. For instance, Monroe was not diagnosed with gender dysphoria until four years after she first sought treatment from IDOC, Melendez had to wait three years to receive a diagnosis and treatment, and Kuykendall and Reed waited almost two years. During these periods, Reed attempted suicide and Kuykendall attempted self-castration. Medical records of the putative class members demonstrate the same pattern of delaying hormone therapy with no medical justification. Also, IDOC denies inmate requests to increase dosages of hormones without testing hormone levels or providing a medical basis. In cases where IDOC did test hormone levels, they were below the therapeutic range.

Moreover, Plaintiffs' experts testified surgery can be medically necessary to treat gender dysphoria, but IDOC has not evaluated a single transgender inmate for surgery. Failing to provide care for a non-medical reason or inexplicably delaying treatment with no penological purpose can amount to deliberate indifference. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Also, "[r]efusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture." *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011).

In addition, IDOC is aware of the serious side effects of the hormones it administers to transgender inmates. Dr. Puga testified hormones caused a transgender inmate to have a stroke that left her partially paralyzed and impaired her speech. Spironolactone and Estradiol, the two agents involved in hormone therapy for transgender women, can cause heart arrhythmias, kidney failure, blindness, and death. Despite these potentially lethal side effects, IDOC does not monitor inmates who take

Higgins-000374

hormones in accordance with the Endocrine Society Guidelines. Dr. Tangpricha reviewed relevant medical records from all putative class members and testified IDOC did not monitor ninety percent of those inmates in accordance with the Endocrine Society Guidelines and did not monitor approximately twenty-five to fifty percent of the inmates at all. For instance, IDOC did not monitor Kuykendall's hormone levels until two years after she started hormone therapy.

Plaintiffs also have put forth evidence that the Transgender Committee is unqualified to make medical decisions for transgender inmates. Dr. Puga is the Chair of the Committee but has never treated a patient primarily for gender dysphoria and is not familiar with the Endocrine Society Guidelines. Dr. Meeks, a medical doctor on the Committee, has never prescribed hormones to a patient (Doc. 123, Ex. 11). Although the Committee consults with Dr. Reister, he testified he defers medical decisions to Dr. Puga, and he is not familiar with the Guidelines. Dr. Puga testified, however, that Dr. Reister has the most experience with transgender health. Dr. Ettner testified the Committee's uninformed decisions place transgender inmates at risk. "The Eighth Amendment protects a [prisoner] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original).

There is also evidence that IDOC prevents Plaintiffs' social transitions by misgendering inmates and denying them access to female commissary items. Social transition is "an important component of medical treatment" and misgendering someone

Page **34** of **39**

Higgins-000375

Case 3:18-cv-00156-NJR Document 186 Filed 12/19/15 Page 35 of 39 Page ID #2354

with gender dysphoria is "traumatic" (Doc. 158 pp. 15, 18). Here, Plaintiffs have repeatedly requested access to commissary items like lotion, makeup, hair brushes, and female undergarments. IDOC often denies or fails to respond to these requests. At best, IDOC provides a bra to transgender inmates residing at male facilities. Also, Plaintiffs testified IDOC staff members call transgender inmates "him," "dude," "it," and "he-she" (Doc. 157, p. 38). IDOC's denial and/or delay of necessary social transition items has exacerbated Plaintiffs' deteriorating mental states. Based on the above, Plaintiffs have met their burden of showing a likelihood of success on the merits for purposes of a preliminary injunction.

**Irreparable Harm and Inadequate Remedy at Law**

The party moving for a preliminary injunction must demonstrate he or she will likely suffer irreparable harm absent the injunctive relief. *Whitaker By Whitake v. Kenosha Unified School district No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "This requires more than a mere possibility of harm" but "does not, however, require that the harm actually occur before injunctive relief is warranted." *Id.* Also, the moving party must demonstrate there is no adequate remedy at law because "any award would be seriously deficient as compared to the harm suffered." *Id.* at 1046 (internal quotations omitted).

Here, Plaintiffs testified that the lack of proper treatment for gender dysphoria has caused them serious mental health issues. Kuykendall stated, "Every day my requests for gender-affirming surgery, hormone monitoring, gender-affirming clothing, and being able to be myself in a women's facility go ignored, I feel myself slipping into a deeper

Higgins-000376

depression. I am struggling with constant thoughts of self-harm." Melendez stated her inability to socially transition is "extremely upsetting" and she has experienced thoughts of suicide in the recent past. Monroe has already attempted suicide because of her gender dysphoria and has mutilated her genitals on several occasions. Moreover, Dr. Ettner and Dr. Tangpricha testified that untreated gender dysphoria can lead to anxiety, depression, self-harm, and suicide. In this case, there is no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages. *See Whitaker*, 858 F.3d at 1045-46 (suicide and diminished well-being do not have an adequate remedy at law and are irreparable harms).

**Balance of Harms and Public Interest**

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Id.* at 1053. The balance of harm substantially weighs in favor of granting injunctive relief. Plaintiffs continue to suffer physical and mental anguish on a daily basis and are at risk of self-mutilation and death. In contrast, Defendants have not identified any harm they will suffer if an injunction were granted.

Moreover, the public has the "highest" interest in preventing the violation of a party's constitutional rights. *See United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."). Also, "[t]he public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *Flynn v. Doyle*, 630 F.Supp.2d 987, 993 (E.D. Wis. Apr. 24, 2009). Accordingly, Plaintiffs have met their burden in moving for a preliminary injunction.

Page **36** of **39**

Higgins-000377

**Ongoing Violations**

Defendants argue Plaintiffs are not entitled to injunctive relief because they cite medical records from several years ago and do not put forth recent evidence to establish an ongoing violation. But Plaintiffs have provided plenty of evidence that IDOC continuously fails to provide adequate treatment to inmates with gender dysphoria. Melendez stated her hormone dosage is ineffective (Doc. 157, pp. 23-24); Reed and Melendez testified they do not have access to female commissary items that would facilitate their social transitions (*Id.* at pp. 33-24, 81-82); the Transgender Committee has never evaluated a single inmate for surgical intervention (Doc. 158, p. 120); and the medical records suggest IDOC fails to adequately monitor inmates' hormones (Doc. 123, Ex. 6, p. 2).

## INJUNCTIVE RELIEF

For the reasons set forth above, the Court **GRANTS** Plaintiffs' request for preliminary injunctive relief (Doc. 123). The Court **ORDERS** Defendants to immediately:

1. cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria and develop a policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria;

2. cease the policy and practice of denying and delaying hormone therapy for reasons that are not recognized as contraindications to treatment, ensure timely hormone therapy is provided when necessary, and perform routine monitoring of hormone levels; and

3. cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance.

Page **37** of **39**

Higgins-000378

The Court **FURTHER ORDERS** Defendants to:

1. develop policies and procedures which allow transgender inmates access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria;

2. allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications of the condition;

3. develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items; and

4. advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates.

As an additional point, the Court notes that no IDOC representative attended *any* portion of the two-day preliminary injunction hearing. Because the Court is concerned that IDOC is not taking Plaintiffs' allegations in this lawsuit seriously, the Court **ORDERS** that each named Defendant shall read the transcript of the evidentiary hearing held on July 31-August 1, 2019 (*see* Docs. 157, 158) and certify to the Court, on or before **January 6, 2020**, that he has done so.

The Court recognizes that these changes will take time, but it in light of the serious deficiencies in IDOC's treatment of transgender inmates set forth above, the undersigned seeks assurance that progress is underway. There is a long way to go, and the issue must be promptly addressed. Thus, on or before **January 22, 2020**, Defendants **SHALL** notify the Court in writing what actions they have taken to implement the directives of this Order. The Court will at that point address Plaintiffs' request for a court-appointed medical expert to oversee implementation of the preliminary injunctive relief in this

Higgins-000379

Order.

In light of its rulings above, the Court **DENIES** at this time Plaintiffs' motions for leave to supplement the record (Docs. 166, 175). Plaintiffs will be given an opportunity to respond to IDOC's compliance with the Court's Order. As set forth in footnote 1, Plaintiffs' counsel shall advise the Court in writing concerning Ms. Monroe's current condition on or before **January 6, 2020**.

Finally, the Court **DENIES** the recently filed motion for status conference (Doc. 185). A status conference will be set after Defendants have an opportunity to respond to the Court's Order.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

**IT IS SO ORDERED.**

**DATED:  December 19, 2019**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

Page **39** of **39**

Higgins-000380