# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| SAMUEL "NIYEH" HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-50038 |
| | ) | |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Niyeh Higgins, through her attorneys, the Community Justice and Civil Rights Clinic at Northwestern Law School, submits the following Statement of Additional Material Facts pursuant to Local Rule 56.1(b)(3).

### BACKGROUND ON PLAINTIFF

1. Plaintiff Niyeh Higgins is a transgender woman who has identified as female since she was five years old. She was admitted, recognized, and processed as a transgender woman when she entered Illinois Department of Corrections ("IDOC") custody on March 19, 2018. Dkt. 165-1 (Higgins Dep.) at 19:16-22; Ex. A (Expert Report of Dr. Nick Gorton) at 11; Ex. B (Early IDOC Records) at 1, 41-43; Ex. C (IDOC email RE identified as transgender) at IDOC 1259.

2. IDOC documents noted that Plaintiff needed a bra and had developed breast tissue, including b-cup breasts; the documents recommended Plaintiff be designated vulnerable because of her transgender identity. They further reflected that Plaintiff had started thinking of herself as a female from a young age; that she strongly desired to have the sexual characteristics of the female gender and exclusively dressed as a woman outside of

1

IDOC; and that she had taken estrogen hormones for seven years to obtain female sex characteristics. Plaintiff was diagnosed with gender dysphoria during an April 24, 2018 assessment. Ex. B (Early IDOC Records) at 41-43, 64.

3. Within IDOC, Plaintiff was designated SMI—"seriously mentally ill"—which increased her risk of being assaulted. Ex. D (Dynan Report) at 24, 47; Ex. E (IDOC Prison Rape Elimination Act "PREA" manual) at 57 (listing metal illness as risk factor for vulnerability to sexual abuse); Dkt. 168 at, *e.g.*, IDOC 280, 302, 308, 1031 (noting that Plaintiff has been designated SMI).

### *MONROE V. BALDWIN* INJUNCTIONS

4. The IDOC was sued in a class action lawsuit, *Monroe v. Jeffreys*, where a class of transgender prisoners alleged that they were endangered and discriminated against as a result of IDOC's policies and practices. On December 19, 2019, the court in that case entered a preliminary injunction order finding that the IDOC made placement decisions that put transgender women at risk and routinely subjected them to harassment. Among other relief, the court ordered individualized placement determinations for transgender women and that the IDOC "avoid" allowing male correctional officers to strip search transgender women. Ex. F (Dec. 2019 *Monroe v. Jeffreys* order) at 1, 34, 37-39.

5. At Pontiac and Dixon, the December 2019 preliminary injunction was interpreted to mean that transgender women who asked to be searched by female officers should be searched by female officers. Officers were instructed that female officers should search transgender women who so requested. But officers at Dixon or Pontiac did not comply with that policy while Plaintiff was incarcerated, who was searched only by male officers during her incarceration. Ex. G (Locke Dep.) at 48:11-50:8; Ex. D (Dynan Report) at 13; Dkt. 165-1 (Pl. Dep.) at 97:9-11.

6. On August 9, 2021, Judge Rosenstengel entered a second preliminary injunction that reaffirmed that transgender women (prisoners who had requested evaluation or treatment for gender dysphoria, like Plaintiff) must be searched by a correctional officer of the gender they requested, ordering that such prisoners "shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested." IDOC was also ordered to evaluate every transgender prisoner who had requested transfer to a facility matching their expressed gender for transfer within 120 days. Ex. H (August 2021 Inj.) at 2, 4.

## PLAINTIFF'S HARMS WHILE INCARCERATED

I. **Sexual and physical attacks, threats, verbal and emotional abuse, and misgendering.**

    A. **Systemic issues.**

7. The significance of the "vulnerable" designation is that inmates labeled "vulnerable" receive different housing assignments and classification to protect them from abuse by other inmates. As of July 2021, more than three years after IDOC first recommended that Plaintiff be designated "vulnerable," Plaintiff's status as "vulnerable" or "not vulnerable" was "still under review." Dkt. 168 at IDOC 861; Ex. I (Nottingham Dep.) at 87:13-89:22; Ex. D (Dynan Report) at 17.

8. According to policy and training, IDOC investigators who investigated sexual harassment or assault were required to collect evidence relevant to the investigation; interview the complainant within 72 hours; and identify and interview any possible witnesses. Ex. J (Anglin Dep.) at 19:10-20:9; 22:7-21; 23:2-26:18.

9. In IDOC's investigations of sexual harassment and assault, if the perpetrator denied the allegations, and the only evidence was statements from the victim and the perpetrator, a

3

finding of "unsubstantiated" was always deemed appropriate. Even if multiple inmates corroborated that there was a PREA violation by a correctional officer, IDOC would not sustain the complaint if the officer denied it and there was no additional evidence. Notably, most investigation reports contain no indication that investigators make any effort to seek out such evidence. Ex. J (Anglin Dep.) at 31:15-24; 33:4-34:17; Ex. D (Dynan Report) at 49.

10. IDOC did not require investigators who investigated sexual assault and harassment to ask accused officers specifically about the acts they were accused of. If the corrections officer made a blanket statement that they had never acted inappropriately, investigators were not required to inquire further. Ex. J (Anglin Dep.) at 40:18-44:22.

11. In PREA complaints involving Plaintiff, IDOC investigators almost never sought statements from witnesses, including officers or prisoners who would have seen or heard the events at issue; frequently allowed officers to give vague or general answers without specifying whether they have a memory of the event at issue and, if so, what they remember happening. Ex. D (Dynan Report) at 24; 49-50.

12. Across dozens of PREA complaints made by Plaintiff, staff and investigators failed to properly identify sexual abuse complaints (which they misclassified as the lesser offense of sexual harassment); failed to adequately investigate multiple sexual abuse complaints, including above-mentioned complaints against Schmeltz and Demon; failed to promptly, thoroughly, and objectively investigate complaints; failed to ask probing questions; failed to get concrete answers from responding officers about the actions they took or whether they had any memory of the alleged events; failed to identify and address all the relevant

allegations by Plaintiff; and permitted undue delays in interviewing accused officers. Ex. D (Dynan Report) at 29.

13. IDOC kept a list and count of its transgender prisoners and the facilities where they resided, but it never analyzed data about PREA complaints based on transgender status-in other words, it never used the information it had to determine how much its transgender prisoners were suffering additional abuse, harassment, or violence, even after it was put on notice through the two injunctions the agency was failing at managing its transgender population. Ex. I (Nottingham Dep.) at 44:20-23; 100:3-22; 103:11-104:6; Ex. D (Dynan Report) at 13-14.

14. Throughout Plaintiff's incarceration, administrators failed to ensure that staff were informed of or complied with directives for the treatment of transgender persons. Ex. A (Gorton Report) at 19.

15. During the times relevant to Plaintiffs' claims, Pontiac and Dixon did not do anything to specifically address the safety of transgender prisoners under their care. Ex. G (Locke Dep.) at 25:24-27:1.

**B.** **Harms at Pontiac.**

16. In January 2021, Plaintiff filed a PREA complaint about another prisoner, Carl Furrell, who had sexually harassed her and threatened her, causing her to feel unsafe. The PREA investigation lasted just two weeks. There was evidence that the two had traded consensual love notes before Furrell's notes turned violent when he wrote: "You played with my heart and there's a zero percent chance this goes unpunished." The investigation was closed because the investigator concluded there was no sexual content in the notes. But the notes had extensive and repeated sexual language, including Furrell describing the size of his penis, calling Plaintiff "sexy," and describing how Furrell had not

5

masturbated in two months. Furrell lied that he had not written sexual messages to Plaintiff and the investigator believed Furrell instead of reading the messages. Ex. L (2021-PON-5027) at IDOC 10072-73, 10077; Ex. K (Anglin Dep. - Confidential) at 64:22-66:5; Ex. D (Dynan Report) at 26-27.

17. IDOC admitted that its investigation into Plaintiff's sexual harassment allegations against Furrell was insufficient and did not meet its own standards, including that it was not sufficiently thorough. Ex. K (Anglin Dep. - Confidential) at 61:6-62:7; 70:8-71:2.

18. On numerous other occasions while incarcerated at Pontiac, Plaintiff suffered repeated assaults, harassment, sexual threats, and bullying by IDOC prisoners. Dkt. 168 at IDOC 358, 362; Ex. M (2020-PON-5211) at IDOC 9138, 9141 (prisoner threatening to force Plaintiff to give him oral sex); Ex. N (2020-PON-5626) at IDOC 9182 (prisoners making sexual advances and threats of physical harm).

**C.  Harms at Dixon.**

19. On May 30, 2021, Correctional Officer Galor taunted Plaintiff, stating, "take your faggot dicksucking ass on and that's why I be fucking your mom." Plaintiff tried to file a PREA complaint, but the sergeant on duty would not allow her to do so. In the PREA investigation, Plaintiff's cellmate Shabazz corroborated that an officer made inappropriate statements to Plaintiff during this incident. An IDOC representative confirmed that the investigators should have corroborated whether Shabazz could identify the officer, which the investigators did not do. Ex. O (Grievance 211981) at IDOC 1573; Ex. P (PREA 2021-DIX-5153) at IDOC 10033-10055; Ex. D (Dynan Report) at 27; Ex. K (Anglin Dep. - Confidential) at 53:4-55:1.

20. On August 24, 2021, Officer Shippert verbally abused Plaintiff, calling her a "dude" and a "dick sucking fag." After asking for a PREA, Plaintiff was told that a PREA complaint

would not be an appropriate response. Ex. Q (2021-DIX-5247) at IDOC 9760; Ex. R (Grievance 213191) at IDOC 1450-51.

21. At Dixon, Plaintiff was bullied by other prisoners, who refused to share a washing machine with her, use the phone after she used it, or even sit next to her at meals. Correctional officers repeatedly used slurs against her like "sissy" and "faggot." Ex. S (Clark Decl.) at ¶¶ 7-8.

22. At Dixon there is a well-established culture of sex-based discrimination. Sexual harassment claims are not taken seriously and result in retaliation against the complainant. Instead, people who made complaints of sexual harassment were ostracized. Dkt. 165-4 (Kemmeren Dep.) at 49:17-52:24.

23. During her time at Dixon, Plaintiff was assaulted and harassed multiple times by IDOC staff. Officers also repeatedly threatened her with physical and sexual violence, made fun of her, told her she wasn't a woman, and used slurs against her. Dkt. 168 at IDOC 791-793; Dkt. 165-1 (Pl. Dep.) at 40:15-42:7; Ex. T (Grievance 212547) at IDOC 1390-93 (officer repeatedly misgendered Plaintiff while confronting Plaintiff for wearing nail polish , then admonished her that "this is a man's prison and (Plaintiff is a man"); Ex. U (Grievance 212971) at IDOC 1445 (complaining that Defendant Kemmeren continually harassed, taunted, poked fun, and discriminated against Plaintiff and other openly transgender prisoners); Ex. V (Grievance 213560) at IDOC 1434-36 (officer called Plaintiff a "faggot ass").

**D.     Slurs and misgendering.**

24. During the relevant times Plaintiff was incarcerated, staff were trained that intentional misgendering, including intentionally referring to a transgender woman like Plaintiff as "he" or "him," constituted sexual harassment. Ex. I (Nottingham Dep.) at 36:9-18.

25. Correctional officers, supervisors, grievance officers, PREA investigators, and prison administrators consistently misgendered Plaintiff, referring to her as "he," "him," "it," and other, more offensive terms. Even the grievance officers responsible for reviewing Plaintiff's complaints of misgendering consistently misgendered her. In fact, in widespread violation of IDOC's supposed policy, **none** of the 39 grievance responses reviewed by Dr. Gorton referred to Plaintiff using her female pronouns. Most of the reports reflecting Plaintiff's medical care similarly fail to appropriately identify her gender. Ex. A (Gorton Report) at 20-21, 25; Ex. W (Grievance No. 214138); Ex. X (Grievance No. 214887); Ex. Y (Grievance No. 214120); Ex. T (Grievance No. 212547); Ex. Z (Grievance No. 89071); Ex. AA (Grievance No. 212757); Ex. BB (Grievance No. 214938).

26. While Plaintiff was incarcerated at Pontiac and Dixon, she suffered a pattern of harassment and abuse that was consistent with a culture of transphobia in which staff were permitted to intentionally traumatize Plaintiff. Staff were allowed to demean and degrade Plaintiff, and unprofessional and harassing behavior was consistently condoned. Ex. A (Gorton Report) at 19; Ex. D (Dynan Report) at 46-48.

## II. Abusive strip searches and other discrimination.

### A. Systemic issues.

27. IDOC trained all staff members on how to conduct pat-down searches of transgender prisoners. Specifically, IDOC security staff were trained to search transgender females who have breasts the same way they would search cisgender females. Security staff were trained to consider a transgender females' breasts as private. Ex. I (Nottingham Dep.) at 28:3-29:8; 54:6-12.

28. From 2019 to April 2021, Plaintiff repeatedly complained that she felt violated and uncomfortable by strip searches by male officers and that she believed female officers should be strip searching her. According to IDOC policy, those complaints should have been documented and provided to the Transgender Committee to review the reports and decide whether to grant a search accommodation (like being searched by female officers). However, her complaints were never presented to the Transgender Committee, and the Transgender Committee never considered granting her search accommodations or informed her that such accommodations were available. In fact, the Committee's forms were written so that search accommodations would not generally be considered for transgender prisoners. Ex. D (Dynan Report) at 11-12, 43; Ex. I (Nottingham Dep.) at 58:13-59:3.

29. Plaintiff never gave free consent to any strip search by male officers; she was coerced into each one. Staff repeatedly used threats to get her to acquiesce to searches. Ex. A (Gorton Report) at 17-18; Ex. D (Dynan Report) at 46-47; Dkt. 165-1 (Pl. Dep.) at 24:12-21.

**B.     Harms at Pontiac.**

30. At Pontiac, male correctional officers often strip searched Plaintiff and cursed her out, calling her "faggot" and "retard." They refused to give Plaintiff anything to cover up with during strip searches and refused to give Plaintiff blankets when the heating was not working and it was very cold, even though they gave blankets to everyone else. Ex. CC (Turner Decl.) at ¶¶ 6-7.

31. On July 19, 2020, Plaintiff was strip searched by male officers in a cage that was in plain view of other prisoners, and during which time numerous people passed by and could see her naked. The grievance was denied because the Administrative Review Board could not

9

substantiate that staff at Pontiac were **<u>aware</u>** of an injunction imposing requirements on searches of transgender prisoners. Plaintiff's grievance and appeal were resolved on April 30, 2021. Ex. DD (Grievance 86983) at IDOC 1234, 1236-37; Ex. A (Gorton Report at 19).

32. On July 22, 2020, CO Eric Myers strip searched Plaintiff in a holding tank where her naked body was exposed to others and further harassed Plaintiff. Plaintiff filed a PREA complaint, but the investigator never contacted any witnesses; instead, the investigator documented generalized denials from the involved officer (without asking specific questions about the incident) two months after the complaint and then denied the allegations without collecting the necessary evidence. Ex. D (Dynan Report) at 25-26; Ex. EE (PREA 2020-PON-5408) at IDOC 9158, 9163, 9170.

33. On January 22 and 23, 2021, Plaintiff was again subjected to strip searches by a male officer over her objections, and was exposed to numerous staff and prisoners while she stood naked in her cell. A lieutenant told her, "You are a man, this is a male prison, you will either strip or you don't go outside." The involved lieutenant was never asked about his statement or investigated, even after Plaintiff made a PREA complaint. Ex. FF (2021-PON-5056 and 2021-PON-5057) at IDOC 9195, 9200, 9212, 9217; Ex. D (Dynan Report) at 27.

34. At Pontiac, officers repeatedly strip searched Plaintiff and exposed her naked body to other prisoners, including by strip searching her in her cell and allowing others who were walking by to see her naked. Plaintiff was called names while this occurred. Ex. CC (Turner Decl.) at ¶¶ 5, 13.

### C.   Harms at Dixon.

35. On May 26, 2021, Plaintiff requested a female officer to search her but was told that no female officer would come. She was threatened with disciplinary reports, loss of privileges, and use of "Orange Crush" (a tactical team) if she did not strip for a male officer during a strip search. She was mocked, humiliated, and called slurs during the incident. Dkt. 165-1 (Pl. Dep.) at 42:8-46:7; Ex. D (Dynan Report) at 20.

36. On August 24 2021, Plaintiff was again told that she must submit to a strip search by a male officer or the tactical team would be called to forcibly strip search her. After she acquiesced under this threat, Plaintiff was sexually harassed and threatened with sexual assault by other inmates and was harassed by officers, and was left naked and exposed in the cage for over 30 minutes. Defendant Kemmeren wrote, falsely, that Plaintiff had "consented" to the search, which was not a permissible option under IDOC policy. The grievance was sustained as a violation of IDOC policy. Ex. A (Gorton Report) at 17; Ex. GG (Grievance # 213190) at IDOC 1359, 1361-62, 1371-72; Ex. G (Locke Dep.) at 52:10-53:24 (testifying on behalf of IDOC that Dixon never instructed supervisors that transgender women should be asked to consent to searches by male officers; that other female staff supervisors could have conducted the search; and that Dixon never gave permission to male officers to strip search transgender women).

37. At Dixon, all transgender female prisoners who requested searches by female officer should have been searched by female officers. However, this never occurred, and **no** female staff members at Dixon conducted strip searches of transgender prisoners during Plaintiff's incarceration. Plaintiff was never strip-searched by a female officer during her incarceration at IDOC: not after Judge Nancy Rosenstengel entered a preliminary injunction against IDOC on December 19, 2019; not after Plaintiff brought the injunction

to the attention of IDOC staff on February 2, 2020; not after Director Jeffreys signed off on grievances specifically noting the injunction on 10/21/20 and 4/30/21; not after IDOC officially adopted a policy allowing Plaintiff the right to be searched by female officers on (absent exigent circumstances) on April 2021; and not after Judge Rosenstengel entered a further preliminary injunction which was communicated to IDOC staff in August 2021. Instead, while incarcerated at Dixon, Plaintiff was told that being searched by female officers would "never happen." Ex. A (Gorton Report) at 18-20; Ex. D (Dynan Report) at 12; Dkt. 165-1 (Higgins Dep.) at 93:17-94:8; 97:9-11.

38. Plaintiff was forced to shower while being viewed by male prisoners, and denied access to private, transgender-friendly showers, at Dixon and Pontiac. This, along with other actions by correctional officers to expose her naked body to other prisoners and staff during searches, caused Plaintiff to be sexually harassed and increased her risk of sexual assault. These exposures continued after Plaintiff was sexually assaulted by another prisoner with the nickname "Demon," and exacerbated the traumatic impact of being sexually assaulted. Ex. A (Gorton Report) at 22-23, 26; Ex. HH (Grievance #86198) at 1-3; Ex. II (Grievance # 212458) at IDOC 1806, 1808-09; Ex. JJ (Grievance # 211969) at IDOC 1460-61.

39. On November 6, 2021, Plaintiff was forced to submit to a strip search by a male officer in order to participate in a scheduled visit. A male officer strip searched her, got an erection during the strip search, made Plaintiff aware that he was erect, and left the door open so that others could see Plaintiff's breasts during the search. After the incident, Plaintiff spoke to the warden of Dixon, but the warden told Plaintiff that "a female searching a

12

trans inmate is zero to none" - in other words, it "would basically never occur." Plaintiff asked for a PREA, but none was initiated. Dkt. 165-1 (Pl. Dep.) at 89:7-95:2.

40. In response to the November 6, 2021 incident, Plaintiff filed a grievance. However, that investigation did not address the failure to initiate PREA. It did not address the issue of failure to ensure a female officer was available to search. It did not address the officer getting an erection or intentionally exposing Plaintiff' naked body to others during a strip search. Instead, Internal Affairs denied the grievance "as it is reported that Higgins consented to the strip search." Ex. KK (Grievance 214294) at IDOC 1373-76; Ex. D (Dynan Report) at 23.

## III.    Retaliation.

41. At the time of an audit in July 2021, no one filled the role of retaliation monitor at Pontiac. There is no evidence to show that Pontiac engaged in any retaliation monitoring from 2019 through 2021. Ex. G (Locke Dep.) at 35:22-37:20.

42. According to IDOC policy, in-person check-ins were required with complainants for all complaints of sexual harassment or sexual abuse every 30 days for the first three months following the complaint. However, Plaintiff never received any retaliation monitoring for any of her dozens of complaints of sexual harassment or sexual abuse. Additionally, IDOC never monitored whether retaliation monitoring was occurring for PREA complaints made by transgender prisoners. Ex. D (Dynan Report) at 10; Ex. I (Nottingham Dep.) at 106:2-107:6.

43. At Dixon, around May 2021, Officer White refused to let Plaintiff take showers as retaliation for the PREA complaints she had filed, and the control officer told Plaintiff that she had to apologize if she wanted to take a shower. IDOC did not question the involved officer about whether he had denied Plaintiff a shower and IDOC never

questioned the control officer about the incident. Ex. D (Dynan Report) at 19-20; Ex. JJ (Grievance # 211969) at IDOC 1460.

44. In retaliation, Officer White submitted a disciplinary ticket that Plaintiff had "threatened to file a PREA" on him. In fact, officers and the control officer had regularly called her a "whiny bitch" and the control officer had called her a "whiny ass dick sucking bitch" and a "faggot ass mother fucker." Defendant Kemmeren instructed a mental health professional not to give Plaintiff a PREA and not to file an incident report. Plaintiff was found guilty for "threatening" to file a PREA and was punished, including losing privileges. Dkt. 168 at IDOC 791, 793; Ex. LL (Grievance 212365) at IDOC 1524; Ex. D (Dynan Report) at 19-20.

## IV. Transgender committee and transfer requests.

45. IDOC had a Transgender Committee (which went by different names during Plaintiff's incarceration, and was eventually split into two separate committees), which was responsible for approving accommodations for transgender inmates like Plaintiff, including housing accommodations, search accommodations, other accommodations for commissary and safety, gender-affirming surgery, and transfer to women's prisons. Dkt. 165-16 (Puga Dep.) at 9:21-10:14; 26:11-27:1; Ex. D (Dynan Report) at 15.

46. Until April 2021, IDOC had no criteria to consider requests for transfer to a women's prison by transgender prisoners, nothing was done to make transgender prisoners aware of that option, and there was no paperwork or form designated for that purpose. Dkt. 165-16 (Puga Dep.) at 16:12-18:5.

47. The transgender committee failed to address requests for transfers to women's prisons, failed to request search accommodations, lacked relevant information necessary to make decisions, failed to review PREA issues in a systematic way, failed to address Plaintiff's

14

concerns about housing, failed to review relevant facts and requests for Plaintiff, and failed to follow IDOC's own policies, which was attributable to Defendant Jeffreys' failing to take action to address the harassment and abuse of transgender prisoners who faced dangerous conditions. Ex. D (Dynan Report) at 42-45.

48. During the time she was incarcerated, Plaintiff was placed in a men's prison solely because she had been held in a men's jail before she was transferred to prison. Dkt. 165-16 (Puga Dep.) at 12:21-14:3.

49. Plaintiff repeatedly requested transfer to a women's prison, including once in February 2019, three times in January 2021, and once in December 2021. Her requests were not evaluated. The IDOC's efforts to assess Plaintiff for placement in a women's prison were not just inappropriate, but were essentially non-existent. Ex. A (Gorton Report) at 24; Ex. MM (Grievance 77171); Dkt. 165-18 (CHAMPS) at 1180; Ex. L (2021-PON-5027) at IDOC 10067-68; Ex. D (Dynan Report) at 44-45.

50. In her December 2021 transfer request, Plaintiff explained that Dixon had continuously violated her rights regarding PREA complaints and cross-gender searches and that the issue continued to occur. She explained that staff had written false incident reports that she had consented to searches by men when in fact she stated she was forced to be searched by males or told that the "Emergency Respon[se] team will come and forcefully search me." She stated that the Wardens had refused to address the issue and instead communicated that cross-gender searches would continue. IDOC never investigated or addressed those issues and never considered Plaintiff's transfer request. Ex. NN (Grievance 214799); Ex. D (Dynan Report) at 23.

51. According to policy, the Transgender Committee was supposed to review "any threats to safety experienced or posed by the offender." However, the Transgender Committee never evaluated any of the safety threats that Plaintiff experienced, including her complaints of sexual assault and harassment and threats against her. In fact, the transgender committee did not receive documentation of PREA complaints, incident reports, or other relevant documents, and the committee did not address Plaintiff's repeated concerns about housing, abusive searches, harassment, and misgendering. Ex. D (Dynan Report) at 9, 43.

52. Transferring Plaintiff to a women's prison would be expected to protect her from the emotional and physical trauma she endured while incarcerated, as well as her worsening PTSD, depression, anxiety, and suicidal ideation, within a reasonable degree of medical certainty. Ex. A (Gorton Report) at 25.

53. PREA Standard § 115.42 states: "In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." However, the Transgender Committee failed to follow PREA standards and policies as it evaluated Plaintiff and failed to implement the protections that Plaintiff was supposed to receive, jeopardizing Plaintiff's health and safety. Ex. D (Dynan Report) at 45; Ex. A (Gorton Report) at 25.

### BRIAN SCHMELTZ

54. Defendant Brian Schmeltz was familiar with transgender inmates and was able to identify inmates who dressed or talk more femininely than others. He was aware that transgender women housed in male facilities were vulnerable to sexual abuse and harassment. He

16

knew that he was absolutely prohibited from groping a transgender prisoner's sexual organs or breasts. Dkt. 165-7 (Schmeltz Dep.) at 92:25-93:9; Dkt. 165-8 (Schmeltz Dep.) at 120:9-18.

55. On January 1, 2020, Defendant Schmeltz and his female colleague, Officer Danielle Faletti, conducted a shakedown of Plaintiff's cell. Plaintiff told Schmeltz that she was a transgender woman with breasts who preferred to be searched by a female officer. In response, Schmeltz handcuffed Plaintiff to the cell bar and assaulted her, groping her breasts for more than a minute. Defendant Schmeltz then called Plaintiff a "faggot," said that he hated gay and transgender people, and threatened to harm her again. The entire search lasted multiple minutes, which was longer than a typical search, which only took seconds. Dkt. 165-1 (Pl. Dep.) at 23:3-24:1; 25:22-26:8; 26:22-28:10; 28:15-29:4; 31:2-7; Dkt. 165-14 (Schmeltz Investigation) at IDOC 1133, 1138; Ex. PP (Grievance 83692) at Higgins 307, 309-10.

56. When Schmeltz assaulted Plaintiff, Prentice was walking up and down the gallery and was nearby; in fact, Prentice "could [have] searched [Plaintiff] herself if . . . [her] intention was to actually . . . observe [Plaintiff's] rights and the rules." After being assaulted, Plaintiff was clearly in distress, yelling for a lieutenant or major to respond; Plaintiff spoke with Prentice, but Prentice did not help her and told Plaintiff to talk to someone else and that she didn't want to deal with the situation. Dkt. 165-1 (Pl. Dep.) at 31:8-33:19.

57. According to IDOC policy, Prentice should have written an incident report regarding Plaintiff's allegations to ensure that it was promptly investigated, but she did not do so. She was not interviewed in the subsequent investigation. Dkt. 165-14 (Schmeltz

17

Investigation) (lacking any written incident report from Prentice and reflecting that Prentice was not interviewed); Ex. I (Nottingham Dep.) at 37:13-17 (staff required to individually write incident report anytime they personally received a complaint of sexual abuse or harassment).

58. On February 18, 2020, Plaintiff filed a grievance explaining that Defendant Schmeltz had handcuffed her, groped her breast, destroyed her cell, told her he "hate[s] transgender and gay and faggot people," and stated that he would attack Plaintiff and her cellmate. Plaintiff subsequently appealed the denial of her grievance against Schmeltz, and the IDOC denied that appeal on February 3, 2021. The grievance should have been incorporated into the PREA investigation, but it was not. Ex. PP (Grievance 83692.) at Higgins 307, 309-10; Ex. D (Dynan Report) at 24-25; Ex. QQ (Grievance 83692 appeal) at Higgins 284.

59. The PREA investigation involving Plaintiff's complained-of sexual assault by Defendant Schmeltz was incomplete, leading to a premature and uninformed finding of "unsubstantiated." IDOC did not comply with the 60-day deadline to complete sexual assault investigations and instead waited nearly 8 months—until August 20, 2020—to interview Schmeltz and Faletti. Issues with the investigation included: the search took place after a preliminary injunction that was interpreted at Pontiac to require staff to allow incarcerated people to choose the gender of the person searching them; Schmeltz was not questioned as to whether he knew Plaintiff was transgender or had breasts; investigators did not seek any details from Schmeltz or Officer Faletti about what they actually did or what happened during the search; the investigator did not as probing questions from Plaintiff; the investigators did not question Plaintiff's cellmate; and

investigators did not seek or obtain any relevant documentation from the search. Ex. D (Dynan report) at 24-25, 30-32; Ex. K (Anglin Dep. - Confidential) at 75:13-80:2; 80:7-81:7; 82:5-84:20; Dkt. 165-14 (Schemltz investigation) at IDOC 1133, 1135, 1138.

**SUSAN PRENTICE**

60. Defendant Susan Prentice was the Major in Plaintiff's cellhouse while she was incarcerated at Pontiac Correctional Center. Prentice spoke to Plaintiff on a daily basis. Dkt. 165-1 (Pl. Dep.) at 106:20-23.

61. Although no supervisor instructed her to do so, Prentice personally determined that, at Pontiac, "inmates were not allowed to try to dress like women," including by wearing pants that were too tight. She forbid prisoners from wearing feminine clothing or wearing their uniform in a feminine style. However, Plaintiff had been approved to receive and wear feminine clothing, including a sports bra, which was consistent with IDOC policy that allowed clothing accommodations for transgender prisoners. Dkt. 165-6 (Prentice Dep.) at 128:16-133:8; 133:18-134:10; Dkt. 165-16 (Puga Dep.) at 32:19-33:15; Ex. RR (sports bra recommendation) at IDOC 102.

62. Prentice repeatedly referred to Plaintiff as a "faggot" and "homosexual" and used these slurs in front of other officers, and treated transgender prisoners differently and worse than other prisoners. At one time when Higgins was going to yard, Major Prentice said to Higgins "you can't go outside like that. Get your faggot ass upstairs." When Plaintiff complained about the harassment, Prentice would punish her for it by having officers destroy Plaintiff's possessions under the pretext of searching Plaintiff's cell, which she personally supervised. Ex. CC (Turner Decl.) at ¶¶ 14-17.

63. On July 29, 2020, Durre "walked full force into [Plaintiff] from the back," which resulted in Plaintiff suffering a back injury. Later that day, as Durre was distributing bleach to the

19

prisoners, he poured it all over the bars of Plaintiff's cell and the floor outside of her cell, and then mocked Plaintiff, stating that he was "not a good bartender" and threatening that he hated working in East House with "faggot ass crybabies like [Plaintiff]." Plaintiff reported the incident to Prentice, who should have completed a DOC 434 incident report but who instead, did nothing. Plaintiff's grievance appeal was decided on April 22, 2021. Ex. SS (Grievance 87099) at IDOC 1260-61, 1263-64; Ex. I (Nottingham Dep.) at 37:13-17 (staff required to individually write incident report anytime they personally received a complaint of sexual abuse or harassment).

64. In 2018, Officer Durre engaged in a prolonged harassment campaign against a fellow officer whom Officer Durre believed was gay. That officer had been tricked into hand-drawing a picture of a prisoner masturbating in a cell on a fictitious form labeled "DOC – 069". When Defendant Prentice received a copy of that form, she took no action to investigate or discipline anyone involved; instead, she distributed it further, including messaging another Major with a comment that "I thought it was funny and I thought I had wet my pants from laughing so much." Officer Durre called his fellow officer who had been tricked into making the drawing a "fag," made anonymous phone calls to the officer calling him a "faggot ass bitch," and pressed his body against the officer and asked, "do you want to draw this one?", referring to his own penis. Ex. TT (OEIG Report) at IDOC 3732, 3734-35, 3747, 3763-65; Dkt. 165-6 (Prentice Dep.) at 184:22-185:3.

65. Prentice she never took any action to protect transgender prisoners, including doing anything to prevent officers from conducting abusive strip searches, and she did not intervene to stop officers from calling Plaintiff slurs like "faggot," "dickeater," and

20

"dicksucker" or intervene to stop prisoners from bullying and demeaning Plaintiff. Dkt. 165-6 (Prentice Dep.) at 119:23-120:13; Ex. CC (Turner Decl.) at ¶¶ 12, 18.

66. Prentice's repeated use of transphobic and homophobic language signaled to staff and prisoners that they would be allowed to harass and abuse gay and transgender prisoners. She did not comport with correctional standards for supervision and failed to take actions that would be expected to protect vulnerable prisoners. Her actions endangered Plaintiff. Ex. D (Dynan Report) at 33.

67. Defendant Prentice knew that she understood that some prisoners were more vulnerable than others, that being transgender was one of the factors that contributed to that vulnerability, and that Plaintiff was "very feminine". Dkt. 165-6 (Prentice Dep.) at 73:2-17, 123:23-124:7.

DEFENDANT MICHELLE VICTUM

68. While incarcerated at Dixon, prisoner Tommie Johnson, who went by the nickname "Demon," began threatening Plaintiff, sending her sexually harassing messages that graphically depicted sex acts he was threatening her with. Demon repeatedly stood outside of Plaintiff's cell, masturbated, and made sexually inappropriate comments. Dkt. 165-1 (Pl. Dep.) at 47:3-17; 48:20-49:12; 55:3-7.

69. Plaintiff reported Demon's threats against her immediately after she was threatened to Defendant Michelle Victum (who worked in Plaintiff's housing unit) each time they occurred. Victum was required to document those reported threats via incident reports, but she did not do so, and she did not do anything to help Plaintiff. Dkt. 165-1 (Pl. Dep.) at 51:15-53:5 (describing how Victum was in the "officer's bubble," a big glass cage-like structure where officers could observe the entire gallery, and Plaintiff went there to complain of Demon's threats); Dkt. 165-15 (Demon investigation) (reflecting absence of

incident reports from Victum); Ex. A (Gorton Report) at 22-23; Ex. I (Nottingham Dep.) at 37:13-17 (staff required to individually write incident report anytime they personally received a complaint of sexual abuse or harassment).

70. On June 6, 2021, Demon masturbated in front of Plaintiff and then assaulted her by groping her while masturbating. Plaintiff's cellmate, Shabazz, witnessed both the notes as well as the assault on June 6, 2021. Dkt. 165-1 (Pl. Dep.) at 50:22-51:14, 54:23-56:12.

71. After Demon assaulted her, Plaintiff received no support other than a 10-minute session with a provider who misgendered Plaintiff and told Plaintiff she should try to "cope" with her assault. Demon's assault against Plaintiff exacerbated her gender dysphoria and significantly contribute to Plaintiff's PTSD. Plaintiff attempted suicide in July 2021, shortly after the incident. Ex. A (Gorton Report) at 22-23; Dkt. 168 at IDOC 811, 979.

72. Plaintiff filed a PREA complaint after Demon assaulted her. IDOC interviewed Plaintiff and Demon, and conducted no other interviews—not even Plaintiff's cellmate Shabazz, who was in the cell at the time of the assault. IDOC has admitted that Shabazz should have been interviewed promptly and that the file should have contained some justification for the long delay in investigating the complaint. Ex. D (Dynan Report) at 27-28; Ex. K (Anglin Dep. - Confidential) at 99:5-101:18; Dkt. 165-15 (Demon Investigation).

73. When Plaintiff asked Victum to refer to her as "she" and "her," Victum instead referred to Plaintiff as "sir" and as a male. Victum never did anything to prevent bullying and harassment against Plaintiff; she testified that ensuring transgender women were living in a respectful environment was "not my job." Dkt. 165-10 (Victum Dep.) at 145:22-146:2; Ex. S (Clark Decl.) at ¶¶ 11-14, 18.

74. Victum consistently referred to Plaintiff as "him" or "sir," refused to call Plaintiff by her last name or "her" or "she," told other incarcerated people to refer to Plaintiff as "him," not "she," and told another prisoner that she would pay him to hit Plaintiff—specifically, saying, "hit him [Plaintiff] in the mouth." Victum insisted that she would not call Plaintiff by "she" or "her" because Victum worked in a male institution. Victum was never questioned about asking one prisoner to punch another. Ex. D (Dynan Report) at 28-29; Dkt. 165-13 (2021-DIX-5316) at IDOC 1866.

75. Victum acknowledged that it was unsafe to encourage people who are incarcerated to inflict violence upon each other, and, specifically, that it would be unsafe to tell someone who is incarcerated to hit another incarcerated person. Dkt. 165-10 at 153:20-154:3; 227:4-18.

76. Victum's actions, including failing to use "she/her" to refer to Plaintiff and actively telling other prisoners not to do so, actively antagonizing and demeaning Plaintiff, telling other prisoners to "hit" Plaintiff, and failing to offer Plaintiff the same protection other prisoners received, failed to comport with accepted correctional standards and endangered Plaintiff. Ex. D (Dynan Report) at 35.

**JOANNA KEMMEREN**

77. Defendant Joanna Kemmeren was an Administrative Major at Dixon Correctional Center in 2021 and through the end of January 2022. As an Administrative Major, she was responsible for discipline and disciplinary referrals for security staff, which included the officers, sergeants, and lieutenants who staffed the various housing units at Dixon, and also to ensure that staff complied with policies, including strip search policy. She also conducted tours of the various housing units. Dkt. 165-4 (Kemmeren Dep.) at 27:15-29:14; 77:23-78:5.

23

78. Kemmeren knew that transgender prisoners were vulnerable to sexual harassment and sexual abuse in men's prisons. Dkt. 165-4 (Kemmeren Dep.) at 111:2-17.

79. Kemmeren knew that according to policy transgender prisoners who requested searches by female officers needed to be searched by female officers. However, her practice was to hold such prisoners until they "consented" to searches by male officers until, or unless, a female officer became available (which did not occur because all female officers at Dixon refused to conduct such searches and were not required to do so). Even if male officers did not seek a female officer to strip search transgender prisoners and instead required them to strip and threatened discipline for non-compliance, Kemmeren would not have sought disciplinary action, but just "correction for future instances." Dkt. 165-4 (Kemmeren Dep.) at 122:24-123:19; 125:5-126:15; Ex. D (Dynan Report) at 36-37.

80. Kemmeren knew that female staff members at Dixon refused to conduct strip searches of transgender prisoners—which violated policy. Dkt. 165-4 (Kemmeren Dep.) at 88:5-89:6; Ex. G (Locke Dep.) at 12:14-16:5.

81. Kemmeren testified that she heard officers at Dixon use the terms "faggot" and "tranny" in jokes and didn't stop them. She testified that when she heard other employees use the term "tranny" she "did not see anything wrong with it." By her position, she was required to take supervisory action when employees used language that was discriminatory, but she never corrected her employees' uses of the terms "tranny" or "faggot." Dkt. 165-4 (Kemmeren Dep.) at 186:1-189:14.

82. In April 2021, Plaintiff filed a grievance against Corrections Officer Talley for rubbing up against her after she requested an officer of the same gender to search her. When Plaintiff asked to file a PREA, Talley told Plaintiff she "needed to shut [her] faggot ass

up." The IDOC did not investigate Plaintiff's allegations, did not interview Plaintiff about the complaint, and did not initiate a PREA complaint despite Plaintiff's request. Defendant Kemmeren did not discipline the officer but instead simply moved him to a different unit, emphasizing that his actions were not inappropriate. Ex. UU (Grievance 211365) at IDOC 1430, 1432-33; Ex. D (Dynan Report) at 19; Dkt. 165-4 (Kemmeren Dep.) at 146:12-151:6.

83. In August 2021, Plaintiff sought protection from her cellmate, who was threatening her safety. In response, Kemmeren determined that Plaintiff needed "to fight or go back in [her] cell and fight or walk to segregation" and made transphobic comments. Kemmeren acknowledged that she would not allow Plaintiff to move without being disciplined and going to segregation, stating: "Higgins did not want to stay in their [sic] cell. I do not do room moves for any individual unless for medical reasons (i.e. low bunk issues). I treat everyone the same. If an individual no longer wants to live in their cell, then the individual can go to restrictive housing for refusing housing . . . Higgins chose to refuse housing". Dkt. 165-1 (Pl. Dep.) at 75:18-77:19, 113:10-114:3; Ex. U (Grievance No. 212971) at IDOC 1444-45.

84. Defendant Kemmeren acknowledged that she knew such an instruction—telling a prisoner they would have to fight to get moved out of their housing—would endanger that prisoner. Dkt. 165-4 (Kemmeren Dep.) at 117:22-118:2.

85. Kemmeren believed that "most times" prisoner PREA complaints were "just a manipulation tactic." She never disciplined any security staff for failing to document a PREA. Dkt. 165-4 (Kemmeren Dep.) at 65:18-66:10, 71:9-13.

86. Kemmeren was dismissive towards Plaintiff, treated her like she was bothering Kemmeren or wasting her time, and did not treat Plaintiff's complaints seriously. Kemmeren never did anything to prevent the bullying and harassment that Plaintiff experienced. Ex. S (Clark Decl.) at ¶¶ 15-18.

87. The officers at Dixon, whom Kemmeren supervised, often singled Plaintiff out and harassed her, and consistently refused to refer to Plaintiff as "she" or "her." Ex. S (Clark Decl.) at ¶ 18; Ex. VV (McClendon Decl.) at ¶¶ 5-9.

88. Defendant Kemmeren caused Plaintiff to be repeatedly strip searched by male officers even after injunctions were entered protecting her from those searches; was dismissive of Plaintiff's PREA complaints and at times instructed staff not to treat Plaintiff' complaints as PREA; responded to Plaintiff's safety concerns by forcing her to choose between danger (returning to her cell where she had been physically threatened) and discipline (committing the disciplinary offense of refusing housing); and did so despite knowing of the specific dangers Plaintiff faced as a transgender prisoner. Ex. D (Dynan Report) at 36-38.

**ROB JEFFREYS**

89. In its December 2019 order, the court in *Monroe v. Jeffreys* ruled: "Because the Court is concerned that IDOC is not taking Plaintiffs' allegations in this lawsuit seriously, the Court orders that each named Defendant shall read the transcript of the evidentiary hearing held on July 31-August 1, 2019, and certify to the Court, on or before January 6, 2020, that he has done so." After receiving an extension, on January 19, 2020, Defendant Rob Jeffreys certified to the court under penalty of perjury that he read the evidentiary transcripts. The testimony Defendant Jeffreys read included significant evidence regarding the risk of harm faced by transgender women in IDOC custody, including

26

transgender women who had been incarcerated at Dixon and Pontiac, where they had been sexually assaulted, harassed, abused, and retaliated against. Ex. F (Dec. 2019 *Monroe v. Jeffreys* order) at 38; Ex. WW (Jeffreys certification) at 5; Ex. XX (Monroe Transcript Day 1) at 37:1-20 (describing pattern of prison guards groping transgender prison's breast and buttocks and mocking and demeaning her); 71:10-72:15; (describing pattern of harassment and failure to address PREA complaints); 73:23-74:16 (describing harassment and violations by male officers during strip searches); 195:19-196:19 (describing prisoners and officers raping transgender prisoner); 197:6-198:23 (describing harassment, threats, and retaliatory punishments against transgender prisoner).

90. The testimony from the *Monroe v. Jeffreys* transcripts gave Defendant Jeffreys some knowledge of the risk of harm faced by transgender people in IDOC custody. Dkt. 165-3 (Jeffreys Dep.) at 90:23-91:15.

91. Jeffreys acknowledged that some transgender prisoners in IDOC suffered substantial harm because of IDOC's strip search policy. Dkt. 165-3 (Jeffreys Dep.) at 94:4-15.

92. In January 2020, Teri Kennedy, the warden at Pontiac prison, had received no training about bias and negativity encountered by transgender individuals; she had no information about whether prisoners could expect to be harassed for being openly transgender in a men's prison; she had not learned that transgender women were vulnerable to sexual abuse and physical violence in men's prisons; she could not recall receiving any training or guidance on privacy during showers for transgender female prisoners; and she could not recall any training or guidance on pronoun usage or addressing issues affecting transgender prisoners. This was a result of Defendant Jeffreys' refusal to take any action to protect transgender prisoners. Jeffreys never asked any of the wardens under his

27

supervision about the issues facing transgender prisoners under in their custody. Dkt. 165-5 (Kennedy Dep.) at 69:1-76:15; Dkt. 165-3 (Jeffreys Dep.) at 12:11-14; Ex. D (Dynan Report) at 38-39.

93. Defendant Jeffreys did not take any action to address the harassment of trans women; to stop transgender prisoners from being denied medical care; to stop transgender prisoners being attacked by male prisoners and guards; or to ensure that transgender prisoners would be searched by female officers. Dkt. 165-3 (Jeffreys Dep.) at 31:4-7; 35:23-37:16; 69:11-15.

94. Defendant Jeffreys acknowledged that Pontiac's decision in 2020—to have male officers strip search all prisoners—conflicted with a federal court order from December 2019 requiring IDOC to avoid cross-gender searches. However, Jeffreys did nothing to ensure that all staff were aware of protections for transgender prisoners ordered in the December 2019 preliminary injunction. Dkt. 165-3 (Jeffreys) Dep. at 74:4-19; 81:4-82:6; Ex. D (Dynan Decl.) at 38.

95. Although Jeffreys knew he was required to modify IDOC policies or procedures or at least ensure they were modified as a result of the December 2019 preliminary injunction, there is no evidence that Jeffreys ever did so. Dkt. 165-3 (Jeffreys Dep.) at 100:24-101:11; Ex. D (Dynan Report) at 38.

96. Defendant Jeffreys did nothing after learning about private Facebook groups where officers were mocking transgender inmates in a private, instead of personally taking action to address the harm of officers who harbor an anti-trans bias supervising trans people in custody. Dkt. 165-3 (Jeffreys Dep.) at 52:7-53:7.

28

97. Not only did Jeffreys do nothing himself to address the issues of harm to transgender people, he also never told his subordinates to address the issues raised in federal court injunctions affecting the prison system he ran. Dkt. 165-3 (Jeffreys Dep.) at 32:8-17; 33:6-34:2.

98. Defendant Jeffreys failed to require wardens to meet the basic requirements of the *Monroe* injunction as well as generally accepted standards for protecting transgender prisoners. He did not take actions that would be necessary and expected, from a correctional administration perspective, to ensure that Plaintiff and other transgender prisoners would be safe. Ex. D (Dynan Report) at 41-42, 50.

99. Dixon, Pontiac, and IDOC failed to take appropriate actions to protect transgender prisoners including: failing to follow IDOC policy on searches and harassment; failing to follow federal court injunctions; failing to conduct thorough PREA investigations; failing to conduct meaningful Transgender Committees; failing to hold staff accountable; failing to effectively communicate expectations regarding treatment of transgender prisoners and the federal court injunctions; and failing to monitor changes that, if implemented effectively, would have helped to protect Plaintiff. Ex. D (Dynan report) at 50.

100. It is common knowledge within corrections that transgender prisoners are at risk of sexual harassment and assault, and has been for decades. It is well-known that transgender prisoners are at extremely high risk of rape and sexual violence in prison. A reasonable corrections administrator would have known as much. Ex. D (Dynan Report) at 39-40, 47-48.

**OTHER MATTERS**

101. As of 2020, it was generally accepted that transgender prisoners were particularly vulnerable to harassment and assault, should be assessed for accommodations such as

29

searches by officers of the same gender identity, private showers, and, if appropriate and medically vetted, transfer to a prison of their gender identity. A 2014 report by the Bureau of Justice Statistics found that an estimated 35% of transgender prison inmates reported being sexually victimized in prison within the past 12 months. Ex. D (Dynan Report) at 7; Ex. OO (Bureau of Justice Statistics, PREA Data Collection Activities, 2015) at 2.

102.     Because of Defendants' assaults, harassment, and failures to protect her, Plaintiff suffered a great deal of emotional and physical trauma, as well as constant and profound exacerbation of her gender dysphoria. She suffered worsening PTSD, depression, anxiety, and suicidal ideation. Ex. A (Gorton Report) at 25-26.

103.     Plaintiff served a response to Defendants' contention interrogatories providing responses regarding the factual basis of her claims against Defendants. Ex. YY (Pl.'s Suppl. Resp's to Defs.' First Interrogs.) at ¶¶ 10, 12-19.

Respectfully submitted,

**SAMUEL "NIYEH" HIGGINS**
/s/ Wallace Hilke

One of Ms. Higgins's Attorneys

Wallace Hilke
Eliana Green
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave.,
Chicago, IL 60611
Phone: 312-503-2224
wally.hilke@law.northwestern.edu
*Attorneys for Plaintiff*