# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| SAMUEL "NIYEH" HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-50038 |
| | ) | |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR SPECIAL PROCEDURES TO ENSURE AN IMPARTIAL, UNBIASED JURY

Plaintiff Niyeh Higgins, by her undersigned attorneys, respectfully requests that this Court order special jury selection procedures to ensure an impartial, unbiased jury during her upcoming civil rights trial. In support, Plaintiff states:

### INTRODUCTION

Niyeh Higgins is a Black transgender woman who has brought suit under 42 U.S.C. § 1983 to redress the harassment and physical and sexual abuse that she suffered in the Illinois Department of Corrections ("IDOC") because of her gender identity. Ms. Higgins's gender identity is at the very core of her 8th Amendment claims. Anti-transgender bias is extremely pervasive: 60% of Americans say that gender is determined by sex at birth and more than half of all U.S. adults believe in increasing government restrictions on transgender people.[1] Potential jurors who do not accept the current state of the law cannot fairly decide the central question of

---

[1] Kim Parker et al., Americans' Complex Views on Gender Identity and Transgender Issues, Pew Research Center (June 28, 2022), https://www.pewresearch.org/social-trends/2022/06/28/americans-complex-views-on-gender-identity-and-transgender-issues/.
Transgender people in the United States face a wide variety of harms that call into question their right to exist freely. These harms range from everyday microaggressions that erase trans identity, such as misgendering, to physical and sexual harassment and violence that overtly threaten trans lives.

this case: whether the Defendants failed to protect Ms. Higgins from the harm she faced as a trans woman living in a men's prison.

Anti-transgender bias is markedly more common among adults[2] who—like much of the jury pool in the Northern District of Illinois—live in rural areas,[3] identify as white Evangelical Protestants,[4] or affiliate with the Republican party.[5] This Court should ensure that prospective jurors are screened for anti-transgender bias prior to jury selection by sending a preliminary questionnaire to a larger pool of prospective jurors, so that the panel is comprised of people who can impartially evaluate the evidence in Ms. Higgins's case.

Civil plaintiffs like Ms. Higgins have the right to trial by an impartial jury. *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 284 (7th Cir. 1980). The prevalence of anti-transgender bias among the demographics that comprise most of the District's jury pool poses a significant threat to Ms. Higgins's constitutional rights. Voir dire alone cannot cure these threats. Should this Court empanel a standard-sized venire of 18–24 people from a random cross-section of the

---

[2] Hailey A. Hatch and Ruth H. Warner et al., *Predictors of Transgender Prejudice: A Meta-Analysis,* Sex Roles 87 583 (2022), https://link.springer.com/article/10.1007/s11199-022-01338-6#Sec13.

[3] Jack Thompson, *Rural Identity and LGBT Public Opinion in the United States*, Public Opinion Quarterly, 87 956, (2023), https://doi.org/10.1093/poq/nfad045; Luke A. Boso, *Rural Resentment and LGBTQ Equality*, 71 Fla. L. Rev. 919, 921 (2019) (explaining how [j]udicial opinions and legislation protecting LGBTQ people from discrimination are perceived as serious threats to rural dwellers" and how rural communities typically "perceive urban LGBTQ people as particularly undeserving of special legal protection").

[4] Sethe Zachman, *American Perspectives on the Legitimacy of Transgender Identities,* University of Nebraska-Lincoln, Department of Sociology: Dissertations, Theses, and Student Research, 70 (Apr. 2024), https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1087&context=sociologydiss. As of 2021, 84% of white Evangelical Protestants believe that gender is determined at birth. Gregory A. Smith, *Views of Transgender Issues Divide Along Religious Lines*, Pew Research Center (Nov. 27, 2017), https://www.pewresearch.org/fact-tank/2017/11/27/views-of-transgender-issues-divide-along-religious-lines/.

[5] Pew Research Center, *5. Gender identity, sexual orientation and the 2024 election,* (June 6, 2024), https://www.pewresearch.org/politics/2024/06/06/gender-identity-sexual-orientation-and-the-2024-election/, (polling showing 90% of Trump supporters believe gender is determined by sex at birth). Brown, supra note 1 (versus 54% of all adults, 80% of Republican adults believe that gender is dependent on sex assigned at birth).

District, it is likely that Ms. Higgins will have cause to strike nearly every venire member at voir dire. This process will force the Court to empanel multiple venires. For this reason, Ms. Higgins requests that the Court require prospective jurors to complete the attached questionnaire in order to determine who is qualified to comprise the venire. The Supreme Court and the Seventh Circuit have recognized that trial judges have not only broad discretion, but also an affirmative duty to ensure an impartial jury. *See*, e.g., *Ham v. South Carolina*, 409 U.S. 524, 527 (1973); *Art Press, Ltd. v. Western Printing Machinery Co.*, 791 F.2d 616, 617 (7th Cir. 1986). Juror questionnaires, expanded venires, and extensive voir dire are all widely-accepted tools at this Court's disposal. In this case, a more thorough examination of a larger pool of prospective jurors is required to ensure the fairness of the jury as well as the efficient use of this Court's resources and time.

Pursuant to Local Rule 37.2, the parties conferred on March 3 and 4, 2026, but Defendants oppose Plaintiff's requested relief. This motion follows.

## LEGAL STANDARD

A trial judge exercises broad authority in ensuring that a litigant's constitutional rights are unimpeded. *United States v. Hosseini*, 679 F.3d 544, 554 (7th Cir. 2012) ("Jury selection is 'particularly within the province of the trial judge' and '[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire.'" (quoting *Skilling v. United States*, 561 U.S. 358 (2010))). In cases where juries may be particularly susceptible to bias, courts have discretion in how they may further screen jury venires to diligently and efficiently select an unbiased jury. In trials both large and small, courts have often sent a preliminary questionnaire to potential jurors in order to better prepare lawyers for voir dire. *See*, *e.g.*, *Skilling*, 561 U.S. at 371–72 (providing a 77-question survey to 400 prospective jurors to try the executives of Enron after a high-profile bankruptcy); *Arreola v. Choudry*, 533 F.3d 601, 603 (7th Cir. 2008) (using a pre-voir dire

questionnaire in an incarcerated person's 42 U.S.C. § 1983 suit alleging deliberate indifference to a serious medical need); *United States v. Contreras*, 108 F.3d 1255, 1259 (10th Cir. 1997) (discussing how the district judge sent 250 potential jurors a questionnaire prior to voir dire in a drug trafficking criminal case).

**ARGUMENT**

**I.      Ms. Higgins has a constitutional right to an unbiased jury.**

Like any trial, this case requires a jury that can fairly evaluate a case solely on the evidence before it and not based on bias. Impartiality "is inherent in the right of trial by jury and is implicit in the requirement of the fifth amendment that 'no person shall . . . be deprived of life, liberty or property, without due process of law.'" *Kiernan v. Van Schaik*, 347 F.2d 775, 778 (3d Cir. 1965); see also *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (plurality opinion) ("One touchstone of a fair trial is an impartial trier of fact.").

The right to an impartial jury applies with equal force to civil rights litigants and criminal defendants. When the Supreme Court considered racial discrimination in jury selection during a civil rights case, the Court wrote: "Civil juries, no less than their criminal counterparts, must follow the law and act as impartial factfinders . . . Racial discrimination has no place in the courtroom, whether the proceeding is civil or criminal." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630 (1991) (holding that a litigant in a civil personal injury case was entitled to a jury selection process free of racially discriminatory peremptory strikes by the opposing party); *Fietzer*, 622 F.2d at 284 (stating in a negligence case that voir dire is "subject to the right of the parties to have an impartial jury"); *Arreola*, 533 F.3d at 605 (in a civil prisoner suit alleging deliberate indifference in violation of the Eighth Amendment, the Seventh Circuit cited four

4

criminal cases to assert that the litigants had the right to an impartial jury and that trial judges had broad discretion to ensure the jury was impartial).

A jury is deemed partial if a juror has actual bias in the case at bar. *U.S. v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972). Courts generally look for two types of bias: 1) biases against either party, and 2) biases against the specific facts of the case. Biases against the parties often relate to aspects of parties' identities, such as racial identities, *Ham*, 409 U.S. at 527 (requiring that a judge question jurors about racial bias when the defendant was Black), or religious identities, *U.S. v. Daily*, 139 F.2d 7, 9 (7th Cir. 1943) (upholding questions to potential jurors about bias against Jehovah's Witnesses when the defendant was a Jehovah's Witness). Courts must also allow examination based on the facts of the case: "there must be permitted sufficient questioning to produce, in the light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." *United States v. Martin*, 507 F.2d 428 at 432 (7th Cir. 1974). There is the potential for both party bias and fact-based bias in this case.

As to party bias, a trial court has an affirmative obligation to ensure that potential biases against aspects of litigants' identities are fully vetted during the jury selection process. *Ham*, 409 U.S. at 527. In *Ham*, the Supreme Court reversed the trial court's holding for its failure to vet potential jurors for racial bias. *Id.* at 529. The Supreme Court held that a court's refusal to question jurors about potential racial biases violates the plaintiff's right to an impartial jury, without even needing to prove that individual jurors were biased themselves. *Id.* The second type of bias relates to the nature of the case. In order to root out this bias, potential jurors must be evaluated for life experiences that would interfere with their impartiality. *See Fietzer*, 622 F.2d at 283 (finding error where, during a civil trial regarding a car accident, the trial court failed to

allow potential jurors to be questioned "to the nature of the case" because such questions were "essential to producing disclosure by the jurors of possible prejudice"); *Art Press, Ltd. v. Western Printing Machinery Co.*, 791 F.2d 616, 617 (7th Cir. 1986) (trial court erred when it permitted "no inquiry designed to elicit the venire persons' attitudes toward the general nature or particular facts of the case").

The right to an impartial jury does not require a specific cross-section of the population, but rather, one that is not biased for or against the litigants or the facts of the case. *See Fleming v. Chicago Transit Authority*, 397 Fed. Appx. 249, 249 (7th Cir. 2010); *Sargent v. Idle*, 212 Fed. Appx. 569, 573 (7th Cir. 2006). To ensure Ms. Higgins's right to an impartial jury, this Court must substantially inquire into potential jurors' anti-transgender bias. Ms. Higgins is a transgender woman and gender—like race and religion—is an immutable characteristic. Bias against her identity as a trans person is analogous to bias against a person's racial or religious identity and must be guarded against. See *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (holding that in jury selection, the Equal Protection Clause forbids intentional discrimination based on gender, just as it prohibits discrimination based on race). Thus, inquiry into potential jurors' anti-transgender bias is essential to Ms. Higgins's constitutional right to an impartial jury.

## II. The majority of the jury pool harbors anti-transgender gender bias and cannot be impartial at trial.[6]

### A. The prevalence of anti-transgender bias in the United States.

Recent surveys and polls of U.S. adults reveal that most adults harbor discriminatory views about transgender people. A Pew Research poll revealed that 65% of registered U.S. voters believe that a person's gender is based solely on their sex assigned at birth.[7] This blatant

---

[6] The statistical data provided in this Motion is further detailed in Appendices A & B (Exhibits 1 & 2).
[7] Pew Research, *supra* note 5.

rejection of transgender identity is at odds with the law the jury must apply in this case. These discriminatory attitudes also often come from an emotional place of hate, and have violent, life or death consequences for trans women, particularly Black trans women like Ms. Higgins.  A survey of transgender people in U.S. territories and states revealed that 43% of respondents experienced discrimination based on their sexual or gender identity within the last 12 months.[8]

Popular culture and social media reflects the pervasiveness of anti-transgender bias. An analysis of 10 million social media posts over a three-and-a-half-year period revealed that 1.5 million posts were explicitly transphobic.[9] On YouTube, almost 80% of all discussion related to transgender people was abusive.[10] 34% of U.S. transphobic abuse referred to race, with a recurring theme of abuse towards Black trans women.[11]

Unsurprisingly, many U.S. adults support discriminatory policies towards trans people. Much of this support is based on explicit anti-transgender bias.[12] Almost half of adults believe that transgender people should be forced to use bathrooms that align with their sex assigned at birth.[13] Not only is this discrimination unlawful, *see, e.g.*, *Doe by & through Doe v. Elkhorn Area Sch. Dist.,* 743 F. Supp. 3d 1053 (E.D. Wis. 2024), but those who advocate for these

---

[8] *See* Human Rights Campaign Foundation, Fatal Violence Against Transgender and Gender Non-Conforming People in the United States: 2013-2025 Counts and Other Statistics, (Nov. 17, 2025), https://hrc-prod-requests.s3-us-west-2.amazonaws.com/Research/Trans-Violence-2025.pdf.
[9] Brandwatch, *Exposed: The Scale of Transphobia Online* (2019), https://www.brandwatch.com/reports/transphobia/ (last visited Mar. 4, 2026).
[10] *Id*.
[11] *Id*.
[12] See, e.g., Laurie Higgins, *Pritzker Plans to 'Trans' Schools*, Illinois Family Institute (Jul. 24, 2019), https://illinoisfamily.org/education/pritzkers-plans-to-trans-schools/ (referring to a trans activist as a "a young woman who pretends to be a man and works for [an] 'LGBTQ'-indoctrinating organization[;]" as well as referring to support of trans students as "facilitating their reality-denying feelings, their invasion of the privacy of their peers, their tyrannical linguistic demands of others, and the hijacking of hard-won girls' athletic opportunities by objectively male students").
[13] Anna Brown, Republicans, *Democrats Have Starkly Different Views on Transgender Issues*, Pew Research Center (Nov. 8, 2017), https://www.pewresearch.org/short-reads/2017/11/08/transgender-issues-divide-republicans-and-democrats/ (last visited Mar. 4, 2026).

policies often do so to isolate or ridicule transgender people.[14] Some of these battles have played out in the communities in the NDIL, including other suits against IDOC officials in response to their treatment of transgender inmates. *See, e.g.*, *Monroe v. Varga,* No. 3:17-CV-50218, 2024 WL 1530510 (N.D. Ill. Apr. 9, 2024).

Transgender rights are a political flashpoint in the United States. It is therefore extremely likely that most potential jurors in this case will have had at least some exposure to public debates over the validity of transgender identity. In the past few years, anti-LGBTQ+ and specifically anti-transgender bills and laws have proliferated in the United States.[15] Currently, the ACLU is tracking upwards of 450 anti-transgender bills throughout the country.[16] Recently, an anti-transgender law in Kansas abruptly invalidated state driver's licenses with updated gender markers.[17] The introduction and passage of these bills, most notably those that restrict trans people's access to restrooms and school sports teams based on their sex assigned at birth, are regularly reported on by regional and national news outlets. Lawmakers, who often have no knowledge of transgender girls using single-sex bathrooms or participating in female sports, promote these bans to further their political ambitions and scapegoat transgender people.[18]

---

[14] See Edwin C. Yohnka, *Taunting Transgender Children is Off Limits*, Chicago Tribune (May 6, 2016) (describing a school board meeting about locker room access where a parent described a transgender girl as a "young man with problems," as well as legal groups making false accusations about the girl).
[15] ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2026*, (Feb. 27, 2026, last accessed 3/3/2026), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2026.
[16] *Id.*
[17] ACLU, *Transgender Kansans Challenge State Law Invalidating Their Driver's Licenses and Allowing Them to Be Sued for Using Public Restrooms* (Feb. 27, 2026), https://www.aclu.org/press-releases/transgender-kansans-challenge-state-law-invalidating-their-drivers-licenses-and-allowing-them-to-be-sued-for-using-public-restrooms.
[18] David Fries, Republican House Representative of the 116th District, and Adam Niemerg, Republican House Representative of the 109th District, are co-sponsoring legislation that would force student athletes to compete on teams that conform to their sex at birth rather than their gender identity. David Crary & Lindsay Whitehurst, *Lawmakers Can't Cite Local Examples of Trans Girls in Sports*, Associated Press (Mar. 3, 2021), https://apnews.com/article/lawmakers-unable-to-cite-local-trans-girls-sports-914a982545e943ecc1e265e8c41042e7 (last visited Mar. 4, 2026).

Elected officials who promote anti-transgender policies have broad support in the general public. For example, since 2019, the number of adults who support transgender people openly serving in the military has dropped by 5%.[19] Many who advocate for banning transgender people from the military do so by using harmful stereotypes about transgender people.[20] More than three in five U.S. adults believe that transgender athletes should only be allowed to play on sports teams that correspond with their sex assigned at birth.[21] People supporting this policy position often promote the belief that transgender women are in fact men.[22] Potential jurors who reject this core facts of this case cannot make impartial credibility determinations, find the facts, and deliver a fair verdict based on the facts and law presented at trial.

Discrimination in public domains is particularly pronounced for Black trans women. Black trans women comprise 77.8% of trans murder victims.[23] Black transgender women are nearly twice as likely to have experienced verbal harassment in public accommodations as Black transgender men.[24]

Trans people living in the NDIL is still face challenges to the safety and security of their communities. Senator Andrew Chesney, from Freeport, recently proposed state legislation which

---

[19] *See* McCarthy, *supra* note 16.

[20] *See* Jerry Patterson, *Op-Ed: Transgender Military Service Is About Combat Readiness Not Social Justice*, PoliticsNY (Jan. 23 2019), https://politicsny.com/2019/01/23/op-ed-transgender-military-service-is-about-combat-readiness-not-social-justice/ (claiming that transgender service members may be more likely to kill their fellow soldiers due to their mental health) (last visited Mar. 4, 2026).

[21] *See* Justin McCarthy, *Mixed Views Among Americans on Transgender Issues*, Gallup (May 26, 2021), https://news.gallup.com/poll/350174/mixed-views-among-americans-transgender-issues.aspx.

[22] *See* Alliance Defending Freedom, *Track Athletes Taking a Stand to Defend Women's Sports* (last accessed Sept. 17, 2021), https://adflegal.org/selina-soule-track-athlete-story (repeatedly referring to transgender female athletes as "male," "boys," and "men").

[23] Jared Keller, *HRCF's 2024 Epidemic of Violence Report: Fatal Violence Against Transgender and Gender Non-Conforming People Continues, with Black Trans Women Comprising Nearly Half of the Deaths*, Human Rights Campaign (Nov. 19, 2024), https://www.hrc.org/press-releases/hrcs-2024-epidemic-of-violence-report-fatal-violence-against-transgender-and-gender-non-conforming-people-continues-with-black-trans-women-comprising-nearly-half-of-the-deaths.

[24] *Id.*

would classify transgender status as a mental illness, a step away from modern guidelines on transgender medical care.[25] At the same time, a local high school in Rockford has become a battleground as community members argue about transgender students' access to bathrooms in schools.[26] Transgender peoples' right to exist is hotly debated in the public eye at the national, state, and local levels.

**B.** **Demographic data indicate that many people in the Western Division of the Northern District of Illinois are likely to harbor anti-transgender bias.**

Relying on demographic data as a proxy for bias is imperfect and creates generalizations for which there are always exceptions. That said, opinion polling allows for some informed predictions about the demographics of people most likely to demonstrate anti-transgender bias.

Those polls suggest that jurors who live in rural areas, who are Evangelical Protestants, and who identify as Republican are the people most likely to harbor anti-transgender bias and to support discrimination against members of the LGBTQ+ community, like Ms. Higgins. These are precisely the people most likely to comprise a venire in the Northern District of Illinois, Western ("NDIL-W").

The NDIL-W consists of 10 counties, many of which are rural, and eight of which voted Republican in the last presidential election.[27] Of the 464,895 votes cast in NDIL-W in 2024, 52.73% of the votes were for Donald Trump.[28] A majority of Republicans, 57%, do not believe

[25] Catrina Barker, *Illinois senator's bill on transgender 'mental illness' sparks debate*, The Center Square (Feb. 16, 2026), https://www.thecentersquare.com/illinois/article_315d60bb-876e-4af2-9458-bff08f3671e2.html.
[26] Michael McGinnis, *A fight at Hononegah over a policy in effect for 6 years*, Rockton-Roscoe News, (Apr. 16, 2025) https://roscoenews.com/a-fight-at-hononegah-over-a-policy-in-effect-for-6-years/.
[27] *See* NBC Chicago Staff*, Map: Breakdown of how Illinois voted in the 2024 election, county-by-county*, NBC Chicago (Nov. 7, 2024), https://www.nbcchicago.com/news/local/map-breakdown-of-how-illinois-voted-in-the-2024-election-county-by-county/3595324/.
[28] *See* Massachusetts Institute of Technology Election Data and Science Lab, *U.S. President 1976-2020*, https://electionlab.mit.edu/data (last visited Feb. 26, 2026).

that transgender people should be allowed to serve in the U.S. Military.[29] Eighty-six percent of

Republicans polled believe that transgender people should only play on sports teams that match

their birth sex rather than their current gender identity.[30] Additionally, transgender people living

in rural areas also report higher levels of housing discrimination when compared to the overall

transgender population.[31] When compared to urban residents, rural residents are less likely to

support LGBTQ+ affirming policies.[32] Majority-rural states are also less likely to have

transgender inclusive laws and more likely to have discriminatory laws in place.[33] "Even after

controlling for other factors, such as age, education, sex, and race, '[t]he odds of supporting an

anti-gay marriage amendment are more than twice as high in rural communities of fewer than a

thousand people as they are in cities of 250,000 people or more.'"[34]

According to the Association of Religious Data Archives, 119,663 people in NDIL-W,

approximately 12.30% of the population, are Evangelical Protestants.[35] Anti-transgender bias is

also closely associated with certain forms of religious adherence. A national poll found that 87%

---

[29] *See* Justin McCarthy, *Mixed Views Among Americans on Transgender Issues*, Gallup (May 26, 2021), https://news.gallup.com/poll/350174/mixed-views-among-americans-transgender-issues.aspx.
[30] *Id.*
[31] Movement Advancement Project, *Where We Call Home: Transgender People in Rural America* 22 (2019),
https://www.lgbtmap.org/file/Rural-Trans-Report-Nov2019.pdf.
[32] *Id.* at 51-54.
[33] *Id.* at 26-28.
[34] Luke A. Boso, *Rural Resentment and LGBTQ Equality*, 71 Fla. L. Rev. 919, 921 (2019) (citing Robert Wuthnow, *The Left Behind: Decline and Rage in Rural America* 129 (2018) ("Data from a national survey show that support for a constitutional amendment banning gay marriage rises steadily as the size of communities in which people live decreases . . .")
[35] *See* Association of Religious Data Archives, *Evangelical Protestant Counties* (2020), https://www.thearda.com/us-religion/statistics/rankings?u=0&typ=2&cod=1 (last visited Mar. 4, 2026).

of white Evangelical Protestants believe that sex is determined at birth.[36] Further, 61% of white Evangelical Protestants said that society has gone too far in accepting transgender people.[37]

All available data makes clear that absent action from this Court, the average jury pool in Northern Illinois would hold impermissible anti-transgender bias. The data demonstrates that many in the jury pool may consider their anti-transgender stance, shared by their social circles, to be a part of their very identity and an indicator of their status in their rural, Evangelical, or Republican communities. The parties should be afforded additional screening and a larger jury pool to ensure that a impartial jury without anti-transgender bias can form.

**III. This Court can ensure a fair trial by implementing appropriate juror selection procedures.**

**A. The Court has discretion to implement appropriate procedures.**

A trial judge bears the responsibility to protect a litigant's constitutional right to an impartial jury at all points of trial. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Trial judges have wide latitude regarding how precisely to ensure an impartial jury. *United States v. Wood*, 299 U.S. 123, 145-46 (1936); *Hosseini*, 679 F.3d at 554. Courts have upheld a wide range of jury selection tactics as permissible judicial discretion, from a multi-step process of surveys, group questioning, and individual questioning to determine media bias, see *Skilling*, 561 U.S. at 371–72, to solely allowing group questioning to determine racial bias, see *Hosseini*, 679 F.3d at 554.[38]

---

[36] *See* Michael Lipka and Patricia Tevington, *Attitudes about transgender issues vary widely among Christians, religious 'nones' in U.S.*, Pew Research Center (Jul. 7, 2022), https://www.pewresearch.org/short-reads/2022/07/07/attitudes-about-transgender-issues-vary-widely-among-christians-religious-nones-in-u-s/.

[37] *Id*.

[38] The Seventh Circuit has decided that, while judges have broad discretion to determine jury selection, their discretion is limited only "subject to the essential demands of fairness." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 262 (7th Cir. 1996) (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)). For example, when fair housing groups in Chicago sued a luxury apartment building for racially discriminatory housing practices, the trial court asked members of the venire if they lived in public housing and, if so, if the racial composition of their public housing led to "problems." *Id*. at 259, 261–62. The Seventh Circuit held that because public housing was not at issue in the case, and the questions had

The Seventh Circuit as well as other circuits have addressed the appropriate use of pre-voir dire questionnaires. *See, e.g., Arreola*, 533 F.3d at 603 (using a pre-voir dire questionnaire in an incarcerated person's § 1983 suit alleging deliberate indifference to a serious medical need); *United States v. Contreras*, 108 F.3d 1255, 1259 (10th Cir. 1997) (discussing how the district judge sent 250 potential jurors a questionnaire prior to voir dire in a drug trafficking criminal case); *United States v. Paradies*, 98 F.3d 1266, 1277 (11th Cir. 1996) (describing a 25-page, 108-question questionnaire sent to 250 potential jurors prior to voir dire to determine bias in a public corruption trial); *United States v. North*, 910 F.2d 843, 909-10 (D.C. Cir.) (allowing removal of potential jurors for bias if they indicated in a pre-voir dire questionnaire that they were exposed to a related Congressional testimony), *withdrawn and superseded in part on other grounds*, 920 F.2d 940 (1990); *EEOC v. BOK Fin. Corp.*, No. 11-1132, 2014 WL 12628594, at *2 (D.N.M. Mar. 20, 2014) (finding that "supplemental juror questionnaires are generally reserved for cases directly implicating sensitive, personal, or controversial issues").

### B. A survey will appropriately screen jurors for anti-transgender bias.

Here, the best method to efficiently and effectively screen a jury for anti-transgender bias is a survey. The questions are written not to eliminate jurors of a certain town, political party, or voting history, but rather to find bare prejudice against transgender people or innate biases against trusting any transgender woman. Such questions will isolate potential jurors who would never find Ms. Higgins, her witnesses, or her experts credible, regardless of their testimony and demeanor. For example, questions about whether a prospective juror trusts transgender people to watch children or perform military service implicitly test whether a person is capable of finding a transgender person trustworthy. A survey also respects the efficiency of the court, as it will

---

significant racist undertones, the court's questioning was "beyond the bounds of permissible inquiry" in jury selection. *Id*. at 262.

reduce the time spent by all parties questioning prospective jurors individually, and because it will protect against a biased verdict.

The typical jury selection process, in which nothing but bare demographic data about prospective jurors is known before voir dire, requires litigants to rely on stereotypes when executing peremptory strikes. *See Twelve Angry (And Stereotyped) Jurors: How Courts Can Use Scientific Jury Selection to End Discriminatory Peremptory Challenges*, 7 Stan. J. Civ. Rts. & Civ. Liberties 293, 304, 313 (2011) (arguing that remedies to discriminatory jury selection that focus only on invidious discrimination "largely ignore[] the cause: a dearth of useful information on which to base peremptory challenges[,]" and that pre-voir dire questionnaires are useful for minimizing stereotyping). Of the population of the NDIL-W, counsel for Plaintiff estimate that 58.55% of adults either identify as Republican or identify as Evangelical Christian. Appendix A – NDIL-W Demographics. Data related to the experiences of transgender people and opinion polls done on Republican and Evangelical Protestant adults, coupled with general anti-transgender sentiment in the U.S., reveal a very high likelihood of a heavily biased jury pool. More robust screening of prospective jurors will allow the Parties to make principled and individualized decisions about which jurors can fairly evaluate the evidence and will protect Ms. Higgins's right to an impartial jury. Other courts have approved this procedure. *See Hampton v. Meyer*, No. 3:17-cv-00860 at Dkt. 160 (S.D. Ill. Jan. 21, 2022); Ex. 4 (transcript of motion hearing in *Hampton v. Meyer*).

**CONCLUSION**

In order to protect Ms. Higgins's due process right to an impartial jury while maximizing efficiency, this Court should grant this motion and enter an order:

1. Requiring the Clerk to mail a written questionnaire to at least 116 prospective jurors[39] to screen them for anti-transgender bias that would prevent them from being impartial jurors. Proposed questions are attached as Exhibit 3.

2. Requiring the Clerk to empanel either 48 prospective jurors or however many prospective jurors do not exhibit bias in their answers to the questionnaire, whichever is greater.[40]

3. Allowing counsel to question potential jurors as a group during voir dire. Group questioning will better allow venire members to reflect on their personal biases after hearing others reflect on theirs. See *United States v. Hosseini*, 679 F.3d 544, 554 (7th Cir. 2012) (describing how when one juror identified their bias against Iranian Americans, the juror's comments caused another juror to recognize their own bias).

4. Allowing counsel to question potential jurors individually during voir dire. Individual questioning will allow the Parties to better understand a juror's perspective, an essential element to voir dire questioning. *See United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972) ("We do not believe that a prospective juror is so alert to his own prejudices. Thus it is essential to explore the backgrounds and attitudes of the jurors to some extent in order to discover actual bias, or cause.").

Dated: March 4, 2026

Respectfully submitted,

**SAMUEL "NIYEH" HIGGINS**
/s/ Maria Makar

---

[39] Based on counsel's estimate of the percentage of potential jurors who are likely to hold anti-transgender bias (58.55%), sending the questionnaire to 116 prospective jurors will enable the Court to form a panel of 48 prospective jurors who pass the screening survey.

[40] While a questionnaire is a useful tool, it is imperfect. Transgender identity and legal issues related to trans identity are not always easily understood. For example, a prospective juror may not understand the difference between a drag queen or a transgender woman, may not understand which pronouns are correct when referring to a transgender person, and may not understand the definition of "transgender woman" or "misgendering," especially if, like most Americans, they do not personally know anyone who is transgender. *See* Minkin & Brown, *supra* note 1 (stating that only 42% of Americans know someone who is transgender). Jurors may also think they do not have anti-trans bias until questions of transgender identity involve Black transgender women like Ms. Higgins. Finally, many jurors have a connection to the Illinois Department of Corrections. In 2020, IDOC employed 3,581 people in prisons in the Southern District of Illinois. This accounts for 1% of all employed people in the Southern District who are employed. This figure does not include those who have previously worked for IDOC, who are retired from IDOC, who work for IDOC contractors, and who one day hope to work for IDOC. Thus, many jurors may exhibit an unfair bias in favor of the State because of a personal or financial connection they have to IDOC and its employees.

One of Ms. Higgins's Attorneys

Maria Makar
Hale & Monico, LLC
250 Park Avenue, 7th Floor
New York, NY 10177
Phone: (312) 815-1948
makar@halemonico.com

Wallace Hilke
Eliana Green
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
Phone: 312-503-2224
wally.hilke@law.northwestern.edu


*Attorneys for Plaintiff*