**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SAMUEL "NIYEH" HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  3:23 C 50038 |
| | ) | |
| ROB JEFFREYS; BRIAN SCHMELTZ; | ) | Judge Rebecca R. Pallmeyer |
| SUSAN PRENTICE; MICHELLE VICTUM; | ) | |
| JOANNA KEMMEREN; JOHN DOES 1–20, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Samuel "Niyeh" Higgins brings this action pursuant to 42 U.S.C. § 1983 against Rob Jeffreys, the Director of the Illinois Department of Corrections, and four correctional officers (Officer Schmeltz, Major Prentice, Officer Victum,[1] and Major Kemmeren).  All are sued in their individual capacities and charged with violating Plaintiff's Eighth Amendment rights.  Plaintiff, whose preferred name is Niyeh Higgins, is a transgender woman who was housed in male facilities during the four years she spent in IDOC custody.  She alleges that Officer Schmeltz sexually assaulted her during a pat-down search on January 1, 2020 by groping her breasts for more than one minute, and that Jeffreys, Prentice, Victum, and Kemmeren failed to protect her from sexual assault and failed to intervene when other officers conducted abusive strip searches of her.  All Defendants have moved [162] for summary judgment.

As more fully explained below, Plaintiff's claim against Schmeltz is dismissed as untimely. All but one of Higgins's claims against Prentice are untimely, as well, and the court grants summary judgment in favor of Prentice on that claim; the conduct that Prentice failed to protect Higgins from, reprehensible though it was, did not violate the Constitution.  Because Kemmeren

---

[1]  Officer Michelle Victum's name appears as Michelle "Victum" on the docket; however both Plaintiff and Defendants refer to her as "Victum" in their summary judgment briefing and throughout various motions submitted.  The court adopts the parties' spelling of "Victum".

lacked a realistic opportunity to intervene to prevent violations of Higgins's rights, the court enters summary judgment in favor of Kemmeren on Higgins's failure-to-intervene claim. And while Kemmeren continued to subject Higgins to cross-gender searches, despite her awareness that such searches put Higgins at risk of sexual abuse, Kemmeren is entitled to qualified immunity on Plaintiff's claims concerning this issue. As to Jeffreys, summary judgment is warranted on Higgins's failure-to-intervene claim, but the court requests supplemental briefing from the parties on the qualified immunity defense to Higgins's failure-to-protect claim. Finally, Higgins contends Victum violated her rights by persistently misgendering her, by failing to protect her from sexual abuse, and by inciting another inmate to assault her. Victum is entitled to qualified immunity on the misgendering claim, but the remaining claims against Victum survive this motion and will proceed to trial.

## BACKGROUND

### A.    Factual Background[2]

#### 1.    Higgins is Placed in a Men's Prison

Plaintiff Niyeh Higgins is a transgender woman who entered the custody of the Illinois Department of Corrections ("IDOC") on March 19, 2018. (PSOF [177] ¶ 1.) She has identified as female since she was five years old, but when she entered custody, she was placed in facilities for male prisoners.[3] (*Id.* ¶¶ 1, 48; Defs.' Resp. to PSOF [184] ¶ 7, 48 (undisputed in relevant

---

[2]    The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1. Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [165] ¶ ___." Higgins's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. to DSOF [172] ¶ ___." Higgins has also submitted an Additional Statement of Facts, cited here as "PSOF [177] ¶ ___." Defendants' Response to Plaintiff's Additional Statement of Facts is cited here as "Defs.' Resp. to PSOF [184] ¶ ___."

[3]    The parties agree that Ms. Higgins entered IDOC custody on March 19, 2018, and they also agree that she was housed at Pontiac Correctional Center and Dixon Correctional Center from December 5, 2018, until she was paroled on February 4, 2022. (*See* PSOF [177] ¶ 1; Pl.'s Resp. to DSOF [172] ¶ 1.) It is not entirely clear, however, where she was housed between her March 19, 2018 intake into IDOC custody and arrival at Pontiac on December 5, 2018. Defendants cite to evidence suggesting that Plaintiff underwent an evaluation at Lawrence

2

part).)  Plaintiff asserts the sole reason for this assignment was IDOC's pre-2019 policy under which inmates who had been housed in a men's jail were housed in a men's prison to serve their sentences.  (PSOF [177] ¶ 48.)  The deposition testimony of Dr. William Puga confirms this.  Puga, IDOC's Rule 30(b)(6) corporate representative, has been "personally involved in . . . decisions related to the facility placement of transgender women at [IDOC]" since 2018.  At Puga's deposition, Higgins's attorney asked him: "[D]uring that period [before 2019], you know, in terms of intake, there was no discretion by anyone in the Department of Corrections to decide where a transgender prisoner would go; it was just based on the jail; is that right?" to which Puga responded: "That's correct."  (Puga Dep. [165-16] at 9:21–10:4; 12:21–14:3.)

In 2018, when Higgins entered IDOC's Lawrence facility, IDOC Administrative Directive 04.03.104 established a protocol for screening on intake of prisoners who were "suspected of having a gender identity disorder"; such individuals would undergo "a detailed medical history, physical examination and mental health examination during the reception and classification process."  (Defs.' Ex. 18 [165-19] at 7.)  The screening included questions about the inmate's sexuality, hormone therapy, and the inmate's own sense of gender identity.[4]  (*Id.* at 7–8.)  Higgins underwent such a screening within 24 hours of her entering IDOC custody, and IDOC medical providers documented that she had taken estrogen for seven years, that she had developed breast tissue, and that she required a bra.  They also recommended that she receive a designation of "vulnerable" because she is transgender.  (PSOF [177] ¶ 2; Pl.'s Ex. B [171-1] at 43.)  The "significance of the 'vulnerable' designation is that inmates labeled 'vulnerable' receive different housing assignments and classification to protect them from abuse by other inmates."  (PSOF [177] ¶ 7 (undisputed in relevant part).)  Higgins claims that, despite this initial recommendation,

---

Correctional Center in April 2018 (Defs.' Resp. to PSOF [184] ¶ 7), so the court assumes she was housed at Lawrence during that time.

[4]     In 2018, the IDOC Administrative Directive directing agency policies in the treatment of transgender inmates was the directive that had become effective in May 2013.  The directive was amended in July 2019, after Higgins's initial processing.

her status as vulnerable remained "under review" several years into her incarceration, until at least July 2021, and it is unclear whether she ever received the benefits of the vulnerable status determination. (*Id.*) Defendants acknowledge that as of July 27, 2021, the "transgender committee" reported that Higgins's Predator/Vulnerable status was " 'still under review.' " (Defs.' Resp. to PSOF [184] ¶ 7 (quoting Defs.' Ex. 17 [168] at 629).) They contend, however, that this fact is immaterial, because "the vulnerable/predator determination 'lies with the Chief of Mental Health,'" and "[n]one of the defendants in this case were the chief of mental health during the time periods in the complaint." (*Id.* (quoting Nottingham Dep. [170-7] at 95:22–96:5).)

On January 15, 2019, after Higgins was transferred to Pontiac Correctional Center ("Pontiac"), she also underwent a mental health screening. (Medical Records [168] at 48.) The screening provider designated Higgins as SMI—"seriously mentally ill." (*Id.*; PSOF [177] ¶ 3.) IDOC's Prison Rape Elimination Act ("PREA") manual identifies mental illness as a risk factor for vulnerability to sexual abuse. (Pl.'s Ex. E [170-3] at 57.)

### 2. Searches by Male Officers

#### a. Pontiac Correctional Center

On December 5, 2018, Higgins was transferred from Lawrence to Pontiac, another male facility. Beginning in 2019 (the record is unclear when exactly), Higgins began complaining to prison officials that she "felt violated and uncomfortable by strip searches by male officers and that she believed female officers should be strip searching her." (PSOF [177] ¶ 28.)

IDOC's policy regarding searches in 2019 "was that all prisoners at 'men's prisons' would be searched by male guards, regardless of whether the prisoner was a cisgender male or a transgender female." (Defs.' Resp. to PSOF [184] ¶ 28 (quoting Dynan Rep. [170-2] at 11).) IDOC Administrative Directive 05.01.113, which became effective in September 2019, stated:

> In situations where a transgender offender expresses concern for the gender of the staff performing [a] strip search, staff shall proceed with the search and, upon completion of the search, shall complete an Incident Report, DOC 0434, documenting the expressed concern. The DOC 0434 shall be submitted through

4

the chain of command to the Transgender Care Review Committee for review and appropriate action.

(*Id.*)  According to IDOC policy at the time, "the only way a . . . transgender female could have strip searches conducted by a woman was for the Transgender Care Review Committee to review the incident reports and grant a search accommodation."  (Nottingham Dep. [170-7] at 58:13–59:3; PSOF [177] ¶ 28; Defs.' Resp. to PSOF [184] ¶ 28.)  Higgins offers the testimony of a prison administration expert, Christine Dynan, to opine on "the generally accepted standards relevant to Ms. Higgins's treatment as a transgender inmate."  (Dynan Rep. [170-2] at 1.)  Dynan is a "retired correctional administrator" who was previously employed by the Federal Bureau of Prisons ("BOP") and worked as a supervisor in BOP facilities for 22 years.  (*Id.* at 2.)  Dynan now works as a "correctional consultant."  (*Id.*)  Dynan reviewed all of the Transgender Care Review Committee reports in Higgins's file and found "no DOC 0434 form attached for the committee's review," which led her to conclude that "there is no indication that anyone ever considered granting [Higgins] search accommodations, or, indeed, that she was ever informed that such accommodations were available." (*Id.* at 12.)

In December 2019, Chief Judge Nancy Rosenstengel of the Southern District of Illinois issued a preliminary injunction against IDOC regarding its treatment of transgender prisoners in *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 546 (S.D. Ill. 2019).[5]  Judge Rosenstengel's order required IDOC, among other things, to "develop a policy to allow transgender inmates medically necessary social transition, including . . . avoidance of cross-gender strip searches."  *Id.* at 547. Importantly, Judge Rosenstengel also ordered that each of the named defendants in the case before her "read the transcript of the evidentiary hearing" and "certify to the Court . . . that he has done so," out of a concern that "IDOC [was] not taking Plaintiffs' allegations in this lawsuit seriously."  (*Id.*; PSOF [177] ¶ 89.)  When Jeffreys replaced John Baldwin as IDOC director, Chief Judge Rosenstengel also ordered him to read the transcript.  *See* Minute Order [204] in *Monroe*,

---

[5]        Ms. Higgins was not a party to this case.

No. 3:18-cv-156 (S.D. Ill. Jan. 31, 2020). The testimony in the *Monroe* transcripts included "significant evidence regarding the risk of harm faced by transgender women in IDOC custody." (PSOF [177] ¶ 89.) Jeffreys certified to the court that he had read the transcripts on January 19, 2020. (*Id.*)[6]

Despite the preliminary injunction order and Jeffreys's familiarity with the testimony that led to it, Plaintiff Higgins was repeatedly strip searched and patted down by male correctional officers. On January 1, 2020, according to Higgins, Defendant Brian Schmeltz, a correctional officer at Pontiac, and one of his female colleagues, Officer Danielle Faletti, conducted a shakedown of Higgins's cell. (*Id.* ¶ 55.) During the shakedown, Higgins claims that she informed Schmeltz that she is a transgender woman with breasts who preferred to be searched by a female officer. In response, Schmeltz allegedly handcuffed Higgins to a cell bar and "grop[ed] her breast for more than one minute." (*Id.*) He then, according to Higgins, proceeded to call her a "faggot," told her that he "hated gay and transgender people" and threatened to harm her again. (*Id.*) Higgins began calling out in distress and yelled for a major or lieutenant to respond. By Higgins's account, Defendant Susan Prentice, who was employed by IDOC as a Correctional Major at Pontiac, was walking up and down the gallery nearby and heard Higgins's cries for help. But, Higgins says, Prentice "did not help her," and told Higgins "to talk to someone else" because "she didn't want to deal with the situation." (*Id.* ¶ 56.) Higgins alleges that Prentice could have conducted the search herself, rather than leaving Higgins to be searched by a male officer. (*Id.*)

Defendants summarily deny that Schmeltz ever conducted a shakedown of Higgins's cell, and deny that Higgins ever spoke to Prentice. (Defs.' Resp. to PSOF [184] ¶¶ 55–56; DSOF [165] ¶¶ 58–69.) Still, they admit that Prentice was listed as the "person accepting report" for an incident

---

[6] On appeal, on December 5, 2024, the Seventh Circuit vacated the preliminary injunction, concluding that it had expired after 90 days and that the district court erred in *sua sponte* converting the preliminary injunction to a permanent one. *See Monroe v. Bowman*, 122 F.4th 688, 699 (7th Cir. 2024).

report dated January 1, 2020 which was related to Higgins's allegations against Schmeltz. (DSOF [165] ¶ 57.) Both parties agree that the report resulted in a PREA investigation,[7] and that the investigation resulted, on November 19, 2020, in a finding that Higgins's allegations were "unsubstantiated." (DSOF [165] ¶ 57; Pl.'s Resp. to DSOF [172] ¶ 57.) The quality of the investigation itself is disputed, however. Higgins contends that the investigation was incomplete because it failed to incorporate a grievance filed by Higgins on February 18, 2020 regarding the incident with Schmeltz, failed to question Schmeltz about whether he knew Higgins was transgender or had breasts, failed to seek details from Schmeltz or Faletti about what happened during the search, failed to question Higgins's cellmate, and failed to seek or obtain any relevant documentation from the search. (PSOF [177] ¶ 59.) Higgins also alleges that the PREA investigation was deficient because the investigators "did not comply with the 60-day deadline to complete sexual assault investigations and instead waited nearly 8 months—until August 20, 2020—to interview Schmeltz and Faletti."[8] (*Id.* ¶ 59.) Defendants argue that these facts are "immaterial because neither IDOC nor the investigators are defendants in this case." (Defs.' Resp. to PSOF [184] ¶ 59.)

---

[7]     Illinois has adopted national Prison Rape Elimination Act ("PREA") standards in IDOC's PREA Sexual Abuse and Harassment Prevention and Intervention Program Manual. (Pl.'s Ex. E [170-3] at 1.) The Manual states that IDOC "shall provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment," and that prisoners should be encouraged by IDOC "to report allegations to staff at all levels." Once an allegation of sexual abuse or harassment is reported to IDOC staff, the Manual provides that IDOC "shall ensure that an administrative or criminal investigation is completed," and "shall do so promptly, thoroughly, and objectively for all allegations." (*Id.* at 21, 39.) The Manual instructs investigators to "gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data"; to "interview alleged victims, suspected perpetrators, and witnesses"; and to "review prior complaints and reports of sexual abuse involving the suspected perpetrator." (*Id.* at 39.)

[8]     IDOC's PREA Manual does not contain reference to a 60-day deadline (*See* Pl.'s Ex. E [170-3]), but Joshua Anglin—IDOC's Fed. R. Civ. P. 30(b)(6) witness who was called to "testify on the policies and practices regarding PREA and investigations," (Defs.' Resp. to PSOF [184] ¶ 17)—testified that "by policy, there's different levels of investigations" and that "most investigations are assigned a 60-day completion policy." (Anglin Dep. [171-2] at 56:18–22.) It is unclear whether the investigation of Higgins's allegations against Schmeltz was, like most investigations, a 60-day completion deadline.

7

As to Higgins's February 18, 2020 grievance, it was denied by a grievance officer on the basis that the "[a]llegation of staff misconduct [was] not substantiated." (Pl.'s Ex. PP [170-32] at 1.) The Chief Administrative Officer concurred with the grievance officer's denial one month after Higgins filed the initial grievance, on March 18, 2020. (*Id.*) Under IDOC grievance policies, Higgins had 30 days from the date of the Chief Administrative Officer's decision to appeal the denial to the ARB. 20 ILL. ADMIN CODE § 504.850. But Higgins did not appeal the decision until September 29, 2020, more than 195 days later; she has provided no explanation for this delay. (Pl.'s Ex. PP [170-32] at 1.) On February 3, 2021, the ARB declined to address Higgins's appeal because it was not timely filed. (Pl.'s Ex. QQ [170-33] at 1.)

Higgins contends prison officials conducted the cross-gender strip searches under humiliating conditions. Defendants admit that during these searches, correctional officers called her demeaning names like " 'faggot' and 'retard.' " (PSOF [177] ¶ 30; Defs.' Resp. to PSOF [184] ¶ 30.) Officers also "refused to give Plaintiff anything to cover up with during strip searches and refused to give Plaintiff blankets when the heating was not working and it was very cold, even though they gave blankets to everyone else." (PSOF [177] ¶ 30.) Some of these strip searches were conducted in plain view of other prisoners. For example, on July 19, 2020, Higgins was subjected to a strip search by male officers "in a cage that was in plain view of other prisoners, and during which time numerous people passed by and could see her naked." (*Id.* ¶ 31.) After this strip search, Higgins filed a grievance complaining that her rights had been violated, specifically referencing the *Monroe* preliminary injunction. (Pl.'s Ex. DD [170-22] at 3, 5–6.) Her grievance was eventually denied by the Administrative Review Board ("ARB") on April 30, 2021 on the basis that the ARB was unable to "substantiate that staff at Pontiac were aware of the injunction." (PSOF [177] ¶ 31 (emphasis removed); Pl.'s Ex. DD [170-22] at 1.) IDOC Director Jeffreys's signature appears on the ARB decision form, but Defendants contend that Jeffreys "had no role in the grievance procedure." (DSOF [165] ¶ 44.) Defendants contend (and Higgins does not dispute) that Jeffreys delegated to the Chief Inspector of IDOC (unnamed in the record) "the

8

authority for [his] signature to conduct anything related to grievances." (*Id.;* Pl.'s Resp. to DSOF [172] ¶ 44.)

Just three days after the July 19, 2020 strip search, Higgins was subjected to another strip search by a male correctional officer, Eric Myers. According to Higgins, Myers strip-searched her "in a holding tank where her naked body was exposed to others," and subjected her to "further [sexual] harass[ment]." (PSOF [177] ¶ 32; Pl.'s Ex. EE [171-8] at 2.) In response, Higgins filed a PREA complaint. Defendants do not dispute that the PREA investigator "never contacted any witnesses," and instead "documented generalized denials from the involved officer (without asking specific questions about the incident) two months after the complaint," deeming the allegations unsubstantiated "without collecting the necessary evidence." (PSOF [177] ¶ 32; Defs.' Resp. to PSOF [184] ¶ 32; *see also* Pl.'s Ex. EE [171-8] at 1.)

On January 22 and 23, 2021, Higgins was again subjected to strip searches by a male officer over her objections. Defendants do not dispute that during these searches, Higgins "was exposed to numerous staff and prisoners while she stood naked in her cell." (PSOF [177] ¶ 33; Defs.' Resp. to PSOF [184] ¶ 33.) During one of these searches, a lieutenant told her: "You are a man, this is a male prison, you will either strip or you don't go outside"—presumably a threat to deprive Higgins of recreation time if she refused the strip search. (PSOF [177] ¶ 33.) After the incident, Higgins again filed a PREA complaint, and Defendants admit that the involved lieutenant was never asked about his statement or investigated. (*Id.*)

### b. Dixon Correctional Center

On February 4, 2021, Higgins was transferred from Pontiac to Dixon Correctional Center ("Dixon"). (Pl.'s Resp. to DSOF [172] ¶ 1.)

About two months after the transfer, on April 3, 2021, Higgins was walking towards her housing unit when a male correctional officer, Officer Talley, told her that he needed to conduct a pat-down search. (PSOF [177] ¶ 82; Pl.'s Ex. UU [170-35] at 3–4.) Higgins requested that a female officer conduct the search. In response, Talley began "rubbing up against her" and told

9

her that she "needed to shut [her] faggot ass up." (*Id.*) Higgins filed a grievance complaining about the incident, in which she requested that a PREA investigation be initiated. Higgins alleges that, in response, Defendant Joanna Kemmeren, a shift supervisor and administrative major at Dixon who was responsible for disciplinary referrals and compliance with policy for correctional officers at Dixon, moved Talley to another assignment within the facility. (PSOF [177] ¶¶ 77, 82.) Defendants dispute this account; they challenge Higgins's characterization of these events on two grounds. First, they assert that the grievance officer conducted an investigation and concluded that the allegation of misconduct by Talley was unsubstantiated. And second, they dispute that Kemmeren moved Talley to a new assignment in response to this incident, but the only basis for the denial is that Kemmeren does not recall doing so and that a transfer is not noted in the grievance response. (Defs.' Resp. to PSOF [184] ¶ 82.)

A few weeks later, on May 26, 2021, Higgins was subjected to a strip search. Higgins again requested that the search be conducted by a female officer, but she was told (she does not say by whom) that no female officer would come. She was then "threatened with disciplinary reports, loss of privileges," and warned that a tactical team called "Orange Crush" would forcibly strip her if she failed to voluntarily remove her clothing and permit a male officer to conduct the strip search; again, Higgins does not identify the perpetrator of these threats. (PSOF [177] ¶ 35.) Higgins was also "mocked, humiliated, and called slurs during the incident," also by an unnamed individual. (*Id.*) Defendants do not dispute Higgins's account. (Defs.' Resp. to PSOF [184] ¶ 35.)

On August 24, 2021, Higgins was instructed (by yet another unidentified person) that she must "submit to a strip search by a male officer or the tactical team would be called to forcibly strip search her." (PSOF [177] ¶ 36.) Higgins "acquiesced under this threat" and submitted to the search, which happened in a cell that was, again, in the plain view of other prisoners. (*Id.*; Gorton Rep. [171] at 17.) During the search, she was "sexually harassed" by (unidentified) prisoners and officers and "threatened with sexual assault by other inmates." (PSOF [177] ¶ 36.)

10

She was also "left naked and exposed in the cage for over 30 minutes."[9] (*Id.*) Higgins filed an emergency grievance in response, and Kemmeren responded to the grievance by stating that Higgins had "consented" to the search. (*Id*.) Ultimately, the ARB sustained the grievance as a violation of IDOC policy in part, noting specifically that the "Warden should advise staff to follow Chief Eilers email sent out on 8/11/21 indicating 'the transgender non-conforming individual in custody shall be searched by the gender of staff designated on their identification card.' " (Defs.' Resp. to PSOF [184] ¶ 36 (quoting Pl.'s Ex. GG [170-23] at 1).) The parties do not provide more information about the referenced email from Eilers, what prompted it, or to whom it was sent.

But male correctional officers continued to strip search Ms. Higgins. On November 6, 2021, she was again "forced to submit to a strip search by a male officer." (PSOF [177] ¶ 39.) The officer strip searching Higgins (whose identity is not clear from the record) became sexually aroused during the search and made Higgins aware that he was erect. He also "left the door open so that others could see [Higgins's] breasts during the search." (*Id.*) After this incident, Higgins claims she spoke to the warden at Dixon whose name she could not recall, who told her that the likelihood of "a female searching a trans inmate is zero to none," and that her request to be searched by female staff "would basically never occur," presumably because no female officers would consent to conduct the strip search. (*Id.*; Higgins Dep. [165-1] at 93:19–94:1; Kemmeren Dep. [165-4] at 123:3–10.) The identity of the individual she spoke with is unclear, but it could not have been Tarry Williams, whom Plaintiff originally named as a defendant; Williams's employment with IDOC began on February 1, 2022, several months after this incident. And Higgins admitted that she does not know who Williams is. (DSOF [165] ¶¶ 9, 61–64; Pl.'s Resp. to DSOF [172] ¶¶ 9, 61–64; Higgins Dep. [165-1] at 100:4–100:5 (Q: "Who is Tarry Williams?" A: "Tarry Williams, I am not familiar.") Higgins also filed a grievance after this incident, but the

---

[9] Defendants do not dispute this account, but the parties' frequent use of the passive voice and repeated failure to identify the individuals engaged in the wrongdoing frustrates the court's effort to determine whether the conduct supports a finding of liability on the part of these Defendants.

grievance was denied solely on the basis that "Higgins consented to the strip search," without discussion of Higgins's repeated requests for a female officer to search her, without investigation of the officer's conduct, and without initiation of a PREA investigation. (PSOF [177] ¶ 40.) Indeed, throughout her four years in custody, Higgins was never once searched by a female officer, despite the *Monroe* preliminary injunction ordering IDOC to limit "cross-gender strip searches." (PSOF [177] ¶ 37; Defs.' Resp. to PSOF [184] ¶ 37 (undisputed in relevant part).)

Kemmeren, who was responsible for ensuring that staff complied with policies, knows that IDOC policy requires that transgender prisoners who request a search accommodation be searched by female officers. (PSOF [177] ¶¶ 77, 79.) Kemmeren testified in her deposition that Dixon policy required that when a transgender inmate requested that a female conduct a strip search, the officers were to hold the inmate in custody until a female officer became available to conduct the strip search, or until the transgender inmate "consented" to search by a male officer. (Kemmeren Dep. [165-4] at 123:3–10.) Higgins suggests that this practice was designed to force transgender inmates to consent to searches by male officers: according to Higgins, choosing to wait for a female officer to become available would mean, essentially, being confined indefinitely, as "all female officers at Dixon refused to conduct such searches and were not required to do so." (PSOF [177] ¶ 79.) Defendants contest Higgins's implication that Defendants were attempting to force consent. They note that Kemmeren testified that sometimes prison staff "would have to wait hours for female staff from another facility to come to our facility to conduct the strip search," but the court does not read this as inconsistent with Higgins's claim that female officers at Dixon refused to conduct strip searches, effectively forcing "consent" on Higgins's part. (Defs.' Resp. to PSOF [184] ¶ 79 (quoting Kemmeren Dep. [165-4] at 82:22–83:1).) Kemmeren acknowledged that staff at Dixon did not always wait for female staff to arrive from another facility before proceeding with a strip search: on those occasions, "[it] would be documented that the inmate requested a female, no female was available or willing, and so the male conducted the search." (Kemmeren Dep. [165-4] at 83:4–7.)

12

### 3.    Sexual Harassment and Abuse by other Prisoners

In January 2021, while she was still incarcerated at Pontiac, Higgins filed a PREA complaint about another prisoner, Carl Furrell, claiming that he had "sexually harassed her and threatened her, causing her to feel unsafe." (PSOF [177] ¶ 16.)  The parties agree that Furrell and Higgins were initially engaged in a consensual relationship in which the two exchanged love notes (*id.*, Defs.' Resp. to PSOF [184] ¶ 16), but Higgins claims that these notes turned violent when Furrell wrote: "You played with my heart and there's a zero percent chance this goes unpunished." (PSOF [177] ¶ 16.)  The facility commenced a PREA investigation which lasted two weeks and was closed after the investigator concluded that there was "no sexual content in the notes." (*Id.*)  That finding, however, is plainly at odds with the evidence.  In notes that Furrell wrote to Higgins (and that the investigator himself attached to the PREA investigation report), Furrell describes the size of his penis, calls Higgins "sexy," and tells Higgins that he had not masturbated in two months. (*Id.*; Pl.'s Ex. L [171-3] at 17–26.)  Despite the obviously unsupported determination made by the PREA reporting investigator, Leonta L. Jackson—who also served as the Warden of Pontiac at the time—concurred with the investigator's determination.[10]  (Pl.'s Ex. L [171-3] at 1.)  Throughout her time at Pontiac, Higgins filed several other grievances regarding "numerous other occasions" in which she "suffered repeated assaults, harassment, sexual threats, and bullying by IDOC prisoners." (PSOF [177] ¶ 18.)

At Dixon, Higgins was also the victim of sexual harassment and abuse at the hands of another prisoner, Tommie Johnson, who goes by the nickname "Demon." (PSOF [177] ¶ 68.)

---

[10]    In a subsequent deposition, Anglin testified that the facility's investigation into Plaintiff's sexual harassment allegations against Furrell did not meet IDOC's standards for thoroughness in PREA investigations.  (PSOF [177] ¶ 17; Defs.' Resp. to PSOF [184] ¶ 17 (undisputed in relevant part).)  Defendants object to Plaintiff's use of this testimony on the grounds that it was outside the scope of what Anglin, a Rule 30(b)(6) witness, was called to testify about— namely, IDOC's PREA policy and practices.  In the court's view, Anglin's testimony regarding how PREA policies and practices were implemented in a particular factual context is well within the scope of his testimony.  In any event, even without reference to Anglin's testimony, the inadequacy of this investigation is obvious on its face.

The harassment began (the record is unclear when) in a series of messages Demon sent Higgins, depicting sex acts that he threatened to engage in. Demon also stood outside Higgins's cell, masturbating and making sexually inappropriate comments directed at her. (*Id.*) Higgins claims that she reported each incident of harassment to Defendant Michelle Victum, an officer at Dixon who worked in Higgins's housing unit. (*Id.* ¶ 69; DSOF [165] ¶ 8.) Higgins asserts that although IDOC policy required Victum to file incident reports, she failed to do so and took no steps to protect Higgins from the harassment. (PSOF [177] ¶ 69.) This claim is disputed in that Defendants assert that Higgins never spoke to Victum about Demon at all. (Defs.' Resp. to PSOF [184] ¶ 69.) For purposes of summary judgment, the court accepts Higgins's testimony on this score.

On June 6, 2021, Demon's behavior became more egregious: he masturbated in front of Higgins while groping her. Higgins's cellmate, who Higgins identifies as "Shabazz," witnessed the incident. (PSOF [177] ¶ 70.) The incident was extremely traumatic for Higgins: it "exacerbated her gender dysphoria and significantly contribute[d] to [her] PTSD." In the month after the incident, Higgins attempted suicide. (*Id.* ¶ 71.)

Higgins filed a PREA complaint regarding the assault on June 8, 2021. PREA investigations are, as noted earlier, ordinarily to be completed within 60 days after an incident is reported, but the investigation of Demon's assault took nearly 4 months. (Anglin Dep. [171-2] at 56:11–22; 100:23–101:11.) Over the course of this time, the investigating officer interviewed just two people: Higgins and Demon. Demon denied the allegations and stated that he "believed the PREA allegations were made in retaliation for an altercation he had with Shabazz." (DSOF [165] ¶ 75.) Thus, according to Higgins, Shabazz witnessed the incident; according to Demon, Higgins manufactured the incident out of loyalty to Shabazz. Yet the officer investigating Higgins's complaint did not attempt to interview this key witness. Anglin testified that Shabazz should have been interviewed promptly, and that the file should have contained some justification for the long delay in investigating the complaint. (PSOF [177] ¶ 72.) The PREA investigation ultimately found that Higgins's complaint was unsubstantiated. (DSOF [165] ¶ 74.)

14

During her time at both Dixon and Pontiac, Higgins claims that she was forced to shower in a setting where her naked body was visible to male prisoners and staff.  Defendants assert that the showers in both facilities are private showers with walls and shower curtains, and that neither facility has communal showers.  (DSOF [165] ¶¶ 34–35.)  Higgins does not dispute this, but nevertheless asserts that she was "forced to shower while male prisoners and staff could view her naked body, despite the presence of individual showers."  (Pl.'s Resp. to DSOF [172] ¶ 34–35.)  Higgins claims that these "exposures continued after [she] was sexually assaulted by [Demon]" which "exacerbated the traumatic impact of being sexually assaulted."  (PSOF [177] ¶ 38.)

### 4.    Other Conduct by Prison Staff

It is undisputed that IDOC staff have been trained that intentionally misgendering transgender inmates constitutes a form of sexual harassment.[11]  (PSOF [177] ¶ 24; Defs.' Resp. to PSOF [184] ¶ 24.)  Defendants contend that Higgins has failed to demonstrate this training happened before or during the time she was incarcerated (Defs.' Resp. to PSOF [184] ¶ 24), but have not said what their own records show about the timing of the training.  In any case, Higgins was consistently misgendered by correctional officers, supervisors, PREA investigators, and prison administrators throughout her time in IDOC custody.  In fact, Defendants do not dispute that "[e]ven the grievance officers responsible for reviewing Plaintiff's complaints of misgendering consistently misgendered her."  (PSOF [177] ¶ 25.)  Higgins's expert, Dr. Gorton, an emergency medicine and primary care physician who has "provided primary care and transition-related care to more than 1000 transgender patients," found that persistent misgendering caused "profound gender dysphoria and mental suffering that Ms. Higgins experienced continually throughout her time in IDOC custody from 2018-2022."  (Gorton Rep. [171] at 1, 25.)

---

[11]    Dr. Gorton, defines "misgendering" as "when transgender people are addressed either accidentally or intentionally with wrong pronoun or with the [individual's] prior name (generally their birth name)."  (Gorton Rep. [171] at 9.)

Higgins alleges that various named defendants either engaged in transphobic conduct themselves or failed to intervene or protect Higgins when they were responsible for doing so. The court examines the evidence relating to each of the named defendants on this issue in turn.

### a. Michelle Victum

Higgins asserts that when she asked Victum to use Higgins's preferred female pronouns, Victum refused and continued to refer to Higgins using male pronouns. (PSOF [177] ¶¶ 73, 74; Defs.' Resp. to PSOF [184] ¶¶ 73, 74 (nonresponsive to relevant part); DSOF [165] ¶ 65.) Higgins also claims that Victum told other inmates to refer to Higgins as male and that Victum told another prisoner that she would "pay him to hit" Higgins (how Higgins became aware of this threat is unexplained). (PSOF [177] ¶ 74.) Victum "denies telling other inmates that Plaintiff was a man" and "denie[s] harassing" Higgins, but does not dispute that she intentionally misgendered Plaintiff. (Defs.' Resp. to PSOF [184] ¶ 74.)

When Kemmeren was informed (it is unclear by whom) of Victum's refusal to refer to transgender inmates using their preferred pronouns, Kemmeren had a conversation with Victum in an attempt to address the issue. (DSOF [165] ¶ 65.) The record is unclear as to when this conversation occurred. (*See* Defs.' Ex. 11 [165-13] at 15.) The issue persisted, so Kemmeren and another shift supervisor moved Victum to a different housing unit, though, again, it is unclear when. (DSOF [165] ¶ 66.) Internal affairs conducted an investigation regarding Victum's conduct, and Higgins's allegations were substantiated in a November 24, 2021 Investigation Report. (*Id.* ¶ 67; Defs.' Ex. 11 [165-13] at 1.)

### b. Susan Prentice

Next, Higgins alleges that, as a Correctional Major (presumably a role in which she had some relevant authority), Defendant Prentice "personally determined that, at Pontiac, 'inmates were not allowed to try to dress like women,' including by wearing pants that were too tight." (PSOF [177] ¶ 61.) Defendants admit that under Pontiac policy, inmates were not allowed to dress like women, though they dispute that this policy was the result of a personal determination

16

by Prentice; instead, Defendants attribute the rule to the broader policy that "individuals in custody (and Officers)" were expected to "wear their uniform properly." (Defs.' Resp. to PSOF [184] ¶ 61.) They admit, however, that Prentice personally told prisoners that they were not allowed to wear tight pants (a direction that Higgins appears to believe reflects transphobia). (*Id.*)

Higgins also claims that Prentice "repeatedly referred to [her] as a 'faggot' and 'homosexual' and used these slurs in front of other officers." For example, on one occasion when Higgins was walking to the yard on an unspecified date, Prentice told Higgins: "[Y]ou can't go outside like that. Get your faggot ass upstairs." (PSOF [177] ¶ 62.) When Higgins complained about the harassment she had experienced, Prentice would, according to Higgins, "punish her for it by having officers destroy Plaintiff's possessions under the pretext of searching [Higgins's] cell." (*Id.*) Prentice personally supervised these "random" searches. (*Id.*) But Higgins does not explain the basis for her belief that the searches were ordered by Prentice with this malicious intent. Defendants dispute Higgins's allegations, stating that Prentice has never used the term "faggot" while on duty at IDOC, and asserting that "Prentice does not treat prisoners differently based on their gender identity." (Defs.' Resp. to PSOF [184] ¶ 62.) There is no indication that Higgins filed grievances about these incidents, and the record is unclear as to when exactly these instances occurred.

On July 29, 2020, Correctional Officer Durre "walked full force into [Higgins] from the back," resulting, according to Higgins, in a back injury. (PSOF [177] ¶ 63.) Later on the same day, Durre, for an unexplained reason, was distributing bleach to the prisoners when he stopped at Higgins's cell and intentionally poured the bleach all over the bars of her cell and on the floor outside. He then proceeded to tell Higgins that he "hated working in East House with 'faggot ass crybabies' like [her]." (*Id.*) Higgins reported the incident to Prentice who, according to Higgins, should have completed an incident report; no such report appears in the record. (*Id.*) For their part, Defendants assert that Prentice has no recollection of any complaint made by Higgins. (Defs.' Resp. to PSOF [184] ¶ 63.) But it is undisputed that Higgins filed a grievance about the

17

incident on the same day it occurred, and timely appealed the grievance through the proper channels. (Pl.'s Ex. SS [170-34] at 4.) The ARB denied the grievance on April 22, 2021, concluding that Higgins's "[a]llegations were not substantiated." (*Id.* at 1.)

In her deposition, Prentice testified that she understood that some prisoners are more vulnerable than others and that transgender status is a factor that contributes to vulnerability. She also acknowledged that Higgins presented as "very feminine." (PSOF [177] ¶ 67.)

### c. Joanna Kemmeren

As discussed above, Defendant Kemmeren was a shift supervisor and administrative major at Dixon while Higgins was incarcerated there. Kemmeren testified at her deposition that she knows that transgender prisoners are vulnerable to sexual harassment and sexual abuse in men's prisons. (PSOF [177] ¶ 78.) Defendants do not dispute that she so testified, nor do they suggest that Kemmeren was unaware that Higgins is transgender. They nevertheless make the unconvincing assertion that Kemmeren's awareness "that transgender prisoners writ large were more vulnerable to sexual harassment and abuse is immaterial to whether she was aware that Plaintiff herself was at risk [of] specific harm." (Defs.' Resp. to PSOF [184] ¶ 78.)

On August 12, 2021, Higgins filed a grievance regarding Kemmeren's refusal to allow Higgins to move to a different cell for protection from a cellmate that Higgins was "having issues with." (Pl.'s Dep. [165-1] at 76:1–6.) Without identifying specific instances, Higgins stated in her grievance that Kemmeren taunted and harassed her and other inmates due to gender identity and sexual orientation. (Pl.'s Ex. U [170-13] at 3–4.) Kemmeren responded to the grievance as follows: "Higgins did not want to stay in their [sic] cell. I do not do room moves for any individual unless for medical reasons (i.e. low bunk issues). I treat everyone the same. If an individual no longer wants to live in their cell, then the individual can go to restrictive housing . . . ." (PSOF [177] ¶ 83.)

When questioned about Higgins's complaint in her deposition, Kemmeren acknowledged that when she heard officers at Dixon use the terms "faggot" and "tranny" in jokes, she did not

18

stop them. (PSOF [177] ¶ 81.) Indeed, she testified that she "did not see anything wrong" with IDOC employees' use of the term "tranny." (*Id.*) Higgins contends that Kemmeren thus failed to meet her responsibility to "take supervisory action when employees used language that was discriminatory." (*Id.*) Defendants do not dispute Higgins's account of Kemmeren's testimony, but they contend that account is "missing context" because Kemmeren also testified that she was not aware until the end of her tenure that the term "tranny" was offensive. She also testified that she never heard the terms "fag" or "faggot" directed at any individual, and if she had, she would have "absolutely correct[ed] it." (Defs.' Resp. to PSOF [184] ¶ 81 (quoting Kemmeren Dep. [165-4] at 187:23–188:1).)

### d. Other IDOC Staff

On May 30, 2021, while Higgins and her cellmate were leaving the dining hall at Dixon, Correctional Officer Galor told Higgins to "take your faggot dicksucking ass on and that's why I be fucking your mom." (PSOF [177] ¶ 19; Pl.'s Ex. O [170-9] at 3–4.) Higgins tried to file a PREA complaint in response to this ugly comment, but the sergeant on duty, Sergeant Wheeler, would not allow her to do so because the incident was "not a PREA issue." (Pl.'s Ex. O [170-9] at 4.) Higgins nevertheless filed a grievance, and the grievance officer responded on June 3, 2021 by saying that a "PREA investigation will be initiated." (*Id.* at 1.) Defendants admit that Higgins filed a grievance regarding this incident. Noting that a PREA investigation was ultimately completed between June and July 2021, they deny that staff precluded her from filing a PREA complaint, but the court notes that there is no record that any investigation was initiated before Higgins filed the grievance. (Defs.' Resp. to PSOF [184] ¶ 19; Pl.'s Ex. P [171-6] at 1–2.)

On August 24, 2021, Officer Shippert "verbally abused" Higgins, calling her "dude" and "dick sucking fag." (PSOF [177] ¶ 20.) Higgins claims that, immediately following this incident, she again attempted to file a PREA complaint, but Lieutenant Hochbaum told her that "a PREA complaint would not be an appropriate response." (*Id.*) Higgins filed a grievance on August 25, 2021 about the incident and Hochbaum's comment regarding a PREA complaint. In fact, a PREA

19

investigation was completed on September 2, 2021.  (Defs.' Resp. to PSOF [184] ¶ 20; *see also* Pl.'s Ex. Q [171-7] at 1.)   Defendants contend this demonstrates that Higgins was not prevented from filing a PREA complaint.  It again appears, however, that this PREA investigation was only initiated after Higgins filed a grievance about the incident.  That said, the fact that a PREA investigation was completed just eight days later supports Defendants' assertion that Higgins was not prevented from filing a PREA complaint about it.  (*Id.* at 3.)

### 5.    Transfer Requests

Transgender individuals in IDOC custody may request transfers from a male facility to a female facility by sending a request directly to the Transgender Care Review Committee ("TCRC"),[12] or by communicating with their therapist, their mental health practitioner, or Warden staff.  (DSOF [165] ¶ 31.)  Prior to 2019, the TCRC would make a recommendation to the Director of IDOC regarding a transfer request for the Director's final approval.  After 2019, the policy changed to give the TCRC final say on whether a transgender individual will be transferred to a female facility.  (*Id.* ¶¶ 32–33.)  Defendants assert that in making decisions on transfer requests, staff must balance the safety of the transgender individual and the safety of the women prisoners in the female facility.  (*Id.* ¶¶ 26–27.) They point to two transfers of transgender women from a male to female facility, one of which was successful, and the other, which took place sometime prior to 2018, resulted in "unexpected security safety issues, a lot of threats and aggressions and sexual acting out and allegations of her raping others."  (*Id.* ¶¶ 28, 29; Puga Dep. [165-16] at 66: 21–67:6, 9:21–10:4.)

---

[12]     The TCRC is an IDOC wide committee established "for the purpose of reviewing placements, security concerns and overall health-related treatment plans of transgender offenders and offenders diagnosed with Gender Dysphoria; and overseeing the gender related accommodations for these offenders."  The TCRC is, according to IDOC Administrative Directive 04.03.104, "[a]t minimum . . . comprised of" the Agency Medical Director or Chief of Psychiatry; Chief of Mental Health; Transfer Coordinator; and Chief of Operations.  (Defs.' Ex. 18 [165-19] at 2.)

Higgins "repeatedly requested transfers to a women's prison, including once in February 2019, three times in January 2021, and once in December 2021," but she claims that these requests were "not evaluated." (PSOF [177] ¶ 49; Defs.' Resp. to PSOF [184] ¶ 49.) Defendants dispute this, and assert that records of Higgins's transfer requests show that these requests *were* evaluated and rejected. (Defs.' Resp. to PSOF [184] ¶ 49.) There is evidence, however, that any institutional review that did take place was limited: One transfer request appears in a grievance that Higgins submitted on February 27, 2019, but there is no response from the institution attached. nor any other record showing that the request was evaluated. (Pl.'s Ex. MM [170-29] at 1.) Higgins's cumulative counseling log includes two other grievances dated January 4, 2021 and January 7, 2021 referring to an institutional transfer request; those grievances were submitted for first level review, but there is no record of the institution's addressing these grievances. (Defs.' Ex. 16 [165-18] at 26.) A third transfer request is contained in the PREA investigator's notes from the investigation of Carl Furrell's conduct at Pontiac, where Higgins told the investigator that "a long term solution to address her concerns is for her to be transferred to Logan CC," a female facility. (Pl.'s Ex. L [171-3] at 12.) It is not clear that this request was addressed beyond the investigating officer's documentation. And finally, Higgins submitted a grievance requesting a transfer on December 8, 2021, but again, there is no evidence of a response from the institution. (Pl.'s Ex. NN [170-30] at 1–2.)

IDOC's Transgender Committee was responsible for reviewing "any threats to safety experienced or posed" by a transgender prisoner requesting transfer. (PSOF [177] ¶ 51; DSOF [165] ¶¶ 32–33.) Higgins's prison administration expert, Ms. Dynan, reviewed records from the Transgender Committee's treatment of Higgins and found that the committee "never evaluated any of the safety threats that Plaintiff experienced, including her complaints of sexual assault and harassment." (PSOF [177] ¶ 51.) Dynan determined, in fact, that the Transgender Committee "did not receive documentation of PREA complaints, incident reports, or other relevant documents" that would be relevant to their determination regarding Higgins's transfer request.

21

(*Id.*)  Defendants dispute this characterization, arguing that Dynan's determination is supported only by "sporadic external evidentiary citations."  (Defs.' Resp. to PSOF [184] ¶ 51.)  The court does not fault Dynan's report for its lack of evidentiary support on this point, however, as it is unclear what evidence she would cite in order to prove the absence of records.  Moreover, if Dynan's conclusions are wrong, the court expects Defendants themselves would have records to establish that.

### B.        Procedural Background

This lawsuit resulted.  Higgins filed her Complaint [1] on January 20, 2023.  Her Second Amended Complaint ("SAC") [52], the operative complaint in the case, brings five claims against Defendants, all in their individual capacities.  In response to Defendants' motion for summary judgment, Higgins has withdrawn claims against Defendants Hochbaum, Kennedy, and Williams, and voluntarily dismissed those Defendants from the case.  (Pl.'s Opp'n. [176] at 6 n.1.)  Four counts remain:  (1) failure to protect in violation of the Eighth Amendment, under 42 U.S.C. § 1983 against Defendant Jeffreys ("Count II"); (2) cruel and unusual punishment via abusive searches in violation of the Eighth Amendment, also under 42 U.S.C. § 1983 against Defendants Kemmeren, Schmeltz, and various John Does ("Count III"); (3) cruel and unusual punishment via failure to protect from sexual and physical assault in violation of the Eighth Amendment, also brought under 42 U.S.C. § 1983 against Defendants Prentice, Kemmeren, Victum, Schmeltz, and various John Does ("Count IV"), and finally, failure to intervene in violation of the Eighth Amendment, again under 42 U.S.C. § 1983 against all Defendants ("Count V").  Defendants moved for summary judgment on December 6, 2025, arguing that Defendants are not liable for the various claims brought by Higgins, that Higgins's claims related to allegations that occurred prior to January 20, 2021 are time-barred, and that all Defendants are shielded from liability on the basis of qualified immunity.  Higgins filed her response [172], and Defendants replied [183-1].  The motion is now fully briefed and ready for the court's consideration.

**LEGAL STANDARD**

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact,' and the moving party 'is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, the court construes "the facts in the light most favorable" to the non-moving party and draws "all reasonable inferences in its favor." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). It does not "weigh evidence or make credibility determinations." *Edwards*, 164 F.4th at 1079.

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

**DISCUSSION**

I.    **Abusive Searches**

A.    **Schmeltz**

Higgins first alleges that Officer Schmeltz subjected her to cruel and unusual punishment through a pat-down during which he groped her breasts while using derogatory slurs. The pat-down, according to Higgins, occurred on January 1, 2020, more than three years before Higgins filed suit on January 20, 2023.

23

Actions under § 1983 are governed by the state-law statute of limitations for personal injury actions—in Illinois, two years. 735 ILCS 5/13-202; *see also Kalimara v. Ill. Dep't of Corr.*, 879 F.2d 276, 277 (7th Cir. 1989); *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015). Under federal law, which determines the accrual date for the purposes of calculating the two-year period, "a claim accrues when the plaintiff knows or has reason to know of the injury giving rise to the cause of action." *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992). Federal courts also adopt state-law tolling rules when assessing the timeliness of § 1983 claims. *See Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001). Under Illinois law, "[w]hen the commencement of an action is stayed by . . . statutory prohibition, the time of the continuance . . . is not part of the time limited for the commencement of the action," meaning that the statute of limitations is tolled. 735 ILCS 5/13-216. Because the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that prisoners exhaust their administrative remedies before suing in federal court, a "federal court relying on the Illinois statute of limitations in a § 1983 case must toll the limitations period while a prisoner completes the administrative grievance process." *Rivera*, 272 F.3d at 521–22.

Defendants assert that any claims arising out of events that occurred prior to January 20, 2021 are time-barred. The two-year statute of limitations bars Higgins's claims, according to Defendants, against Schmeltz and Prentice, as well as any claims "related to a pat down, strip search, misgendering, policies, showers, or a transfer occurring prior to January 20, 2021." (Defs.' Mem. [167] at 29.) Higgins counters that the statute of limitations does not bar her claims because the statute of limitations was tolled while she was incarcerated and statutorily barred by the PLRA from filing a lawsuit related to any incidents for which she had failed to exhaust the grievance process. Higgins is correct that she is entitled to tolling while she worked to complete the administrative grievance process. *See Rivera*, 272 F.3d at 521–22. But Higgins urges the court to go a step further. She argues that, if the court were to find that she had not exhausted her administrative remedies as to any particular incident, then the tolling would extend until the

24

date she was released from prison, February 4, 2022, because before that date the PLRA barred her from filing suit. (Pl.'s Opp'n [176] at 36.) In effect, Higgins asks this court to find that any prisoner who has failed to exhaust her administrative remedies can simply wait until she is released from prison to bring even decades-old claims because the statute of limitations should be tolled while the PLRA prevented her from filing suit.

The court declines to adopt this novel theory. The PLRA is not an absolute bar for prisoners' claims under § 1983. Rather, it places a prerequisite to filing suit, and its statutory prohibition applies only to those inmates who fail to meet those prerequisite requirements. *Smith v. Zachary*, 255 F.3d 446, 451 (7th Cir. 2001) ("Requiring administrative review does not foreclose a prisoner's ability to file suit, it merely creates a necessary precondition. The requirement is not designed to stop prisoners from filing suits, but rather to facilitate the litigation process."). Tolling can only apply, therefore, during the time a prisoner is actively working to satisfy the exhaustion requirement or waiting for a response from the institution to a properly filed grievance, and not during periods where she simply "sat on [her] hands" and let deadlines expire without taking necessary action. *Salley v. Parker*, No. 18-CV-5700, 2020 WL 4736412, at *9 (N.D. Ill. Aug. 14, 2020).[13] Thus, to determine the timeliness of Higgins's claims arising out of the allegedly abusive pat-down search at Pontiac, the court must consider whether tolling of the time Higgins engaged in the grievance process revives her otherwise untimely claims.

---

[13] The court recognizes that many of these arguments sound in the affirmative defense of failure to exhaust. Defendants Hochbaum, Jeffreys, Kennedy, Prentice, Schmeltz, Victum, and Williams asserted this affirmative defense in their Answer to Higgins's SAC [72], along with the affirmative defense that many of the events giving rise to Higgins's claims were barred by the statute of limitations. (Defs.' Answer to SAC [72] at 46.) However, on December 15, 2023, these Defendants clarified to Magistrate Judge Jensen that they would waive their exhaustion defense considering that Higgins was no longer incarcerated when she filed suit. (Defendants' Status Report [76].) Although Defendants' failure-to-exhaust argument is waived, the timeliness defense is not. The court therefore must still examine Higgins's efforts to exhaust her administrative remedies to determine the times during which she is entitled to tolling of the statute of limitations.

25

Is a prisoner entitled to tolling during the period between accrual of her claim (i.e., when the prisoner becomes aware of her injury) and the point at which she files her grievance?  This is, for now, an open question in this Circuit.  *Schlemm v. Pizzala*, 94 F.4th 688, 690 (7th Cir. 2024) ("We pause to acknowledge that our precedent is inconsistent on whether the gap between claim accrual and grievance filing is included in the tolling period . . . We will need to address this question, but given Appellees' waiver, we leave it for another day.").  Answering this question in the way most favorable to Higgins, she is entitled to tolling of the time between January 1, 2020, and March 18, 2020, when she received a response from the Chief Administrative Officer.  But even assuming this time is tolled, Higgins's Complaint remains barred by the statute of limitations. With respect to Defendant Schmeltz, this is true even if the court generously determines that the 30 days in which she could have appealed the Chief Administrative Officer's decision to the ARB should also be tolled.  And even assuming that Higgins's efforts to pursue a PREA investigation would fulfill the exhaustion requirement (as discussed further below, they would not), she is entitled to tolling only until November 19, 2020, meaning that her claims remain untimely.

The court grants summary judgment in favor of Defendant Schmeltz on Count III. Summary judgment for Schmeltz is also warranted on Count V, Higgins's failure to intervene claim, because Higgins's factual allegations against Schmeltz are limited to the search discussed above, rendering that claim against Schmeltz untimely for the same reason.  Furthermore, it is unclear what factual allegations could support a failure to intervene claim against Schmeltz, as the only allegations against him relate to this search.  To the extent that Higgins is arguing that Schmeltz should have intervened to stop *himself* from conducting an unconstitutional pat down, the court is unaware of any case law that would support this theory.

**B.    Kemmeren**

While Higgins alleged in her complaint that Defendant Kemmeren personally engaged in abusive strip searches, no evidence has surfaced in discovery to establish this.  Higgins's allegations that Kemmeren failed to protect her from these abusive searches, and failed to

intervene when they happened, are raised in separate counts that will be addressed below. Because there is no factual support for the claim that Kemmeren herself engaged in abusive searches, the court enters summary judgment in her favor on Count III.

## II.     Failure to Protect and Intervene

Prison officials have a duty to take "reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). That duty includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 833. To establish a claim that prison officials violated her Eighth Amendment rights by failing to protect her, Higgins "must produce evidence showing that [she] faced a substantial risk of harm and that officials acted with deliberate indifference to that risk." *Rosario v. Williams*, No. 23-CV-2726, 2025 WL 2306966, at *3 (N.D. Ill. Aug. 11, 2025) (citing *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005)). A risk is "substantial" when it is "almost certain to materialize if nothing is done." *Brown*, 398 F.3d at 911. "The risk must be somehow specific to [an inmate], and not a mere general risk of violence." *Thomas v. Dart*, 39 F.4th 835, 842–43 (7th Cir. 2022) (cleaned up) (pretrial detainee). Still, "it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Sinn v. Lemmon*, 911 F.3d 412, 421 (7th Cir. 2018) (quoting *Farmer*, 511 U.S. at 843). Instead, what matters is "is the relevant defendant's subjective awareness, which includes the inmate's complaints along with any other information that defendant may have." *Id.* at 421.

Higgins also asserts that all Defendants failed to intervene in the alleged constitutional violations. To succeed on a failure-to-intervene claim, Plaintiff must show that Defendants: "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent" the violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir.

27

2005) (emphasis in original) (citation omitted). Importantly, however, without an underlying constitutional violation, a failure to intervene claim has no legs to stand on. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

### A. Jeffreys

#### 1. Merits of Constitutional Violations

Higgins's complaint alleges that Jeffreys is liable for failure to protect her against Eighth Amendment violations because he (1) failed to enforce policies that allow her to choose to be searched by female guards and to shower alone; (2) failed to require prison officials to act when they received reports of sexual violence, abuse, or harassment of transgender prisoners; and (3) failed to discontinue a policy of placing transgender individuals in male prisons. (SAC [52] ¶ 115.)

Defendants who, like Jeffreys, "are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy," *Sinn*, 911 F.3d at 423 (citation and internal quotation marks omitted), or for "the institution of a 'policy that, when enforced, causes a constitutional deprivation.' " *Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015) (*quoting Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1013 (7th Cir. 2000)). "But an inmate cannot show a 'widespread practice of an unconstitutional nature,' such as a custom of ignoring prison policy, by pointing to 'isolated incidents of inmate-on-inmate brutality.' " *Sinn*, 911 F.3d at 423 (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003)). Rather "[a] risk of serious harm may be shown . . . by evidence of a series of bad acts that the policymaking level of government was bound to have noticed, like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault." *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) (citations omitted).

Defendants argue that Higgins's claim against Jeffreys is doomed because she can only demonstrate that Jeffreys was aware of a general risk to transgender inmates, and was not subjectively aware of the risk that Higgins specifically faced. But Higgins argues that regardless

28

of whether or not Jeffreys knew that Higgins specifically was at risk of assault, his "expos[ure] to the information" in the *Monroe* evidentiary hearing transcripts regarding the substantial risk of sexual assault that transgender women faced in male facilities is evidence sufficient to support a finding that he had actual knowledge of the risk. *Mayoral v. Sheahan*, 245 F.3d 934, 938–39 (7th Cir. 2001) (noting that "if a plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge").

A reasonable jury could find that, by failing to implement or enforce policies that would have permitted Higgins to transfer to a female facility,[14] and by failing to ensure that she was not exposed to other male inmates while showering, or subjected to strip searches during which she was made more vulnerable to sexual harassment and assault by correctional officers and other inmates, Jeffreys failed to protect Higgins against a known and substantial risk of sexual abuse. That leaves the issue of qualified immunity for this claim, discussed in more detail below.

Before reaching that issue, the court considers another claim Higgins has leveled against Jeffreys: failure to intervene. To prove that claim, Higgins must demonstrate that Jeffreys had a realistic opportunity to prevent a violation of her constitutional rights. Ordinarily such a claim arises when officers are physically present during a violation but fail to step in to prevent it. *See e.g.*, *Gill*, 850 F.3d at 342. Courts in some instances have recognized a failure to intervene claim against officers not physically present during a constitutional violation, but only where those

---

[14] Defendants also challenge claims arising out of Higgins's transfer requests as untimely, because she made several of these requests before the statutory period, which began on January 20, 2021. While it is true that at least 4 of her requests were made outside of the statutory period, Higgins did also file a transfer request in December 2021, which, based on the record, appears not to have been evaluated. Her earlier requests appear to have suffered the same fate, which would entitle her to tolling of the statutory period, as a lack of response from prison administration would render the grievance process unavailable to her. *See Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002).

defendants "directly and personally acquiesced in the specific unconstitutional act (or actor) at issue." *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1008 (N.D. Ill. 2024); *see also Smith v. Burge*, 222 F. Supp. 3d 669, 687 (N.D. Ill. 2016) (declining to dismiss a failure-to-intervene claim against supervisors who knew, but "turned a blind eye" to the fact that a specific officer was repeatedly torturing and coercing confessions from suspects).

Higgins lacks such evidence in this case; she has not established Jeffreys's specific knowledge of and acquiescence in wrongdoing. True, Jeffreys's signature appears on the ARB's decision regarding the July 19, 2020 search; but it is undisputed that Jeffreys delegated the grievance review process to his Chief Inspector and did not review any grievances himself. (DSOF [165] ¶ 44; Pl.'s Resp. to DSOF [172] ¶ 44.) Because Jeffreys did not review grievances himself, Ms. Higgins cannot show that the standard grievance process was sufficient to put him on notice of the risks that she faced specifically—Jeffreys could not have turned a blind eye to violations he had no subjective awareness of. *Harrison v. Wexford Health Sources Inc.*, No. 18 C 893, 2023 WL 6929569, at *5 (N.D. Ill. Oct. 19, 2023) (finding no subjective awareness by defendant where it was "undisputed . . . that although [defendant's] signature appears on the responses to [plaintiff's] grievances, he did not review or sign those grievances and instead delegated this responsibility to his staff"); *Couch v. Godinez*, No. 3:13-CV-1100-SMY-PMF, 2016 WL 1555155, at *2 (S.D. Ill. Apr. 18, 2016) (finding that plaintiff had "no support – beyond speculation – for the subjective element of his Eighth Amendment claim" where it was undisputed that another prison official signed appeals as a designee for defendant).[15]

---

[15] The court finds it troubling that Jeffreys can avoid liability on the basis of lack of knowledge by the expedient of delegating authority to review grievances to other (unnamed) prison officials. It is, of course, likely unrealistic to expect the Director of IDOC to personally review all of the numerous grievances directed to him for his review. The court nevertheless suggests that, having been made aware of the serious risks that transgender inmates face in male facilities, Jeffreys should have instructed the Chief Inspector to ensure that Jeffreys personally reviews grievances from transgender inmates regarding sexual misconduct. His failure to do so to date is, in the court's view, negligent, but the court is bound by the rule that "[n]egligence or even gross negligence is not sufficient to support a § 1983 claim." *Smith v. Does*, No. 25-3324,

Summary judgment is granted for Jeffreys on Count V.

### 2. Qualified Immunity

The court now turns to the question of whether Jeffreys is shielded from liability for his failure to protect Higgins on the basis of qualified immunity. "Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). "A constitutional right is clearly established 'if the right in question is sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024) (quoting *Smith*, 10 F.4th at 742). To be clearly established, the right must be "defined with specificity," *id.* at 489, and "should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation and internal quotation marks omitted). The "clearly established law must be 'particularized' to the facts of the case." *Brown v. Randle*, 847 F.3d 861, 864 (7th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Sabo v. Erickson*, 128 F.4th 836, 845 (7th Cir. 2025) ("[O]ur court does not break new ground when defining clearly established Eighth Amendment law with specificity."). "A case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)

In arguing that none of the Defendants are entitled to qualified immunity, Higgins points the court to cases dealing with the duties of line-level officers to protect prisoners from sexual assault. (*See* Pl.'s Opp'n [176] at 33.) But Jeffreys's invocation of qualified immunity requires this court to determine not just whether the right to protection from sexual assault was clearly established, but also whether or not Jeffreys, as the Director of IDOC, had a clearly established

---

2026 WL 265789, at *1 (C.D. Ill. Feb. 2, 2026) (citing *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018)).

31

duty to address the systemic deficiencies that resulted in Higgins's injuries. *Cf. Ollison v. Gossett*, 136 F.4th 729, 750 (7th Cir. 2025) (Hamilton, J., dissenting) (suggesting that claims against supervisory prison officials "require evidence that each actually knew of [] systemic failures [and] . . . failed to respond reasonably."). The parties' briefing is silent on this issue. The court directs the parties to file supplemental briefing on this issue to aid the court in making its final determination on Jeffreys's entitlement to qualified immunity.

## B. Prentice

Higgins alleges Prentice violated her Eighth Amendment Rights both personally, through Prentice's own verbal harassment, and by failing to protect Higgins from her subordinates' constitutional violations. Defendants contend that Higgins's claims against Prentice are time-barred, and assert in the alternative that the conduct at issue does not amount to constitutional violations.

Higgins's allegations against Prentice all took place during Higgins's time at Pontiac, between December 5, 2018 and February 4, 2021. There is only a very brief period when claims arising at Pontiac are actionable: January 20, 2021 (two years before Higgins filed suit) to February 4, 2021, when Higgins left Pontiac. Any events that occurred outside of this 15-day period are time-barred unless Higgins can demonstrate that she is entitled to tolling.

Higgins's allegations against Prentice relate to Prentice's use of derogatory slurs against Higgins, and Prentice's alleged policy of barring inmates at Pontiac from dressing as women. When these events took place is unclear from the record. While Defendants bear the burden of establishing their affirmative defense that Higgins's claims are untimely, at the summary judgment stage, they can prove untimeliness by "pointing to the absence of evidence in the record to support the plaintiff's timeliness." *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 744 (7th Cir. 2021). Higgins alleges that Prentice repeatedly referred to her as a "faggot" and "homosexual" (PSOF [177] ¶ 62), but she presents no information regarding when any particular use of these slurs occurred. In light of this lack of evidence of timeliness, summary judgment for Prentice is

32

warranted on claims arising out of Prentice's verbal harassment. *Celotex*, 477 U.S. at 325 (explaining that the party moving for summary judgment may meet its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case").

As to Higgins's claim against Prentice related to her failure to protect Higgins from sexual and physical abuse, these claims arise out of two main incidents. The first is Officer Schmeltz's pat-down, which, as the court has already discussed, is time-barred. The second is Higgins's allegation that Prentice failed to protect her from, and failed to intervene in, Officer Durre's physical abuse and verbal harassment. Recall that on July 29, 2020, Officer Durre "walked full force into [Higgins] from the back" which Higgins claims resulted in her suffering a back injury, poured the bleach all over the bars of her cell and on the floor outside, and told Higgins that he "hated working in East House with 'faggot ass crybabies like [her].' " (PSOF [177] ¶ 63.) Higgins filed a grievance on the same day and timely appealed the grievance through the proper channels. She received a denial of her grievance from the ARB on April 22, 2021, and she is entitled to tolling of claims arising out of these allegations until that date. Higgins's claims against Prentice for failing to protect her from this specific instance of abuse and failing to intervene in response are therefore timely.

Higgins's failure-to-intervene claim against Prentice nevertheless does not survive summary judgment because Officer Durre's conduct, ugly as it was, does not rise to the level of a constitutional violation. That Durre made physical contact with Higgins—running into her in a manner that may very well have been accidental—is not alone sufficient to constitute cruel and unusual punishment. *Jones v. Anderson*, 116 F.4th 669, 678 (7th Cir. 2024) (finding no Eighth Amendment violation where "[t]here was no violent force, only a minimal degree of unwanted physical contact—not enough to characterize as anything more than *de minimus* [sic] force for Eighth Amendment purposes.")

As to Durre's use of homophobic slurs in addressing Higgins, this conduct, while offensive and unprofessional, is also not sufficiently serious to constitute a constitutional violation. This is

not to say that verbal harassment cannot ever "amount to cruel and unusual punishment." *See Beal v. Foster*, 803 F.3d 356, 357 (7th Cir. 2015). In *Beal*, the plaintiff alleged that a defendant prison guard made repeated sexual comments and displayed his penis to the plaintiff. Reversing dismissal of the complaint on motion, the court concluded this conduct "could have been understood by the inmates as implying that the plaintiff is homosexual," making the plaintiff vulnerable to sexual abuse, and thus subjecting him to cruel and unusual punishment. *Id.*; *Perkins v. Kohler*, No. 22-CV-1125, 2024 WL 402567, at *6 (E.D. Wis. Feb. 1, 2024), *aff'd sub nom. Perkins v. Koehler*, No. 24-1508, 2024 WL 4835249 (7th Cir. Nov. 20, 2024) (explaining that "comments that label a plaintiff homosexual . . . increase[] the likelihood of sexual assaults on [her] by other inmates,' " and therefore can rise to the level of cruel and unusual punishment (cleaned up)).

But courts applying *Beal* have declined to extend its holding where the alleged verbal harassment lacked the "compounding factor" present in *Beal*. *See e.g.*, *Elkins v. Quinn*, No. 3:19-CV-55-MAB, 2022 WL 602982, at *4 (S.D. Ill. Mar. 1, 2022) (finding no constitutional violation where "comments were not made in front of other inmates, did not incite other inmates to harm Plaintiff, were not accompanied by a threatening act, and were isolated to a single day.") There is no evidence in the record that Durre subjected Higgins to repeated verbal harassment, nor any evidence that the homophobic slur was uttered in the presence of other prisoners. The court has no praise for Durre's behavior or for Prentice's tolerance of it. But because Durre's conduct did not violate the constitution, Higgins's failure-to-intervene claim against Prentice relating to this incident must also fall. *See Harper*, 400 F.3d at 1064 ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.")

Summary judgment is granted in favor of Prentice on Counts IV and V.

**C.     Kemmeren**

Higgins argues that the court should deny summary judgment in favor of Kemmeren because "[a] reasonable jury could conclude that Kemmeren encouraged and condoned abusive

strip searches of [Higgins], which violated the Eighth Amendment." (Pl.'s Opp'n [176] at 26.) Higgins also alleges that Kemmeren failed to protect her from prisoners who threatened her safety. (*Id*.) Again, the evidence is insufficient to support this claim.

### 1. Failure to Intervene

Because a failure-to-intervene claim must be premised on an underlying constitutional violation, the court turns, first, to the question of whether the strip searches to which Higgins was subjected violate the Eighth Amendment. Generally, "only those [bodily] searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional. In other words, the search must amount to calculated harassment unrelated to prison needs, with the intent to humiliate and inflict psychological pain." *Whitman v. Nesic,* 368 F.3d 931, 934 (7th Cir. 2004) (citations and internal quotation marks omitted).

To the extent that Higgins argues cross-gender searches on their own violate the Eighth Amendment, the case law she cites does not appear to support the argument. For example, in *Hall v. Eddy*, No. 24-3332, 2025 WL 1943386 (C.D. Ill. July 15, 2025), the prisoner alleged that male officers "sexually harassed her while performing strip searches through disparaging verbal comments and using restraints in a sexually suggestive manner." *Id.* at *1. In allowing that claim to proceed, the court did not recognize the mere occurrence of a cross-gender search as sufficient to state a claim for a constitutional violation. And a plaintiff's burden of proof at summary judgment is higher than the burden to state a claim at the pleading stage. Higgins's reference to *West v. Radtke*, 48 F.4th 836, 850 (7th Cir. 2022) fares no better. The Seventh Circuit's analysis there centered around the inmate's claims that such searches violated his religious beliefs, an allegation that Higgins does not raise. And while the Seventh Circuit determined that "more intrusive cross-sex privacy invasions—'like a strip search, in the absence of an emergency' . . . require a reasonable accommodation," the court determined only that such searches might violate the

35

Fourth Amendment, not the Eighth. *Id.* at 851; *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994).[16]

Strip searches constitute cruel and unusual punishment under the Eighth Amendment where they are "intended to humiliate the victim or gratify the assailant's sexual desires." *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012). A reasonable jury could find that several of the searches Higgins underwent at Dixon rose to that level. For example, during the August 24, 2021 strip search, Higgins's naked body was inexplicably left exposed to other prisoners for thirty minutes. During that time, inmates sexually harassed her and threatened her with sexual assault, and she was harassed by other officers. (PSOF [177] ¶ 36.) Similarly, on November 6, 2021, the male officer strip searching Higgins became sexually aroused during the search and made Higgins aware of this, suggesting his conduct during the search was meant to gratify his sexual desires. That would squarely violate the Eighth Amendment. *See Holloway v. Doe*, No. 22-2717, 2023 WL 7412949, at *1 (7th Cir. Nov. 8, 2023). He also "left the door open so that others could see [Higgins's] breasts during the search." (PSOF [177] ¶ 39.) While the Seventh Circuit determined in *Whitman*, 368 F.3d at 931, 935, that being forced "to stand naked for twenty minutes in a bathroom stall until he produced a urine sample" is not a " 'sufficiently serious' condition of confinement to rise to the level of a constitutional violation," Defendants have not asserted that any reasonable penological interest justified the exposure of Higgins's body to other inmates, and certainly not for such an extended period. Nor could they, especially in light of Higgins's vulnerability to sexual assault as a transgender woman in a male facility.

With the possibility of an underlying constitutional violation established, the court now turns to Kemmeren's alleged failure to intervene. "To succeed on a failure-to-intervene claim, a

---

[16] Higgins has not alleged that these cross-gender searches violated her Fourth Amendment rights, and because the parties have not addressed institutional need or justification for the searches, the court is not certain that a Fourth Amendment claim would have merit. As the parties will be filing supplemental briefs, the court will entertain arguments on this issue, including arguments regarding waiver or forfeiture of any Fourth Amendment claim.

plaintiff must demonstrate that jail officials had a 'realistic opportunity to step forward' but 'fail[ed] to do so.' " *Young v. Dart*, No. 17-CV-1914, 2021 WL 3633927, at *5 (N.D. Ill. Aug. 17, 2021) (quoting *Harper*, 400 F.3d at 1064). Higgins has provided no evidence that Kemmeren was aware of the unconstitutional search as it was happening. She has only alleged that Kemmeren responded to a grievance about the incident after the fact. But Kemmeren is liable for failure to intervene only if she had a realistic opportunity to intervene in the constitutional violation as it was occurring. *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) ("A realistic opportunity to intervene may exist if an officer could have called for a backup, called for help, or at least cautioned the officer to stop." (citation and internal quotation marks omitted)); *Wright v. Brennan*, No. 17-CV-398-JPS, 2018 WL 1247398, at *3 (E.D. Wis. Mar. 9, 2018) (Defendants "could not intervene against a use of force which they did not know about until (at best) after the fact.") Because she has failed to do so, summary judgment for Kemmeren on Count V is warranted.

### 2.    Failure to Protect

A failure-to-protect claim generally alleges that a prison official failed to protect the plaintiff from other inmates, but defendants may also be liable for failing to protect a prisoner from substantial harm caused by other prison officials. *Compare Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners"), *and Farmer*, 511 U.S. at 833 ("As the lower courts have uniformly held, and as we have assumed, prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (cleaned up)) *with Nielsen v. Sexton*, 168 F.4th 968, 980 (7th Cir. 2026) (assessing a failure-to-protect claim lodged against high-ranking prison officials for the repeated sexual assault of plaintiff by a prison counselor). Higgins brings her failure-to-protect claim against Kemmeren under both theories, and the court will discuss each in turn.

Higgins contends that Kemmeren had a duty to ensure that other officers protected Higgins from sexual harassment by other inmates—that is, Higgins attempts to hold Kemmeren

37

accountable for the constitutional violations of other officers who inexplicably left Higgins's body exposed to other inmates while they conducted their strip searches. Kemmeren allowing cross-gender searches does not support the conclusion that she condoned the conduct of the officers performing the search. There is evidence that unnamed officers failed to protect Higgins from sexual harassment at the hands of other inmates. Those officers (who have not been named as Defendants) themselves may be liable for failure to protect—but Kemmeren is not liable for those failures under a theory of *respondeat superior*. *See Askew v. Sheriff of Cook Cnty., Ill.*, 568 F.3d 632, 637 (7th Cir. 2009) (explaining that the doctrine of *respondeat superior* is not recognized under § 1983).

Higgins also alleges that Kemmeren failed to protect her from her cellmate by denying her request to move cells. In her deposition, Higgins testified that she "requested to be moved to another cell because [she] was having issues with [her] cellmate at that time," without clarifying or expounding upon the nature of those issues. (Pl.'s Dep. [165-1] at 76:1–6.) Having "issues" with a cellmate is presumably not an unusual occurrence. The testimony Higgins cites does not establish that she faced a substantial risk of harm from her cellmate; nothing in her grievance arising out of the incident suggests this was the case either. (Pl.'s Ex. U [170-13] at 3–4.) Nor is there any record evidence that Higgins made Kemmeren aware of any threat to her safety from Higgins's cell mate.

As for Kemmeren's failure-to-protect Higgins from the sexual harassment and assault by other prison officers during these cross-gender searches, genuine disputes of material fact exist. It is undisputed that Kemmeren knew that transgender prisoners were vulnerable to sexual harassment and abuse in men's prisons. (PSOF [177] ¶ 78; Defs.' Resp. to PSOF [184] ¶ 78.) And, on at least one occasion, after the search conducted by Officer Talley, Higgins filed a grievance complaining about sexual abuse during a cross-gender strip search that Kemmeren was arguably made aware of. (Pl.'s Ex. UU [170-35] at 3 (Grievance Counselor responding to Higgins's grievance regarding the Talley search: "Per Major Kemmeren, Officer Talley no longer

works in HU29.").) And Kemmeren's testimony that she did not recall moving Talley to a different housing unit does not mean it did not happen. This is sufficient to leave open the possibility that Kemmeren had actual knowledge of the risk to Higgins of sexual harassment and abuse at the hands of prison officers during these cross-gender searches, creating a triable issue of fact. Kemmeren may be able to demonstrate that she took "reasonable measures to abate" the risk Higgins faced during these cross-gender searches, *Dale*, 548 F.3d at 569—for example by, at the direction of the warden, implementing a policy of waiting for female staff volunteers, even if those volunteers needed to come from other prisons—but based on the record here, the court cannot say definitively that these measures were reasonable in light of the magnitude of the risk. That determination is more appropriately left for a jury.

### 3. Qualified Immunity

That leaves the question whether Kemmeren is shielded from liability under the doctrine of qualified immunity—a defense available if the right Higgins asserts was not clearly established at the time of the violation. Relevant case law does clearly establish that inmates have a right to be free from sexual abuse in prison, but the cases Plaintiff cites in support of her failure-to-protect claim all involve a prison official's failure to protect an inmate from a specific threat by another inmate who is a known and identified perpetrator. *Gevas v. McLaughlin*, 798 F.3d 475, 478 (7th Cir. 2015) (rejecting qualified immunity defense where plaintiff told defendants specifically that his eventual assailant—his cell mate—was threatening to stab him); *Kozar v. Munoz*, 230 F. Supp. 3d 915, 924 (N.D. Ill. 2017) (rejecting qualified immunity defense where defendants "failed to reasonably respond to an ongoing assault" by other inmates, and "failed to reasonably respond to warnings of a future assault" after plaintiff repeatedly complained to prison officer about his cellmate's increasingly agitated behavior). However, at the time of Higgins's incarceration, no case decided by the Seventh Circuit, nor the Supreme Court, had clearly established that a prison official violated a prisoner's constitutional right by failing to remove her from a situation where she faced a greater risk of sexual abuse by *prison officers*.

*Nielsen v. Sexton*, 168 F.4th 968 (7th Cir. 2026), recently decided by the Seventh Circuit, comes closer. In that case, the court held that prison officials could be held liable for their failure to protect a prisoner from sexual assault by a prison counselor after they learned definitively that the counselor had repeatedly sexually assaulted her. But *Nielsen,* like the cases distinguished above, involved a known perpetrator, not the possibility of attack by an unknown future assailant. And *Nielsen* was decided in 2026, several years after Higgins's release from custody. Assuming that *Nielsen* clearly established Higgins's rights to protection by Kemmeren, that right was not clearly established "at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735. Summary judgment for Kemmeren is warranted on Count IV on the basis of qualified immunity.

### D.     Victum

#### 1.        Merits of Constitutional Claims

That leaves Higgins's allegations against Defendant Victum. Higgins alleges that Victum failed to protect her from sexual harassment and assault and failed to intervene to stop other officers' constitutional violations. Because Higgins has not identified any specific incident when Victum failed to intervene in a constitutional violation by another officer, the court grants summary judgment in favor of Victum on Count V.

As for Higgins's failure-to-protect claim, Higgins alleges that Victum failed to protect her from sexual harassment and abuse by other inmates both by refusing to refer to her using female pronouns and encouraging other prisoners to inflict harm against Higgins, and by failing to take action to protect Higgins from Demon. There is evidence creating disputes of fact on both claims.

First, a reasonable jury could find that by repeated misgendering of Higgins, and by encouraging other prisoners to refer to Higgins using male pronouns, Victum violated Higgins's Eighth Amendment rights. As noted, in *Beal,* the Seventh Circuit recognized that verbal harassment can rise to the level of cruel and unusual punishment when it puts a prisoner at risk of harm by other inmates or when it inflicts "significant psychological harm." 803 F.3d at 358–59. While single instances lack the compounding factor necessary to raise harassment to the level of

40

a constitutional violation, repeated verbal harassment can violate the Constitution on its own. *Cf. id.* at 358 (explaining that verbal harassment does not rise to the level of a constitutional violation when it is " 'fleeting,' [or] too limited to have an impact"). Higgins's expert, Doctor Gorton, found that persistent misgendering caused "profound gender dysphoria and mental suffering that Ms. Higgins experienced continually throughout her time in IDOC custody from 2018-2022." (Gorton Rep. [171] at 25.) Taking this evidence together with Victum's persistent refusal to refer to Higgins using female pronouns, even after Higgins regularly corrected her, a reasonable jury could find that Victum's conduct rose to the level of a constitutional violation.

Further, if Victum's behavior encouraged other inmates to cause harm to Higgins, this conduct, too, clearly violates Higgins's Eighth Amendment rights. In *Turner v. Pollard*, 564 F. App'x. 234, 239 (7th Cir. 2014) the Seventh Circuit held that prison officials violate an inmate's Eighth Amendment rights by maliciously encouraging other prisoners to harm them, even if they are not actually harmed physically. *Id.*; *Jackson v. Stolworthy*, No. 17-CV-420-DRH, 2017 WL 4122786, at *9 (S.D. Ill. Sept. 18, 2017) ("Allegations that a prison officer has provoked or persuaded other inmates to cause harm to a plaintiff support an inference that the officer attempted to inflict injury on the plaintiff in violation of the Eighth Amendment."). Victum denies that she incited other prisoners to cause harm to Higgins, but there is a genuine dispute of material fact, precluding summary judgment on this claim.

As for Victum's failure to protect Higgins from sexual assault by Demon, a reasonable jury could similarly find that Victum acted with deliberate indifference to a known substantial risk of harm. Recall that Higgins asserts that she informed Victum each time Demon subjected her to harassment or assault. She claims that she told Victum about the notes that Demon sent to her, and she went to the "bubble," where Victum worked, and informed her each time Demon masturbated in front of her cell. (Pl.'s Dep. [165-1] at 51:15–53:5, 61:17–62:6; PSOF [177] ¶ 69.) Victum denies that Higgins ever spoke to her about Demon's conduct. (Defs.' Resp. to PSOF [184] ¶¶ 69, 74.) But disputes on this issue are resolved in favor of Higgins.

41

If her evidence is believed, it is sufficient to support a reasonable jury's finding that Victum had subjective awareness that Higgins faced a substantial risk of sexual assault by Demon. Sexual assault is an obviously serious harm, and prison officials' failure to protect inmates from such harm can violate the Eighth Amendment. *See Farmer*, 511 U.S. at 833–34 (treating sexual assault as serious harm). And "[i]n failure to protect cases, [a] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480 (citation and internal quotation marks omitted). The jury may believe Victum's denials that Higgins ever informed her about Demon's threats. But he evidence is sufficient to create a triable issue of fact on this issue.

### 2. Qualified Immunity

Finally, the court turns to the question of whether Victum is shielded from liability for Higgins's various claims on the basis of qualified immunity. Because the court has concluded the facts are sufficient to establish a constitutional violation, qualified immunity turns on whether Higgins's right to be free from such violations was clearly established.

The Seventh Circuit has clearly established that a prisoner has a right to protection from physical harm after she has reported that harm to prison staff. *Id.* at 484 ("[Prison staff] have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner, and this is a now well-settled aspect of Eighth Amendment jurisprudence."). And while the Seventh Circuit and the Supreme Court have not addressed the question of whether inciting other inmates to harm a prisoner violates the Constitution, existing precedent holds clearly that failing to protect an inmate from violence at the hands of other prisoners with deliberate indifference does constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 833 ("Gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective." (cleaned up)). It follows that a prison guard violates the Eighth Amendment by encouraging the very assaults they are obliged to protect against, as both the Eighth and Tenth Circuits have recognized. *See Irving v. Dormire*, 519 F.3d 441, 449 (8th Cir. 2008) (officer's attempt to have

42

other inmates attack plaintiff may violate Eighth Amendment, even where the plaintiff was not actually assaulted); *Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992) (Eighth Amendment claim stated where guard "intended to do harm to [a prisoner] by inciting inmates to beat him[;]" guard told other inmates that plaintiff was a snitch). Because the evidence supports a jury finding that Victum not only failed to protect Higgins, but actively encouraged other prisoners to assault her, Victum is not entitled to qualified immunity on the failure to protect claim.

Higgins's claims arising out of Victum's persistent and deliberate misgendering are on a different footing. Victum's alleged conduct is improper and disturbing, but no case law establishes that it constitutes a violation of Higgins's constitutional rights. *Beal* established that verbal harassment can violate a prisoner's constitutional rights, but the right to be free from misgendering specifically is not a right where the "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Smith*, 10 F.4th at 742. Summary judgment for Victum is warranted on the basis of qualified immunity for any claims arising out of her intentionally misgendering Higgins.

## CONCLUSION

IDOC's practice of housing Plaintiff, a transgender prisoner described as "very feminine," in an all-male facility had predictably painful results. Prison officials responded to her repeated complaints with indifference at best and mocking hostility at worst. Establishing constitutional claims is difficult, however, and much of Higgins's evidence suffers from a lack of specificity concerning dates and actors. The court concludes that certain of her claims do survive summary judgment, however, and Defendants' motion for summary judgment [162] is granted in part and denied in part. Summary judgment is granted for Defendants Schmeltz, Prentice, and Kemmeren. Summary judgment is denied on Higgins's claims against Victum for her failure to protect Higgins from sexual abuse and her encouraging another inmate to assault Higgins. Summary judgment is granted in favor of Defendant Jeffreys in part, as described herein. The parties are directed to file, within 21 days, supplemental briefing regarding Jeffreys's invocation of qualified immunity

and possible Fourth Amendment violations arising out of cross-gender searches.  As Defendant

John Does have yet to be identified, claims against those Defendants are dismissed.

ENTER:

Dated: May 8, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

44