UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| SAMUEL "NIYEH" HIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-50038 |
| | ) | |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM REGARDING QUALIFIED IMMUNITY AND FOURTH AMENDMENT CLAIMS**

As this Court has concluded, the Illinois Department of Corrections' ("IDOC") practice of housing Plaintiff Niyeh Higgins, a transgender woman, in an all-male facility had "predictably painful results"—and a jury could find that despite persistent sexual abuse and harassment committed by guards, prison officials responded to Plaintiff's complaints "with indifference at best and mocking hostility at worst." Dkt. 213 at 43. The Court ordered supplemental briefing on two issues: qualified immunity on Plaintiff's Eighth Amendment failure-to-protect claim against Jeffreys, and Fourth Amendment claims arising from cross-gender searches. *Id.* at 43-44.

As the Court found, a jury could conclude that Jeffreys failed to protect Higgins against sexual abuse. *Id.* at 29. The outstanding issue is whether Jeffreys, as IDOC Director, had a clearly established duty to address the systemic deficiencies that resulted in Higgins's injuries. *Id.* at 32. Because, as demonstrated below, prison officials have consistently been held liable for failing to respond to systemic deficiencies resulting from staff sexual abuse and harassment of prisoners, Plaintiff's Eighth Amendment failure-to-protect claim against Jeffreys must be tried.

Further, the pattern of coerced, humiliating, and abusive searches of Plaintiff—conducted with no valid penological purpose—gives rise to Fourth Amendment failure-to-protect claims

1

against Defendants Kemmeren and Jeffreys. These claims are supported by Plaintiff's pleadings and are properly before the Court.

**I.       Defendant Jeffreys is not entitled to qualified immunity.**

Defendant Rob Jeffreys was Director of the IDOC at the times relevant to Plaintiff's claims. A jury could find that Defendant Jeffreys violated the Eighth Amendment, as he had notice but failed to respond to pervasive and severe risks of harm affecting transgender women including Plaintiff. The Court identified numerous material facts relevant to Jeffreys's liability, including patterns of abusive searches detailed in Section II, below.

Jeffreys knew of these risks: he had read transcripts containing "significant evidence regarding the risk of harm faced by transgender women in IDOC custody." Dkt. 213 at 6; Dkt. 177 (Pl.'s Statement of Facts) ¶ 89. Based on this information, Jeffreys acknowledged that IDOC's strip search policy caused substantial harm to some transgender prisoners. Dkt. 184 (Defs.' Resp. to Pl.'s Statement of Facts) ¶ 91. That was obvious from the transcripts he read, which contained detailed accounts of sexual abuse and misconduct by correctional officers. One incarcerated transgender woman testified to officers squeezing her breasts, "smacking [her] on the ass," calling her "a fat bitch or sissy, fag," and staring at and taunting her while she stood naked in the shower. Dkt. 165-3 at 28:5-30:4. Another incarcerated transgender woman testified that she had been physically attacked by guards and sexually assaulted by a male correctional officer, leading her to attempt suicide. Dkt. 170-38 at 195:10-196:1; Dkt. 177 ¶ 89. Guards made comments like "Oh, you'll never be a woman with tits that small," and "rubb[ed] her down" instead of conducting a standard pat-down. *Id.* at 204:16-25. The testimony also included notice of patterns of harassment and failures to address PREA complaints. *Id.* at 71:10-72:15; Dkt. 177 ¶ 89. For these and other reasons identified by correctional expert Christine Dynan, "Director

2

Jeffreys had ample reason to know that transgender women in the prisons he oversaw were at risk of sexual assault and harassment." Dkt. 170-2 at 38.

The Court concluded in its summary judgment order:

> A reasonable jury could find that, by failing to implement or enforce policies that would have permitted Higgins to transfer to a female facility, and by failing to ensure that she was not exposed to other male inmates while showering, or subjected to strip searches during which she was made more vulnerable to sexual harassment and assault by correctional officers and other inmates, Jeffreys failed to protect Higgins against a known and substantial risk of sexual abuse.

Dkt. 213 at 29. The Court ordered briefing on whether Jeffreys "had a clearly established duty to address the systemic deficiencies that resulted in Higgins's injuries." *Id.* at 31-32.

### A.      Legal standard.

In evaluating Jeffreys's qualified immunity defense, the Court must answer two questions: (1) whether the facts, taken in the light most favorable to Plaintiff, depict a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court has already resolved the first question for Plaintiff, leaving only the question of clearly established law.

Plaintiff has also satisfied this second step. While courts must not define "clearly established law at a high level of generality," there need not be a case directly on point. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Rather, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Officials may still be on notice that their conduct violates established law even in novel factual circumstances[.]" *McGreal v. Ostrov*, 368 F.3d 657, 682-83 (7th Cir. 2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the

3

defendants fair warning that their treatment of the plaintiff was unconstitutional." *Id.* at 683

(citing *Hope*, 536 U.S. at 741).

> **B.  Seventh Circuit and Supreme Court law clearly established Defendant Jeffreys's duty to act.**

It has long been established that prison officials must remedy systemic deficiencies that

endanger incarcerated people, especially those relating to physical and sexual assault.

Prison officials must address not just individualized threats and dangers, but also known

hazards that systemically affect groups of incarcerated people. Prison officials are deliberately

indifferent to a known hazard where they know of a systemic risk that is "real and significant,"

the plaintiff belongs to "an identifiable group of prisoners" subject to that risk, and the

defendants "devised and operated a security system which ignored that risk" or "failed to

institute procedures and safeguards." *Walsh v. Mellas*, 837 F.2d 789, 796-98 (7th Cir. 1988)

(rejecting defendants' excuse that they lacked manpower and time because risk was "real and

obvious" and "in America we respect the sanctity of human life, including . . . in penal

institutions"). Officials are also liable when they "know of the danger or where the threat of

violence is so substantial or pervasive that their knowledge could be inferred" but "fail to enforce

a policy or take other reasonable steps." *Goka v. Bobbitt*, 862 F.2d 646, 651 (7th Cir. 1988).

As has long been established, these risks are especially acute for transgender prisoners in

male facilities. *See Meriwether v. Faulkner*, 821 F.2d 408, 417 (7th Cir. 1987) ("The plaintiff

here has alleged frequent assaults, and given that she is a transsexual housed in an all male

prison, the risk of assault would appear to be sufficiently serious to require the defendants to take

some minimal measures to protect her from assault[.]").

Thus, where a supervisor is aware of "a systematic lapse in enforcement of a policy

critical to ensuring inmate safety" and takes no action, that supervisor may be held liable "from

condoning a constitutional deprivation." *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (internal quotation marks and citation omitted); *see also Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013) ("A risk of serious harm may be shown . . . by evidence of a series of bad acts that the policymaking level of government was bound to have noticed, like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault." (internal quotation marks and citations omitted)). Such liability is "direct, not vicarious." *Steidl*, 151 F.3d at 741; *cf. Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 432 (7th Cir. 1989) (denying qualified immunity to a prison medical director for failing to correct systemic deficiencies, and holding it was clearly established by 1975 "that a prison official's failure to remedy systemic deficiencies . . . constituted deliberate indifference").

The Supreme Court affirmed the same rule in *Farmer v. Brennan*, holding specifically that a prison official need not know the identity of the victim or the likely perpetrator of an assault to be held liable for deliberate indifference:

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

511 U.S. 825, 843 (1994). Certainly, a plaintiff "must prove that wardens knew of and disregarded a substantial risk of harm." *Ollison v. Gossett*, 136 F.4th 729, 736 (7th Cir. 2025); *see also Ollison*, 136 F.4th at 750 (Hamilton, J., dissenting) (agreeing that claims against supervisory prison officials "require evidence that each actually knew of those systemic failures . . . [and] failed to respond reasonably"). However, like any evidentiary matter, such knowledge may be proven by inference: prison officials are not "free to ignore obvious dangers to inmates," and "a factfinder may conclude that the official knew of a substantial risk from the

5

very fact that it was obvious." *Farmer*, 511 U.S. at 826. Even indifference "to the level of turning a blind eye" can suffice. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Policymakers at the highest levels have been held responsible for preventing sexual abuse by correctional staff. As the Seventh Circuit has recognized, incarcerated people:

> [a]re confined in circumstances where they depend[] on male guards for nearly everything in their lives—their safety as well as their access to food, medical care, recreation, and even contact with family members. With this authority and control for the guards [comes] power and, in turn, access and opportunity to abuse it. . . . The confinement setting is a tinderbox for sexual abuse.

*J.K.J. v. Polk Cnty.*, 960 F.3d 367, 381-82 (7th Cir. 2020). Where policymakers like Jeffreys have a "plain example of predatory sexual behavior staring [them] in the face," there is "one unavailable option—doing nothing." *Id.* at 383. And nothing is exactly what Jeffreys did—he did not act in response to the risks or order his subordinates to act. Dkt. 177 ¶¶ 93-98. Having "taken no action despite the obvious and known risk of sexual assaults," Jeffreys "could not claim a lack of notice, much less surprise, upon learning that [the plaintiff had been] sexually assaulted." *Polk Cnty.*, 960 F.3d at 383.

This duty of prison officials to prevent sexual abuse committed by prison staff has been repeatedly affirmed. *Ortiz v. Jordan*, 562 U.S. 180, 190-91 (2011) (holding, regarding a failure-to-protect claim as to staff sexual abuse, that "the pre-existing law was not in controversy"); *Nielsen v. Sexton*, 168 F.4th 968, 990 (7th Cir. 2026), *reh'g denied*, No. 23-3060, 2026 WL 853117 (7th Cir. Mar. 26, 2026) (holding that, as of 2016 and 2017, it was clearly established that prison officials must act to prevent sexual abuse "whether the threat comes from other inmates or, as in this case, from prison staff.").

Prison officials, once they receive notice of systemic deficiencies exposing incarcerated people to sexual harassment and abuse by other prisoners or correctional staff, must take some

action to address that risk. As this Court noted, "Defendants who, like Jeffreys, 'are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy.'" Dkt. 213 at 28 (quoting *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018)). *Nielsen* further confirmed that "the Constitution does not allow [] officials instead to choose deliberately to leave vulnerable prisoners at the mercy of abusive prison staff. [Defendants] did just that. They are not entitled to qualified immunity." 168 F.4th at 995.

Ultimately, it was clearly established on multiple levels that Jeffreys was required to take action to prevent sexual abuse and harassment of transgender prisoners. High-ranking officials can be held liable under the Eighth Amendment for failing to address systemic conditions of which they have notice. *See, e.g.*, *Farmer*, 511 U.S. at 843; *Sinn*, 911 F.3d at 423; *Walsh*, 837 F.2d at 796; *Gentry*, 65 F.3d at 561; *Goka*, 862 F.2d at 651. Officials must act to protect incarcerated people from sexual abuse by staff where they have notice of such risks. *See, e.g.*, *Ortiz*, 562 U.S. at 190-91; *Nielsen*, 168 F.4th at 990; *Polk Cnty.*, 960 F.3d at 381-83. And officials who become aware of such risks cannot simply do nothing. *See, e.g.*, *Nielsen*, 168 F.4th at 995; *Polk Cnty.*, 960 F.3d at 383. Defendant Jeffreys had ample knowledge of the "identifiable group" of transgender prisoners who faced the "real and significant" risk of sexual abuse by staff. *Walsh*, 837 F.2d at 796. Even with this knowledge, Defendant Jeffreys did nothing to address the problem. Plaintiff's harms resulted directly from Jeffreys's inaction as evidenced by, among other things, the "obviously unsupported" and inadequate investigations into Plaintiff's complaints of sexual assault and threats. Dkt. 213 at 13.

### C.    A robust consensus of out-of-circuit cases clearly established Defendant Jeffreys's duty to act.

Although Seventh Circuit authority suffices, Plaintiff may also identify clearly established law through a robust consensus of appellate authority. *al-Kidd*, 563 U.S. at 741-42. To do so, Plaintiff must show "such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000)); *see Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016) (finding clearly established law via three out-of-circuit decisions). That standard is met here.

The Tenth Circuit has repeatedly held that "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013) (holding that prison warden was subject to Eighth Amendment failure to protect liability) (citing *Ortiz*, 131 S.Ct. at 892-93); *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (holding that county sheriff responsible for administration of jail was subject to Eighth Amendment failure to protect liability). The Tenth Circuit has further held that failure-to-protect liability extends where a prison official fails to ensure compliance with policies designed to protect incarcerated people from sexual abuse by staff—even where the official has implemented such policies on paper. *Keith v. Koerner* ("Keith II"), 843 F.3d 833, 849 (10th Cir. 2016); *see also Tafoya*, 516 F.3d at 919 (holding that, in the context of sexual abuse of incarcerated people by prison guards, that "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference."); *Gonzales v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005) (reversing summary judgment for sheriff with sufficient knowledge of sexual harassment and assault risks, noting such knowledge need not be specific as to the potential perpetrator or victim).

8

The Eighth Circuit has similarly held that "as of December 14, 2002, it was clearly established that a prison official could be held liable under § 1983 for exhibiting deliberate indifference to a substantial risk that a detainee would be sexually assaulted by a guard." *Kahle v. Leonard*, 477 F.3d 544, 554 (8th Cir. 2007) (citing *Daskalea v. Dist. of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998); *Hovater v. Robinson*, 1 F.3d 1063, 1066 (10th Cir. 1993)). Other circuits agree. *See Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (reversing dismissal of Eighth Amendment claim against supervisor who failed to protect prisoner from sexual abuse by guard); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (holding that allegations that county sheriff knew of systematic unconstitutional actions by prison staff leading to deaths and injuries, and failed to respond stated Eighth Amendment claim); *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (affirming verdict against prison system commissioner for failing to protect incarcerated people from assaults by prison guards).

These cases exceed the threshold the Seventh Circuit found sufficient in *Figgs* to establish a robust consensus. Qualified immunity should be denied.

II.    **Plaintiff's Fourth Amendment claims against Defendants Jeffreys and Kemmeren should proceed to trial.**

   A.    **Plaintiff has presented a genuine factual dispute as to whether Defendants Jeffreys and Kemmeren acquiesced to unreasonable searches of Plaintiff in violation of the Fourth Amendment.**

The Fourth Amendment protects prisoners from unreasonable searches, including non-emergent visual strip searches by the opposite sex. *Henry v. Hulett*, 969 F.3d 769, 782 (7th Cir. 2020) (citing *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)). Whether a strip search was reasonable depends on "the scope of the particular intrusion[s], the manner in which [they were] conducted, the justification for initiating [them], and the place in which [they were]

conducted." *Id.* at 784 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Here, these factors turn on multiple facts that remain in dispute, making summary judgment improper. *See* Fed. R. Civ. P. 56; *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (advising "caution in approaching claims that the Fourth Amendment is inapplicable as a categorical rule in a particular context"); *id.* at 537, 104 (O'Connor, J., concurring) ("The Fourth Amendment 'reasonableness' determination is generally conducted on a case-by-case basis[.]").

Plaintiff has presented evidence that she was repeatedly subject to unnecessary, malicious, and humiliating searches by male officers who were never investigated or disciplined. Dkt. 177 ¶¶ 33-40. These strip searches were performed by coercion and without her consent. Dkt. 177 ¶ 29. As discussed above, in the Court's summary judgment decision, and in Plaintiff's concurrently filed motion to reconsider, neither Kemmeren nor Jeffreys did anything to protect Plaintiff from harm during these searches despite knowledge of the risks. Indeed, this Court found it undisputed that on January 22 and 23, 2021, Plaintiff "was exposed to numerous staff and prisoners while she stood naked in her cell." Dkt. 213 at 9. These searches happened "over her objections" and during one search, a lieutenant threatened her: 'You are a man, this is a male prison, you will either strip or you don't go outside.'" *Id.* Higgins filed a PREA complaint after both incidents, but "Defendants admit that the involved lieutenant was never asked about his statement or investigated," *id.*, evidencing their inaction.

This Court identified evidence of other unreasonable searches, which resulted in no discipline or remedial measures:

- On April 3, 2021, male Officer Talley conducted a pat-down search over Plaintiff's objections. *Id.* Officer Talley "rub[bed] up against her" and told her that she "needed to shut [her] faggot ass up." *Id.* at 9-10. A jury could find that Defendant Kemmeren had notice of this incident, including "actual knowledge of the risk to Higgins of sexual harassment and abuse at the hands of prison officers during these cross-gender searches." *Id.* at 38-39.

10

- On May 26, 2021, Plaintiff was subject to a strip search and requested a female officer. *Id.* at 10. The officer told her that a female officer was not coming and threatened her with disciplinary reports, loss of privileges, and use of "Orange Crush" (a tactical team) if she did not strip for a male officer during a strip search; during the subsequent search, she was "mocked, humiliated, and called slurs." *Id.* Kemmeren acknowledged that male officers were allowed to strip-search transgender prisoners under such circumstances. *Id.* at 12.

- On August 24, 2021, Plaintiff was again forced to submit to a strip search by a male officer. Plaintiff was "sexually harassed" by prisoners and officers and "threatened with sexual assault by other inmates," and was "left naked and exposed in the cage for over 30 minutes." *Id.* at 10-11. Defendant Kemmeren wrote, falsely, that Plaintiff had "consented" to the search. *Id.* at 11.

- On November 6, 2021, during another forced strip search by a male officer, the officer "became sexually aroused during the search and made Higgins aware that he was erect" and "left the door open so that others could see [Higgins's] breasts during the search." *Id.* After the incident, Plaintiff spoke to the warden of Dixon, but the warden told Plaintiff that "the likelihood of 'a female searching a trans inmate is zero to none.'" *Id.* at 11. Dixon failed to initiate a PREA investigation following this incident. *Id.* at 11-12.

Based on this record, a jury could find that Defendants Kemmeren and Jeffreys turned a blind eye to these unreasonable, abusive searches, in violation of the Fourth Amendment.

**B.      Plaintiff's right against unreasonable searches was clearly established at the time of the searches.**

It has long been established that "searches must be conducted in a reasonable manner." *Bell*, 441 U.S. at 560. Moreover, a prisoner's Fourth Amendment right against unreasonable searches is violated where cross-sex "observations or inspections of the naked body" are "more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence." *Canedy*, 16 F.3d at 187.

The Seventh Circuit and other circuits have consistently and clearly established that abusive, harassing, and unnecessarily exposing searches like those that Plaintiff consistently suffered—and Jeffreys and Kemmeren failed to protect Plaintiff from—violate the Fourth Amendment. In *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020), citing *Bell* and *Canedy*, the Seventh Circuit held that the Fourth Amendment protects prisoners from strip and body cavity

11

searches "that may be related to or serve some institutional objective, but where guards nevertheless perform the searches in an unreasonable manner, in an unreasonable place, or for an unreasonable purpose." *Id*. at 781.

Multiple circuits have explicitly held that there is a clearly established right "not to be subjected to a humiliating strip search in full view of several (or perhaps many) others *unless the procedure is reasonably related to a legitimate penological interest.*" *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) (citing *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002) (same holding); *see also Parkell v. Danberg*, 833 F.3d 313, 325 (3d Cir. 2016) (holding that "a right to privacy in one's own body . . . is so fundamental that society would recognize it as reasonable even in the prison context"); *Seltzer-Bey v. Delo*, 66 F.3d 961, 962, 964 (8th Cir. 1995) (holding that complaint alleging guard conducted excessive strip searches while making sexual comments about plaintiff's penis and buttocks asserted Fourth Amendment violation); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) (holding that "not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest").

Critically, Plaintiff's arguments do not presuppose that cross-gender searches of transgender prisoners are *per se* unconstitutional. The abusive searches that Plaintiff suffered due to Defendant Kemmeren and Jeffreys's failures to protect her would have violated her Fourth Amendment rights regardless of her gender. That said, it was well-established that Plaintiff's privacy issues were especially acute as a transgender woman in a male facility. "[A] transsexual inmate housed in an all-male prison has a privacy interest in not being 'regularly forced to strip before guards and other inmates' if 'unrelated to prison needs.'" *Canedy*, 16 F.3d at 187 (quoting *Meriwether*, 821 F.2d at 417).

12

The record demonstrates triable issues regarding whether Defendants Kemmeren and Jeffreys knew that transgender prisoners were being searched in a manner unrelated to prison needs—for example, by being gratuitously exposed, sexually abused, harassed, and otherwise humiliated. And the general backdrop that non-emergency cross-sex searches violate the Fourth Amendment was well-established, although Plaintiff's Fourth Amendment claims would require trial regardless of her gender identity. *See Henry*, 969 F.3d at 782; *Shaw v. D.C.*, 944 F. Supp. 2d 43 (D.D.C. 2013); *see also Cookish v. Powell*, 945 F.2d 441 (1st Cir. 1991); *Harris v. Miller*, 818 F.3d 49 (2d Cir. 2016); *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981); *Moore v. Carwell*, 168 F.3d 234 (5th Cir. 1999); *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135 (9th Cir. 2011); *Perrill*, 288 F.3d 1254.

The record is clear that Plaintiff was repeatedly subject to abusive, harassing, and non-essential searches despite her vulnerability as a transgender woman in a male prison, and that Defendants Jeffreys and Kemmeren knew of but did nothing to remedy those violations. Dkt. 177 ¶¶ 33-40. They never investigated or disciplined the officers responsible, or otherwise attempted to correct the practice. Dkt. 177 ¶¶ 33-40. The state of the law at the time of the searches "gave the defendants fair warning" that such inaction was unconstitutional, "even in novel factual circumstances." *McGreal*, 368 F.3d at 682-83 (citing *Hope*, 536 U.S. at 741). The Court should deny qualified immunity.

### C.      Plaintiff has not waived or forfeited her Fourth Amendment claims.

Plaintiff is not required to plead legal theories, and may alter her legal theories during the litigation. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). There is no "burden on the plaintiff to justify its altering its original theory." *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996). "As a general rule, district courts should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant or the

13

case's development—for example, by making it 'more costly or difficult' to defend the case, or by causing unreasonable delay." *Chessie*, 867 F.3d at 859 (citing *Vidimos*, 99 F.3d at 222).

Instead, a plaintiff may be limited to legal theories that are supported by her factual allegations. *See Ollison*, 136 F.4th at 740; *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). Here, Plaintiff's operative complaint put Defendants on notice that she challenged the appropriateness of repeated abusive searches conducted by prison guards.

Specifically, Plaintiff's complaint expressly alleged that male guards "conducted numerous physically and sexually aggressive pat downs and/or strip searches of Niyeh," that none occurred "during exigent circumstances," and that each officer "knew that Niyeh was a transgender woman and that a female officer should have conducted the search." Dkt. 52 ¶ 25. The complaint further alleged specific incidents in which Plaintiff requested a female officer, no exigent circumstances were present, and male officers nonetheless proceeded with strip searches over her objections—stripping her in a cage in plain view of other prisoners, who stared at her and threatened her with sexual and physical violence. *Id.* ¶¶ 28, 63-64. Regarding Jeffreys, the complaint alleged that "[d]espite his awareness of a substantial risk of harm to transgender prisoners, Defendant Jeffreys failed to protect transgender prisoners from abusive strip searches by neglecting to require or enforce a policy that prisoners could choose the gender of their searching guard." *Id.* ¶ 115. As to Kemmeren, the complaint alleged that Defendants "knew the risk of harm that their misconduct posed to Plaintiff and nevertheless acted with deliberate indifference in executing the invasive, abusive strip searches." *Id.* ¶ 131.

Plaintiff further raised notice of the factual basis for her claims in her interrogatory responses, where she stated that "Defendant Kemmeren allowed the officers under her command to conduct abusive and inappropriate searches of Plaintiff" and that "Defendant Jeffreys

14

personally knew that transgender prisoners in Illinois Department of Corrections facilities like Plaintiff were at great risk of physical abuse, sexual harassment, retaliation, mistreatment, and numerous other harms." Dkt. 170-39 at 10. In those interrogatory responses, Plaintiff did not cabin her claims against Kemmeren or Jeffreys to the Eighth Amendment. There will be no harm to Defendants from Plaintiff pursuing a Fourth-Amendment theory, and her Fourth Amendment claims should proceed to trial. *See Whitaker v. Milwaukee County*, 772 F.3d 802, 808-09 (7th Cir. 2014) (holding that plaintiff should have been permitted to proceed on new summary judgment theory that recharacterized already-alleged facts and did not offer "any unfair surprise").

**CONCLUSION**

For the above reasons, Plaintiff's Eighth Amendment failure-to-protect claim against Defendant Jeffreys and Plaintiff's Fourth Amendment claims against Defendants Jeffreys and Kemmeren should proceed to trial.

Dated: May 29, 2026                    Respectfully submitted,


                                       **SAMUEL "NIYEH" HIGGINS**
                                       /s/ Maria Makar

                                       One of Plaintiff's Attorneys

                                       Maria Makar
                                       Hale Law, LLC
                                       250 Park Avenue, 7th Floor
                                       New York, NY 10177
                                       Phone: (312) 815-1948
                                       mmakar@ahalelaw.com

                                       Wallace Hilke
                                       Eliana Green
                                       Community Justice and Civil Rights Clinic
                                       Northwestern Pritzker School of Law
                                       375 E. Chicago Ave.
                                       Chicago, IL 60611

15

Phone: 312-503-2224
wally.hilke@law.northwestern.edu